**BC**

**RECEIVED** PJJ
11/26/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**FILED** PH
12/4/2025
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Sossamma George Sebastin, | ) | |
| *Plaintiff,* | ) | 1:25-cv-14471<br>Judge Jeffrey I. Cummings<br>Magistrate Judge Jeffrey T. Gilbert<br>RANDOM / Cat. 2 |
| v. | ) | Case No.:_____ |
| Sebastin Francis, | ) | **JURY DEMAND** |
| Judge Rhonda Bruno. | ) | |
| Dr. David Finn, | ) | |
| Caryn Barone, | ) | |
| James Jones. | ) | |
| Dr. Chinni Chilamkurti | ) | |
| *Defendants*. | ) | |

**INTRODUCTION**

- Plaintiff Sossamma George Sebastin, a *pro se* litigant, files this Complaint against Defendants for the systematic, bad-faith deprivation of her fundamental constitutional rights. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation and conspiracy to deprive Plaintiff of rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as rights protected under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. Plaintiff demands a trial by jury on all issues so triable

-  Over nearly four years of state court litigation, the Defendants have engaged in a coordinated conspiracy to sever Plaintiff's relationship with her children. Their unconstitutional conduct culminated in the seizure of Plaintiff's children based on a

secret report, the imposition of a two-year no-contact order without a finding of abuse or unfitness, and the effective termination of her parental rights through a process based on fraud, bias, perjury, ex parte communications, falsification of records, and the systematic exclusion of exculpatory, inculpatory, impeachment and rebuttal evidence.

- Plaintiff brings this action only after exhausting all available state court remedies, including appeals to the Illinois Appellate and IL Supreme Courts, which declined to correct these egregious violations of constitutional rights. This Complaint does not seek federal appellate review of final state-court judgments. Rather, it challenges independent, unconstitutional procedures themselves—including the conspiracy, fraud, and bias that corrupted the process and seeks prospective, declaratory, and injunctive relief to prevent their continuation, as well as damages wherever applicable. This narrow claim falls outside the scope of the Rooker-Feldman doctrine and satisfies the requirements for avoiding Younger abstention, as the relief sought is tailored to rectify ongoing procedural injuries rather than overturn a state-court outcome.

**JURISDICTION AND VENUE**

- This court has jurisdiction over this action under 28 U.S.C. § 1331, 28 U.S.C. § 1343, 28 U.S.C. § 1367, 42 U.S.C. § 1983 and authority to issue declaratory and further relief under 28 U.S.C. §§ 2201–2202.
- Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District and/or at least one defendant resides here.

- Defendants are subject to personal jurisdiction in Illinois and in this District. Plaintiff seeks damages against non-immune individual defendants and prospective declaratory and injunctive relief against appropriate officials in their official capacities.

**PARTIES**

- Plaintiff, Sossamma George Sebastin ("Plaintiff"), is the mother of two minor children, R.S. (now age 17) and A.S. (now age 8). She is the Respondent in the underlying Lake County, Illinois cases 20D905 and 2023OP002596, initiated by Defendant Sebastin Francis, which culminated in the unconstitutional deprivation of her parental rights alleged herein.

- Defendant Sebastin Francis ("Defendant Francis") is former spouse of Plaintiff and the father of R.S and A.S. He initiated the underlying state court litigation and acted under color of state law through his joint participation with state actors to deprive Plaintiff of her constitutional rights. He is being sued in his individual capacity for damages for his central role in the conspiracy, bad-faith litigation, and constitutional violations.

- Defendant Judge Rhonda / Randie Bruno ("Judge Bruno") served as the presiding judge in the underlying cases. She is being sued in her official capacity for prospective injunctive and declaratory relief, and in her individual capacity for damages for non-judicial acts, actions in clear absence of jurisdiction, and participation in fraud upon the court

- Defendant Caryn Barone ("Defendant Barone") was the court-appointed Guardian ad Litem (GAL) the underlying cases. She is sued in her official capacity for prospective relief and in her individual capacity for damages for actions beyond her GAL authority, perjury and participation in the conspiracy.

- Defendant Dr. David Finn ("Defendant Finn") was the court-appointed custody evaluator in the underlying cases. He is being sued in his official capacity for prospective relief and in his individual capacity for damages for forensic fraud, evidence alteration, perjury, and participation in the conspiracy

- Defendant James Jones ("Defendant DCFS Jones") served as the investigator for the second DCFS investigation against Defendant Francis. He is sued in his individual capacity for damages for constitutional violations in his investigative role

- Defendant Dr. Chinni Chilamkurti ("Dr. Chinni") is the therapist who was designated to treat Plaintiff by Court. She is being sued for her joint action with state actors on specific conduct and seeks damages in her individual capacity

- Plaintiff alleges that the conduct of certain participants, whose identities are not currently known despite Plaintiff's reasonable diligence, contributed to the violations alleged herein. Plaintiff reserves the right to seek leave to amend this Complaint to add such "John Doe" defendants when their identities and specific roles are ascertained through discovery.

**<u>FACTUAL ALLEGATIONS:</u>**

1. On 07/01/2020, Defendant Francis filed a petition for dissolution of marriage stating both parties were fit to share parental responsibility and decision-making. Service reached Plaintiff through regular mail in approximately late Aug or Sep 2020 during COVID time. This case no. is 20D 905 in Lake County.

2. Beginning in 2021, R.S. started experiencing mental health challenges, which escalated to multiple hospitalizations, residential treatments, and a suicide attempt in 09/2022.

Defendant Francis repeatedly either opposed the idea of appointing a therapist for R.S. or put unreasonable restrictions.

3. In 04/2022, Defendant Barone issued an initial parenting proposal granting Plaintiff major parenting time and identifying concerns about corporal punishment and alcohol use (directed to Defendant Francis). From 08/2022, when Defendant Francis retained attorney Michone Riewer, Defendant Barone's position shifted drastically against Plaintiff. See FedComplaint-Appendix A for Defendant Barone's initial parenting proposal

4. From approximately 08/2022 through 07/2024, Defendant Francis filed more than 16 emergency motions, most heard and granted as emergencies immediately with inadequate notice and allowing no time for Plaintiff to respond. Most of these motions sought to remove Plaintiff's parenting time, remove Plaintiff's decision-making, and to grant Defendant Francis exclusive access to the marital home, and to award him attorney's fees from Plaintiff. Defendant Francis filed such motions even during periods when R.S. was critically ill (solely cared by Plaintiff) and while Plaintiff and minor children were mourning Plaintiff's father's death. Defendant Francis also filed extensive discovery requests and motions to compel discovery on Plaintiff even during critical times. His numerous motions claimed that he possessed information obtained from Defendant Barone and Defendant DCFS Jones outside of Plaintiff's presence. Defendant Barone then echoed these allegations in court with alignment to Defendant Francis's position, presenting them directly to the judge without prior notice to Plaintiff.

5. In 08/2022–09/2022, Defendant Francis attempted to enroll R.S. in a public school associated with prior trauma, contrary to the therapist's recommendation for private

school. On 09/02/2022, Judge Bruno ordered R.S. to attend Oak Grove School if not immediately enrolled in private school in the next two business days. Plaintiff offered to pay solely for private school and this is reflected in the order. Defendant Francis also excluded Plaintiff from A.S.'s first day of the first school year, which was ignored by Defendant Barone and Judge Bruno. The evidence of this exclusion/alienation was submitted as final trial evidence.

6. Following R.S.'s suicide attempt on 09/01/2022, R.S.'s therapist, Safia Khan, notified Defendant Barone, Judge Bruno and other parties in the case of her concerns. Immediately thereafter, without an evidentiary hearing and while R.S. was critical, Judge Bruno ordered that R.S.'s therapist is removed from giving therapeutic care to both children and appointed Defendant Finn as custody evaluator over Plaintiff's objection. Defendant Finn was introduced by Mr. Francis. See FedComplaint – Appendix M for an email from Safia Khan to Defendant Barone and Plaintiff's attorney, with all other counsel copied.

7. Defendant Finn and Mr. Francis's counsel, Michone Riewer did not disclose a prior professional relationship (including co-presenting at a bar association conference). See FedComplaint – Appendix I.

8. In 09/2022, Judge Bruno ordered release of R.S.'s protected health information (PHI) to both parents, Defendant Barone, and counsels, without seeking input from R.S., then age 13, despite her expressed preferences regarding PHI.

9. In 10/2022, Judge Bruno ordered Plaintiff to move out of the marital home within four days. The order simultaneously established a 50/50 parenting schedule for A.S. and intentionally designated the very weekend of Plaintiff's move as her parenting time with A.S. Judge

Bruno further mandated that Plaintiff not move out in front of A.S. unless she had the agreement of Defendant Francis, creating a set of contradictory and logistically impossible conditions. Based on the recommendations of medical professionals and the wishes of R.S. (who was in residential treatment at the time), R.S. remained in Plaintiff's sole care from October 2022 until Judge Bruno abruptly changed custody on November 17, 2023.

10. In 10/2022, Judge Bruno ordered both parties to use best efforts to include both on communications regarding Timberline Knolls (TK) and R.S.; if one party was not included, the other must share the information via Our Family Wizard (OFW) application promptly (within 30 minutes unless physically unable to, and then within two hours). During this time, Defendant Francis told TK's medical professionals that he must be included in every interaction TK would have with Plaintiff.

11. On or around Nov/Dec 2022, Defendant DCFS Jones allowed Defendant Barone to view or be a part of the Child Advocacy Center (CAC) interview without a valid court order. The final DCFS report selectively excluded information provided by multiple medical professionals whom the investigator interviewed and instead only included statements that could support an 'unfounded' finding. Most significantly, the report disregarded documented trauma diagnoses and other clinical findings.

12. In 12/2022, Defendant Francis filed an emergency motion on approximately one hour's notice. Judge Bruno proceeded to hear the motion and entered an order that stripped Plaintiff of her medical decision-making authority for R.S. This ruling was based exclusively on baseless hearsay presented by Defendant Barone, without any direct medical testimony or credible evidence. Judge Bruno deemed Plaintiff a "serious endangerment" to the child

despite a complete absence of evidence to support this conclusion and a willful disregard of substantial contrary evidence concerning Defendant Francis's conduct and Defendant Barone's hearsay. During this hearing, Defendant Barone introduced a new, unsubstantiated allegation, claiming for the first time that Plaintiff had requested supervised parenting eight months prior. Plaintiff immediately denied these allegations under oath. Furthermore, Defendant Barone admitted under oath that she had already viewed the Child Advocacy Center (CAC) forensic interview. Court had authorized access to CAC video only on 04/18/2023, which was months after Defendant Barone had already seen the video. However, in this hearing, Judge Bruno allowed Defendant Barone to use her premature, exclusive access to this evidence to misrepresent its contents and falsely accuse Plaintiff, while Plaintiff herself had no access to view the video to mount a defense. See FedComplaint – Appendix H to see Plaintiff's motion calling out these issues. In this hearing, Defendant Barone claimed that she did not know who called for a DCFS investigation even though the child had reported the sexual abuse directly to the medical staff during her hospitalization. However, at May 2024 final trial, Defendant Barone contradicted her earlier statement by testifying that Northshore hospital staff called DCFS.

13. On or around 12/14/2022, Plaintiff texted Defendant DCFS Jones and asked him as to how he concluded that R.S. is lying, and that Plaintiff coached R.S. He responded over text that he did not conclude that R.S is lying or that Plaintiff coached R.S.

14. In 01/2023, during a Rogers Residential intake call involving the parents and R.S., Defendant Francis refused to leave the call when R.S. requested privacy, stated he had sole medical decision-making, and left only when the intake facilitator insisted on R.S.'s privacy. The

Defendant Barone was informed but had no concerns and did not ever bring this up in the case even though there was an active court order that said that neither parent should inform children about court proceedings.

15. On 05/17/2023 (A.S.'s birthday) and 05/19/2023, during hearings on an emergency motion filed by Defendant Francis, Defendant Francis accused Plaintiff of manipulating appointments and excluding him from communications. These allegations were presented without medical testimony or any evidence. These accusations were later proven to be false. However, Defendant Barone minimized and ignored the falsehoods despite the fact that his false allegations necessitated back-to-back court sessions, including one deliberately scheduled on A.S.'s birthday, thereby using judicial processes to harass Plaintiff during emotionally significant family moments.

16. On 06/09/2023, Judge Bruno ordered R.S. to attend Libertyville and for a 504/IEP.

17. On or about 07/07/2023, Judge Bruno issued a qualified medical child support order granting Defendant Francis full access to the children's medical insurance information equal to the policyholder (Plaintiff) without motion, notice, hearing, or findings. Judge Bruno also issued an extraterritorial order prohibiting Plaintiff's family and friends in India from appearing near Defendant Francis and A.S. during their trip to India. This order was issued without any motion, legal justification, or evidentiary basis from Defendant Francis for this sweeping restriction.  Judge Bruno and Defendant Barone had no concerns, and they supported Defendant Francis and A.S. traveling for a leisure trip to India at a time when R.S. was in residential treatment and Defendant Francis had sole medical decision making. See FedComplaint – Appendix L for Plaintiff's attorney's email to Defendant Barone highlighting

the huge disparity in Defendant Barone's approach towards the parties.

18. On or about 07/07/2023, Judge Bruno indefinitely postponed Plaintiff's motion to regain medical decision-making for R.S. which was filed in 04/2023.

19. On or about 07/07/2023, pursuant to a court order, it was revealed that Defendant Francis had actively deceived Plaintiff regarding his international travel with A.S. While he had provided only a single address in India, he was in fact traveling to numerous locations, including 10 different addresses in India and a trip to New York. This material misrepresentation concealed A.S.'s whereabouts and denied Plaintiff basic knowledge of her child's location.   It should be noted that initially Defendant Barone had vouched for Defendant Francis's false compliance with providing information to Plaintiff and wrongly accused Plaintiff of being unreasonable for simply requesting the travel itinerary and overnight addresses for A.S (See FedComplaint – Appendix L).   Furthermore, Defendant Francis created communication bottlenecks that prevented A.S. from having consistent contact with Plaintiff and R.S., leading to days of no communication. These obstacles were documented in the OFW messaging system, which was accessible to Defendant Barone. Despite her duty to protect the children's best interests, including their relationship with their mother and sibling R.S., Defendant Barone never raised these documented issues to the Court. Defendant Barone also failed to bring to the Court's attention several critical issues concerning Defendant Francis despite being the sole medical decision-maker for R.S. These included his failure to accept R.S.'s intake call with a new medical facility—claiming the call went straight to voicemail—which caused delays in care, as well as his refusal to share medical expenses by declining to place his credit card on file at medical facilities,

despite holding exclusive authority over medical decisions.

20. On or around 07/28/2023, Defendant Barone raised a new issue without prior notice to Plaintiff, asserting that Defendant Finn had concerns about R.S. missing a second interview. This was presented despite the child feeling unwell and having refused the interview. Judge Bruno then pressured Plaintiff to schedule a two-hour second interview for R.S with Defendant Finn even though R.S. had escalated the very night when she met Defendant Finn for the first interview. Judge Bruno also did not state why Defendant Finn wanted to meet R.S. for two more hours when Defendant Finn already had exhaustive access to all of her medical, school, and therapeutic records and her care professionals.

21. On or about 08/28/2023, Judge Bruno denied temporary child support to Plaintiff despite R.S. being solely in Plaintiff's care since 10/2022.  In the same order, Judge Bruno refused to require Defendant Francis to contribute to Plaintiff's singular request for contribution toward a major, essential medical expense (the $8,000 bill for R.S.'s treatment at Timberline Knolls) despite the fact that Plaintiff had never sought contribution for routine or smaller medical costs and Defendant Francis had higher assets.

22. On or around 09/2023, Defendant Francis engaged in intrusive conduct (invasion of privacy) by taking photographs of Plaintiff (while standing on her private property) and the interior of her private property without her consent. He then used these photographs with his emergency motion to falsely accuse Plaintiff. Judge Bruno ignored the invasive nature of Defendant Francis's actions and instead used his complaint as a pretext to issue an order restricting video recording the children, a restriction that mischaracterized her outdoor home security camera.

23. On 09/13/2023, following another emergency motion from Defendant Francis containing false allegations, Judge Bruno barred both parents from communicating with R.S.'s therapeutic team and granted Defendant Barone exclusive access by authorizing Defendant Barone to speak to specified providers without the parties being present. The order remained in place even after Defendant Francis's falsehoods were exposed before the next court date.

24. On 10/02/2023, in Plaintiff's absence but with counsel present, Judge Bruno narrowed Plaintiff's subpoena to the Defendant Barone to "notes," and stated that Plaintiff was not seeking emails. Plaintiff had not discussed narrowing the subpoena's scope with her counsel.

25. On 10/25/2023, Judge Bruno set a retroactive cutoff of 10/10/2023 for submissions to Defendant Finn after Defendant Barone presented new issues without notice. Judge Bruno adopted Defendant Barone's version that Plaintiff's meeting with Defendant Finn had not been cut short and ordered that neither party may contact Defendant Finn unless he initiates contact. Defendant Barone had not discussed this matter with Plaintiff and had no evidence to support her claims.

26. The retroactive evidentiary cutoff, imposed by Judge Bruno on 10/25/2023 resulted in exclusion of Plaintiff's 10/17/2023 email to Defendant Finn. This email responsibly addressed R.S.'s sexual abuse allegation by posing six logical questions (which were based on her numerous medical reports), while explicitly stating that Plaintiff was not offering an opinion but merely seeking to understand logical inconsistencies. In the email, Plaintiff began by acknowledging Defendant Finn's perspective: *"I have been thinking about your*

*question regarding the sexual abuse allegation. I agree with you on the lack of evidence examples you gave me. I wanted to share the logical hurdles/questions in my mind for which I am still looking for answers."* and concluded with a clear disclaimer: *"Please note that I AM NOT STATING AN OPINION on R████'s allegation through this email. I am ONLY TRYING TO SHARE THE LOGICAL HURDLES I have in trying to conclude one way or the other."*

27. In or around first quarter of 2023, GAL inquired with one of the medical professionals as to what would happen to R.S. if she was separated from her mother. This occurred while R.S. was still in critical condition and while her medical reports identified Plaintiff as the key adult support system.

**November 17, 2023 - Seizure of Children**

28. On 11/17/2023, a date originally noticed as pretrial, Judge Bruno privately released Defendant Finn's custody evaluation to attorneys only, immediately converted the pretrial to an all-day emergency hearing, and removed both children from Plaintiff while they were at school. Judge Bruno imposed a no-contact order between Plaintiff and her children and barred contact between Plaintiff and children's medical professionals, school staff, and DCFS.

29. The removal and restrictions were based exclusively on Defendant Finn's sealed report, which has never been provided to Plaintiff. Defendant Finn asserted Plaintiff had Munchausen Syndrome by Proxy (MSBP) without supporting medical evidence or establishing expertise. During the May 2024 final trial, Defendant Finn testified that R.S. has no falsified symptoms, which renders his alleged diagnosis both logically and medically

implausible.

30. Defendant Finn cited a video provided by Defendant Francis as evidence incriminating Plaintiff. However, this was later proven to be wrong. During May 2024 trial, it was established that the video actually depicted Defendant Francis's sister and not Plaintiff. Video also contained evidence that A.S. was coached by Defendant Francis.

31. Defendant Finn accused Plaintiff of "sensualizing" showering because she used the word "naked" when reporting that A.S. insisted on such showers and that Defendant Francis was promoting this. Defendant Finn acknowledged Defendant Francis's conduct but characterized Plaintiff's reporting the act using the word "naked" as "serious endangerment" even though attorneys engaged in the same choice of words.

32. As reflected in court proceeding reports, Defendant Finn also clearly chose to believe statements that R.S. allegedly shared only with him (and not with any medical professional), while choosing to disbelieve her statements about Defendant Francis that have been documented across numerous medical records.

33. Defendant Finn and Judge Bruno knew R.S. was at high risk of deterioration if placed with Defendant Francis; both stated in substance that if R.S. could not be with her father, she should be in hospital. Juddge Bruno's words were *"If she can't be with her father, then in the hospital "*, and Defendant Finn's words were *"If she cannot be in her father's care she should be in a hospital where she could be safely monitored and treated."*

34. During the court session, Judge Bruno acknowledged drafting an approximately 11-page order before hearing all evidence and approximately barely half-way through the proceeding.

35. Judge Bruno suggested to Defendant Francis's and Plaintiff's counsel that an emergency OP petition and an emergency motion to modify parenting time be filed simultaneously to effectuate removal of the children from Plaintiff. Judge Bruno's words were "*It's my understanding pursuant to 604-10 (D) and (B) that certainly a party can object, but obviously a Court always has the authority to overrule the objection. The Court could also suggest to Ms. Riewer and Ms. Wu that perhaps simultaneously in addition to filing the petition for emergency O.P. they also file an emergency motion to modify parenting time.*"

36. Judge Bruno ordered Plaintiff to undergo treatment with Dr. Chinni Chilamkurti, a therapist selected by Defendant Finn, requiring completion of 26 sessions before Defendant Finn would determine if any parenting time can be given to Plaintiff. Judge Bruno's order did not quote any medical diagnosis or any medical information on the treatment nor did the order state Dr. Chinni's or Defendant Finn's expertise with the alleged diagnosis.

37. Judge Bruno appointed messaging gatekeeper Pamela Rak (selected by Defendant Finn), restricted Plaintiff's messages to short notes, prohibited her from saying *"I miss you"* to the children and allowed children's therapists to determine whether messages would be delivered.

38. An emergency order of protection was granted based on a fundamentally defective petition that failed to meet the statutory requirements under the Illinois Domestic Violence Act that was magically filed within minutes with numerous pages of countless false allegations. The petition lacked any specific, factual allegations of abuse as defined by the statute and instead relied on inflammatory rhetoric, distortions, and outright falsehoods. Notably, police reports consistently show that law enforcement advised the Plaintiff to seek an order

of protection against Defendant Francis—not the other way around.  The allegations were not only logically incoherent but also contradicted by existing evidence. One such example: the petition falsely claimed that Safia Khan was an unlicensed professional, when in fact, Ms. Khan was—at the relevant time—employed as both a therapist and a social worker in the Emergency Department at NorthShore Hospital. The hearing did not address the extensive list of baseless, speculative, and imaginary allegations made against the Plaintiff. Judge Bruno granted the emergency order of protection in case number 2023OP002596 (Lake County, Illinois) based solely on the sealed report and testimony of Defendant Finn, without requiring Defendant Francis to testify under oath or be subject to cross-examination. The petition set forth countless false, incoherent, and purely imaginative allegations, rendering the filing itself a complete mockery of the judicial process. See FedComplaint – Appendix F for Plaintiff's motion to dismiss OP.

39. Immediately after the legal seizure, Defendant Barone and Defendant Francis went to R.S.'s school to switch custody. According to R.S.'s April 2024 letter (FedComplaint – Appendix C), Defendant Barone told 15-year-old R.S. that Plaintiff had mentally abused her. R.S. wrote that she denied those allegations against Plaintiff and she underwent emotional distress and begged to be returned to Plaintiff.  Defendant Barone and Defendant Francis denied R.S. forcing her to escalate, which led to immediate hospitalization. R.S. remained in medical facilities, moving from hospital to residential treatment for more than 2.5 months and later placed on much higher medications.

40. Plaintiff's role as R.S.'s support system had been documented in medical records and R.S.'s diagnosis qualifies to be protected under Americans with Disabilities Act (ADA). Defendant

Finn had reviewed these medical documents and GAL had access to them too.

41. Judge Bruno instructed that payment to Dr. Chinni and Ms. Rak is Plaintiff's responsibility and out of pocket.

42. Judge Bruno ordered that A.S. begin therapy immediately. Notably, in Oct 2022, Judge Bruno denied Plaintiff's request for A.S. to start therapy when Plaintiff had moved out of marital home and removal of Safia Khan. Following the seizure of A.S., Defendant Francis unilaterally selected a therapist who never communicated with Plaintiff.

43. Two weeks before Defendant Finn's report was released, Defendant Francis filed a pretrial memorandum mirroring Defendant Finn's report's themes and recommendations, including removal of Plaintiff's decision-making and parenting time and requiring Plaintiff to undergo treatment. The pretrial memo included the following passage: *"Thus, Sebastin Francis is seeking sole decision-making and all parenting time with the children. He is further asking Judge Bruno to require that Sossamma get treatment and to restrict Sossamma's contact with the children until she has progressed in therapy and Dr. Finn, or another professional deems her progress sufficient that the children are no longer in any danger."*

44. Defendant Francis' exhibit admitted in May 2024 trial revealed an email communication chain between Defendant Francis, Michone Riewer, Defendant Barone and Defendant Finn from Oct 2023 to April 2024. This evidence shows October 2023 email where Defendant Finn forwarded Plaintiff's materials to Defendant Francis for review saying *"In reviewing your file I realized I do not believe I sent this for your review. Please review and respond as you see fit."* (FedComplaint – Appendix E – page 27) Defendant Finn's email also reveals that there were prior ex parte communications. Defendant Francis after reviewing

Plaintiff's materials makes a bunch of false and defamatory claims on Plaintiff without having to provide any evidence to Defendant Finn for his false claims on Plaintiff. Defendant Francis then provides Defendant Finn the information that Defendant Finn needs to add to the custody evaluation report and Defendant Francis's verbatim to Defendant Finn in an email (dated Oct 5, 2023) is *"Hi Dr. Finn, I'm attaching a timeline relevant especially for R███. I hope it helps as you prepare your report "*.  Defendant Finn never afforded Plaintiff any reciprocal opportunity to review Defendant Francis's materials nor did Defendant Finn take instructions from Plaintiff on what should be covered in his report. Despite this evidence of blatant bias and fraud, the final judgment completely ignored it. Plaintiff obtained this exhibit only after trial concluded. This exhibit also conclusively demonstrates how Defendant Francis provided materially false information and defames Plaintiff regarding basic, verifiable facts, and his account of Plaintiff's action.

45. This exhibit also showed Defendant Francis's out-of-state travel with minor children (New York, approximately 03/26/2024–04/01/2024) without notifying Plaintiff but informing Defendant Finn and Defendant Barone. There was no court order that allowed Defendant Francis to travel out of state without informing Plaintiff. It also showed that R.S. called the police on Defendant Francis at his residence. Neither Defendant Finn nor Defendant Barone presented these facts during May 2024 trial or any other time in the case. Nor did Judge Bruno address this in final ruling even though this evidence was admitted for the final trial.

46. The same exhibit showed Defendant Francis was receiving guidance from Defendant Barone to pursue alleged OP violations against Plaintiff from an incident unrelated to Plaintiff where an unknown person initiated a wellness check on R.S.  See FedComplaint – Appendix

E - Page 10. The exhibit shows Defendant Francis's repeated and deliberate attempts to obtain a false report against Plaintiff, and the defendants' coordinated efforts ultimately failed. It further demonstrates how Defendant Francis exerted control over R.S. and her devices to prevent any additional truth from coming to light through R.S.

47. This same exhibit showed Defendant Francis thanking Defendant Finn, Defendant Barone and his counsel on 11/18/2023 for everything they all did (on 11/17/2023 where the minor children were unconstitutionally seized from Plaintiff).  This exhibit also shows Defendant Finn discussing with Defendant Francis's counsel for preparation for next hearing of OP with Defendant Barone and Defendant Francis copied.


**D. Post–November 17, 2023, Through Trial (May–June 2024)**

48. Plaintiff received minimal information about the children from Defendant Francis. Judge Bruno had barred Plaintiff from accessing children or any of their medical and school professionals and their records.

49. On 11/21/2023, Judge Bruno allowed Defendant Barone to disseminate Defendant Finn's sealed report to treatment providers (children and Plaintiff) and future providers, over Plaintiff's objection, while continuing to deny Plaintiff access to the report. During this hearing, Defendant Francis' counsel informed Judge Bruno that staff at Linden Oaks treatment facility saw Defendant Francis as R.S.'s perpetrator and they need Defendant Finn's report to change the story. No evidence was provided to show that this request for Defendant Finn's report indeed came from R.S.'s medical professionals. Here is the verbatim from Michone Riewer, Defendant Francis's counsel - *"The child is being treated*

*right now. Because -- and we have made this argument multiple times because she was previously treated for the wrong thing, she was treated for sexual abuse instead of being treated for parental alienation, she is at a facility that she has previously been at. We are putting Mr. Francis in a position where the person who they consider the perpetrator without much else is going in and saying I'd like the treatment for my daughter changed to focus in this direction instead. The treaters have asked for that report. When they talked to Mr. Francis they have said that it would be very helpful to have that information, and they have asked for it. It is our belief and Mr. Francis ' belief that it would help R█████; and that R████ in order to get better needs to have someone other than just Mr. Francis telling these medical providers and mental health providers that the story has changed and other than just his word, here is his additional information that will help them treat her. We want to make sure that R████ is being treated for the correct, with the correct treatment and for the correct mental health issues."* Defendant Barone circulated Defendant Finn's report without providing notice to Plaintiff and without establishing any court record documenting who received it.

50. On or about 12/25/2023, Defendant Francis admitted R.S. in an out of state residential program (Discovery Mood & Anxiety, Stamford, CT) and flew with R.S. and A.S. there, without court authorization or notice to Plaintiff. He also later appointed a new outpatient therapist unilaterally and did not send R.S. to any of her previous outpatient therapists.

51. On 01/08/2024, Judge Bruno reaffirmed denial of the report to Plaintiff, assigning Defendant Barone as the exclusive gatekeeper of the report, including to Plaintiff's counsel.

52. On 01/23/2024, Judge Bruno entertained a motion from Defendant Francis to quash

Plaintiff's subpoena to Defendant Finn and barred Plaintiff from viewing subpoenaed documents and again appointed Defendant Barone as the sole gatekeeper of these subpoenaed documents.

53. In 01/2024, Defendant Francis contacted Plaintiff to request items belonging to R.S., including clothing, contact lenses, and other personal effects. Despite the existence of an active OP, which Defendant Francis himself had requested and been granted unjustly, he repeatedly insisted that he could retrieve the items directly from Plaintiff's residence. This conduct appeared to be an attempt to provoke or engineer a violation of the OP by encouraging direct contact in contravention of orders. Plaintiff refused to have direct contact and transferred the requested items to Defendant Barone's office, with a third-party eyewitness.

54. On or about 02/01/2024, Plaintiff's psychologist submitted a letter to Judge Bruno that Plaintiff did not have the alleged diagnosis and that the treatment with Dr. Chinni would harm Plaintiff. This psychologist also reported that Defendant Finn had not consulted her despite her multiple efforts to connect with him. This letter was later admitted as a trial exhibit in May 2024. See FedComplaint – Appendix D

55. On or about 02/16/2024, Judge Bruno denied continuing the hearing and permitted Plaintiff's attorney to withdraw a motion to reconsider without Plaintiff's consent and while she could not attend the court session. Judge Bruno extended the OP, upheld restrictions and ordered retroactive temporary child support to Defendant Francis despite prior denial of temporary child support to Plaintiff. Judge Bruno ordered Plaintiff to pay $59,000 of Defendant Francis's attorney's fees without any legal basis, assigned additional escrow

funds to Defendant Barone without any written request from Defendant Barone. Judge Bruno granted Defendant Francis's request to limit Plaintiff's communications to one message per week per child without medical testimony supporting the restriction. Plaintiff's motion that her counsel withdrew without her consent was a motion to Reconsider the November 17, 2023 order requesting striking out the treatment mandate in court order using Plaintiff's psychologist's letter to Court.

56. On 03/01/2024, Judge Bruno entertained emergency motions by Defendant Francis to seal the case and to incarcerate Plaintiff for alleged OP violations. Plaintiff missed court due to a documented medical emergency while Judge Bruno demanded additional proof. On or around 03/19/2024, Judge Bruno extended the OP through trial without hearing Plaintiff's motion to dismiss the OP or her motions to compel Defendant Finn. Defendant Francis also withdrew his emergency motions.

57. On or about 03/20/2024, Judge Bruno entertained an overbroad subpoena by Defendant Francis' counsel, Michone Riewer against Plaintiff's former counsel, Dwayne Douglas without proper privilege findings.

58. On 04/09/2024 Judge Bruno ordered Dwayne Douglas to produce all emails with attachments to Defendant Finn and Defendant Barone within three days. Dwayne Douglas withdrew his Motion to Reconsider with prejudice.

59. On or about 04/24/2024, Judge Bruno denied Plaintiff's motions for an independent evaluation, discovery enforcement, trial continuance, and subpoenas to medical professionals and records. Judge Bruno also denied Plaintiff's rebuttal expert and her own psychologist to be added as trial witnesses, while continuing to rely on sealed reports.

60. On or about 04/24/2024, Judge Bruno threatened severe consequences on Plaintiff's attorney for minor technical issues. Judge Bruno used derogatory language towards Plaintiff, incorrectly asserted Plaintiff had not sent messages to her children, relied on unsworn Defendant Barone opinions, misapplied standards against Plaintiff, and selectively invoked trial deadlines despite disregarding them when changing custody in 11/2023. Judge Bruno's words were: *"She has done nothing but thumb her nose at this Court over and over and over"* etc. Judge Bruno's wrong claims on Plaintiff's lack of messages to children was later reversed and corrected but it was still used to justify denying her motions.

61. In 04/2024, R.S. sent letters(emails) after six months of no contact with Plaintiff and describing suffering of both children and denying claims against Plaintiff. R.S. wrote that Defendant Barone heavily influenced R.S.' medical professionals to not believe R.S. and spread false accusations against Plaintiff. R.S. also stated she was threatened by Defendant Barone and Defendant Francis that Plaintiff would go to jail if she wrote to Plaintiff. She described her distress on November 17, 2023 that led to hospitalization and also shared her little brother's emotional distress and how they were being alienated from Plaintiff. R.S. also shared that the choices offered to her were either to go to foster care or to go to Defendant Francis's house. She then explained that she had been advised by others about the issues in foster care and that she would be separated from A.S. She then described that she did not want her little brother, A.S., to be left alone with Defendant Francis, and she agreed to go to Defendant Francis's house on the condition that cameras be installed in his home. See FedComplaint – Appendix C

62. Plaintiff promptly sought an in-camera interview with R.S. On or around 04/30/2024, Judge

Bruno denied Plaintiff's emergency motion for an in-camera interview with 15-year-old R.S. Judge Bruno made incorrect and extrajudicial assumption about R.S.' email address. When Plaintiff attempted to clarify the error, the judge repeatedly interrupted Plaintiff, accused her of "not listening," and refused to treat the matter as an emergency despite the child's expressed distress and issues with Defendant Barone. Judge Bruno further prematurely dismissed the email as fabricated without evidence and delegated the issue to Defendant Barone rather than ensuring immediate judicial review.

63. On or around 04/30/2024, Judge Rhonda Bruno statement on the email address was *"I know it very well because I checked on the email website,"* and insisted that Libertyville High School emails must originate from @d128.org. It should be noted that later it was proven that the judge's assertion was factually incorrect and the email was indeed from R.S. However, no correction was made on the denial of in-camera interview of R.S made on wrong assumptions.

64. On or around 04/30/2024, Judge Bruno then ordered Defendant Barone to meet the child. Defendant Barone later admitted under oath that R.S. wrote that letter but Judge Bruno still did not meet with the child. Judge Bruno suppressed R.S.' voice completely by later denying her as a witness too for trial even though R.S. was properly disclosed as a witness as per the court rules.

65. During the 04/30/2024 hearing, the judge falsely asserted that a pretrial settlement offer had been made to Plaintiff, claiming Judge Bruno and opposing counsel "pleaded" with her to accept a recommendation that gave Plaintiff less than 50% parenting time for then 6 year old A.S. and granting Defendant Francis more overnights with A.S. Plaintiff immediately and

consistently objected on the record, stating that no such offer was ever presented to her. Rather than allowing Plaintiff to clarify or address the misstatement, Judge Bruno repeatedly interrupted, threatened removal from court room, and explicitly stated, *"You don't have the right to speak your truth any time you want,"* while simultaneously declaring, *"I am not going to disbelieve Ms. Barone,"*. This exchange not only misrepresented the factual record but also deprived Plaintiff of a fair opportunity to respond.

66. During the same hearing, Judge Bruno falsely stated on the record that Plaintiff's pretrial memorandum requested "supervised contact" between the father and the minor child, A.S., despite Plaintiff immediately and clearly denying that any such language appeared in her filing. When Plaintiff stated that the truth would be clear once the memo was reviewed at trial, Judge Bruno cut her off and declared that the pretrial memo would not be permitted in trial because it was "not relevant" and "forbidden," effectively preventing her from presenting the very evidence that would disprove Judge Bruno's assertion. Judge Bruno repeatedly interrupted her attempts to clarify the record, compared her to *"the little boy who cried wolf,"* and insisted she *"does not have the right to speak [her] truth any time [she] wants,"* despite relying on these mischaracterizations to shape the narrative of the case. Judge Bruno made false allegations on Plaintiff's pre-trial memo while ignoring the fact that Defendant Francis's pretrial memo had requested for complete removal of Plaintiff's parenting time and decision-making rights.

67. In the same hearing, Judge Bruno continued to enforce a prior court order that mandated Plaintiff to complete 21 sessions with Dr. Chinni, as a condition to attempt resuming contact with her children—even though court's order contained no clinical diagnosis, no specific

findings of mental illness, and no explanation of what the proposed treatment was intended to address. When Plaintiff asked why she was being forced into therapy and stated, *"But you haven't said in the order why I need to go to Dr. Chinni,"* the judge immediately dismissed her concern and responded, *"Ma'am, I did say, and that is incorrect. I set it out in tremendous detail in about a seven-page order in November. That is not accurate."* However, Plaintiff asserted that no diagnosis or rationale was ever identified in the court order. Instead of quoting the alleged justification, the judge simply pointed to the disputed report of Defendant Finn saying, *"Dr. Finn set it out in his report. You disagree, and that's .. "*

68. During the same hearing and in a direct interaction between Judge Bruno and Plaintiff, Plaintiff seek clarity by asking what diagnosis was being used to justify court's treatment order and separation from child, Judge Bruno interrupted and demanded Plaintiff's counsel to *"control your client,"* and said, *"I can't let this go on."* She then chastised Plaintiff, stating, *"You are not helping yourself... Orders are not suggestions. They are orders, and yet you refuse to follow them."* Throughout the exchange, the judge made increasingly coercive and punitive statements, blaming Plaintiff for escalating litigation costs. She also repeatedly minimized Plaintiff's concerns about the false diagnosis saying *"You haven't even given the woman the benefit of the doubt... You think you know better. Well, you don't."* Despite acknowledging *"I'm not a therapist,"* Judge Bruno made clinical judgments telling Plaintiff, *"You don't want to talk to her, you're going to have to talk to your counsel about that, but I made an order."*

69. During the same hearing, Plaintiff also attempted to clarify that she had not been diagnosed with Munchausen syndrome by proxy, stating, *"I've already proven to court I don't have*

*anything to do with Munchausen syndrome by proxy."* Judge Bruno immediately dismissed this, saying, *"Ma'am, you didn't listen to a word I just said... Based on the comment you just made, you didn't listen to one word. I never said you had Munchausen by proxy... And no, you haven't proven to court anything of that nature."* Yet again, this exchange highlighted the fact that no diagnosis had been entered into the record, and yet a highly invasive form of mental health treatment was being ordered without explanation or clinical evaluation. It is also important to note that Plaintiff's motion which was withdrawn by her counsel without her consent in Feb 2024 clearly included a letter from her psychologist that contradicted Defendant Finn and also told the court that Defendant Finn did not speak to her. Judge Bruno has seen this motion and this letter from Plaintiff's psychologist was again admitted as evidence in the final trial. See FedComplaint – Appendix D for the psychologist's letter

70. During the same hearing, Judge Bruno relied entirely on the contested and undisclosed report of Defendant Finn to justify cutting off contact, while openly acknowledging that Plaintiff had never seen the report. The judge stated: *"Dr. Finn did not diagnose you with Munchausen by proxy... He said you met the criteria... He did not diagnose you."* Yet this ambiguous reference to "criteria" was used to justify a forced treatment order, an order of protection and a complete deprivation of access to both minor children.

71. During the same hearing, Judge Bruno then made a series of prejudgments about the outcome of the trial, declaring: *"There won't be much of an option for you to have a different therapist other than Dr. Chinni... unless something dramatic comes out at trial, that's going to be the order... You won't have that option; it will be Dr. Chinni or Dr. Chinni*

*or Dr. Chinni."*

72. In April 2024, credible evidence emerged that Defendant Finn had altered critical data of Plaintiff's MMPI-2 (Minnesota Multiphasic Personality Inventory-2) psychological test. Judge Bruno denied Plaintiff's request to sanction Defendant Finn or to bar his testimony or to request the results directly from Pearson (company administering MMPI test). Instead, Judge Bruno ordered Defendant Finn to simply comply with the Plaintiff's subpoena which was filed several months back. Essentially, Defendant Finn had removed the part of Plaintiff's MMPI results that showed that Plaintiff was more trustworthy than Defendant Francis. See FedComplaint – Appendix G to see more details.

**Final Trial May- June 2024**

73. On 05/13/2024, Judge Bruno excluded Plaintiff's properly disclosed witnesses (including 18 children's medical professionals), R.S.' medical records, and R.S. herself. Judge Bruno allowed Defendant Finn to "comply with the subpoena" and submit previously omitted materials on 05/15/2024, preventing meaningful rebuttal

74. Judge Bruno accepted hearsay claims that R.S. refused to sign releases despite no proof and contrary prior evidence and the previous releases from R.S. for Plaintiff still remaining valid. These hearsay assertions were used to block Plaintiff's subpoenas.

75. While allowing hearsay and emails from Defendant Barone and Defendant Francis, Judge Bruno excluded similar materials offered by Plaintiff, blocked her rebuttal witnesses, prevented her from re-calling herself, and excluded medical records previously shared with Defendant Finn. Only Defendant Finn and Defendant Barone were permitted to testify on

mental health issues.

76. Defendant Finn offered a psychological theory lacking foundation, omitted exculpatory evidence for Plaintiff and inculpatory evidence for Defendant Francis, contradicted R.S.' numerous treating providers (at least 18 of them were in Plaintiff's witness list who were barred by Judge Bruno) and Plaintiff's psychologist, and acknowledged R.S. had no falsified symptoms. Defendant Finn had spoken to numerous medical professionals. He reviewed all medical records so far available. Yet, his testimony had little to nothing on what these medical professionals or medical records said but was loaded with rhetoric against Plaintiff with no evidence. He had also ignored all evidence against Defendant Francis.

77. Defendant Finn minimized concerning MMPI results for Defendant Francis which stands for deceptive behavior. He illogically claimed that he believed that Defendant Francis favored joint decision-making while also acknowledging Defendant Francis's extremely high number of emergency motions and most demanding removal of Plaintiff's parenting time and her decision-making rights.

78. Defendant Finn testified that he is not an MSBP expert and he testified that he wants Dr. Chinni to assess and confirm whether Plaintiff truly has MSBP. He did not testify that Dr. Chinni is an MSBP expert nor did he give a medical explanation for recommending Dr. Chinni. He testified that he has sent numerous clients to Dr. Chinni. See FedComplaint – Appendix J for her online profile details

79. Defendant Finn was allowed to submit the authentic MMPI test results of Plaintiff on the day of his final testimony on May 15, 2024, more than 5 months after Plaintiff 's subpoena was served on him and after multiple motions to compel him.

80. Defendant Finn admitted that two of R.S.'s providers informed him that they had a lot of conflict with Defendant Barone, but Defendant Finn refused to share the details. Defendant Finn testified that no medical provider ever raised concerns about Plaintiff coaching R.S. or influencing R.S.'s allegations against Defendant Francis.

81. Judge Bruno barred cross-examination of Defendant Finn using a prior custody report authored by Defendant Finn in another case. Judge Bruno had previously issued a protective order on this report but effectively retracked from her own order on the day of Defendant Finn's testimony. This case had similar facts but extremely different recommendations from Defendant Finn.

82. Defendant Finn admitted that he did not question R.S. meaningfully about her mental health or her struggles or factors related to her mental health issues.

83. Defendant Barone testified with inaccuracies, unverified hearsay, and speculative mental health claims beyond her qualifications; she often lacked notes or recollection. Judge Bruno deemed her credible and accepted her opinions as fact while excluding rebuttal.

84. Defendant Barone admitted not reviewing subpoenaed DCFS records, nonetheless recommending custody outcomes. She presented countless unverified claims including as bizarre as "implanting visions of sexual abuse".

85. Defendant Barone provided materially inconsistent testimony under oath regarding a fundamental case fact. During the December 2022 hearing where Plaintiff's medical decision-making for R.S. was removed, Defendant Barone implied that Plaintiff had reported R.S.'s sexual abuse allegation to DCFS while stating that she did not know who reported the accusation even though she had frequent contacts with Northshore hospital and Defendant

DCFS Jones. However, during her May 2024 trial testimony, Defendant Barone acknowledged that NorthShore Hospital had made the report.

86. Defendant Barone's testimony revealed a fundamental misunderstanding of minor rights, mischaracterizing R.S.'s lawful exercise of HIPAA confidentiality as improper interference by Plaintiff even though R.S. or her medical professionals have never said that R.S.'s choices were influenced by Plaintiff. Defendant Barone then used this false premise to baselessly accuse Plaintiff without evidence. Despite this matter having been previously litigated with no findings against Plaintiff, Judge Bruno permitted it to be relitigated without any new evidence, then accepted Defendant Barone's fabricated narrative as fact.

87. Defendant Barone's testimony revealed how she dictated medical decisions for children, overrode parental medical agreements regarding R.S., and conducted disproportionate home visits (multiple times visiting A.S. at Defendant Francis' house while once visiting A.S. at Plaintiff's house).

88. Judge Bruno imposed an "all 2,000 pages or nothing" rule for Plaintiff evidence which was OFW messages between Defendant Francis and Plaintiff; while allowing references by Defendant Barone and Defendant Francis without the same burden. Judge Bruno also stated Plaintiff's exhibits were not important by saying *"I submit to you that they're not as important as you think they are,"* before they were formally presented.

89. Judge Bruno also allowed Defendant Barone to make mental health accusations on Plaintiff even though Defendant Barone is an attorney and not a medical professional

90. Defendant Barone was proven to be lying under oath in multiple instances. For example: she claimed that Plaintiff canceled R.S' medical appointment when it was Defendant Francis

who canceled the appointment.

91. Defendant Barone produced a long list of false information on R.S' mental health which were left uncorrected to even the child's detriment because Judge Bruno barred all rebuttal evidence – R.S.'s medical records and R.S.'s medical professionals. Defendant Barone went to the extent of inverting the medical truth by claiming that a medical professional told her that Plaintiff is a trigger to R.S. This is false information and the truth is that Defendant Francis is listed as a trigger in R.S.' medical records of a well-respected mental health residential treatment center. Other records from several medical facilities connect Defendant Francis to R.S.' trauma. However, Defendant Barone completely omitted these facts and filled her testimony with speculations and false allegations on Plaintiff and Plaintiff's relationship with children.

92. Defendant Barone's testimony and court records reveal that she wanted R.S. to continue in the eating disorder program against R.S.'s desires and against the advice of long-term medical professionals of R.S (her pediatrician and psychiatrist). In Dec 2022, Defendant Barone had requested Judge Bruno to remove Plaintiff's medical decision-making authority based on this conflict as Defendant Barone wanted to forcibly keep R.S. in eating disorder program. Defendant Barone's recommendation was contrary to the child's best interests, as proven by the pediatrician's and psychiatrist's advice, and the fact that the child gained 20 pounds in three months after she left eating disorder program. Defendant Barone's role did not entail making medical recommendations.

93. Defendant Barone testified that she had been informed by A.S.'s therapist that Plaintiff writing to A.S. about their dog, Charlie, wearing A.S.'s clothes constituted abuse. This

accusation was first introduced by Defendant Barone a month or two back directly in a court session with no prior notice to Plaintiff and shocking Plaintiff. When Plaintiff followed up with Defendant Barone and asked how such a benign message could be harmful and how much A.S. must be missing his mother, if such a message made him cry. However, Defendant Barone did not respond to Plaintiff's question. Notably, no therapist or psychologist known to Plaintiff agrees that mentioning a pet engaged in familiar, comforting activities qualifies as abuse. In fact, A.S.'s older sister, R.S., a mature minor, described the allegation as absurd in her letter and R.S.' words were *"That is totally insane and bullshit"*.

94. Defendant Francis identified Defendant Barone as the ultimate authority on the children's education, therapy, and contact. He testified to refusing sharing medical expenses for R.S. for essential therapy despite having sole decision-making for R.S.

95. Defendant Francis was proven to have lied under oath multiple times, as also documented in the dissolution judgment. Few of them include claiming that Plaintiff canceled RS appointment, claiming that Plaintiff is the one who told Libertyville High School that R.S. has PTSD, claiming that he had not spoken to R.S.' therapist while R.S. was out of the country with mother and A.S. etc. He also claimed that he had no contact with R.S. on the day she attempted suicide when in fact he had taken her out to Dunkin Donuts. He also admitted that R.S. herself directly accused him of the sexual abuse.

96. Defendant Francis introduced new claims of abuse against Plaintiff, and parental unfitness, raising serious procedural and ethical concerns and constituting trial by ambush. He introduced these allegations after four years into litigation and admitted that he has never reported even the alleged physical assault to police, DCFS, or sought medical attention.

97. Defendant Francis mischaracterized a 911 call made by R.S. during a mental health crisis as alienation, despite having been advised by DCFS to stay away from R.S. at that time. His testimony clearly showed that he violated the guidance from DCFS by forcing himself on R.S. Yet Judge Bruno and Defendant Barone not only did not challenge his aggressive and insensitive actions to R.S. but they went along with his false allegations on Plaintiff. Police report for this 911 call is FedComplaint – Appendix B which shows the state of the child as recorded by cops.

98. Defendant Francis also misrepresented numerous incidents which were left unrebutted because Judge Bruno had barred the medical professionals and R.S. herself.

99. Defendant Francis objected to Plaintiff having any parenting time or decision making or any access to the children's medical and educational records.

100. Defendant Francis admitted telling R.S. about the disputed "Munchausen by proxy" diagnosis and that her mother needed to "work on herself," violating a prior court order and constituting parental alienation.

101. Defendant Francis testified about a video of A.S. which Defendant claimed to have been innocently recorded by his sister. The video began with suggestive language *"What did mama say?"* to A.S. showing evidence of coaching. However, Defendant Francis gave unclear answers about how his sister started the recording at the right time and whether he edited the video.

102. Defendant Francis admitted to traveling to India with A.S. while R.S. was in residential treatment and he held sole medical decision-making authority. He characterized the trip as therapeutic for A.S., despite it being a leisure trip, thereby masking medical neglect of R.S.

during a critical period in her care.

103.    Defendant Francis admitted to maintaining 24/7 surveillance throughout his home. Judge Bruno and Defendant Barone raised no concerns. Defendant Francis also unilaterally admitted R.S. to an out-of-state facility and transported A.S. across state lines without court approval or Plaintiff's consent.

104.    Judge Bruno allowed Defendant Francis to give lay opinion testimony—over objection— that Plaintiff posed a "serious endangerment" without mental health treatment.

105.    Defendant Francis also claimed Defendant DCFS Jones told him the child was coached. However, Defendant DCFS Jones later testified about the text that he sent to Plaintiff confirming that he did not conclude that Plaintiff coached the child or that R.S. was lying.

106.    Plaintiff testified that from 2019, Defendant Francis ceased face-to-face communications with Plaintiff, denying co-parenting and childcare support, and she described how she was subjected to verbal abuse and violent behavior from Defendant Francis after drinking. Such behaviors were also witnessed by R.S and other adults.

107.    Plaintiff testified under oath that she never requested supervised parenting, directly refuting a material claim made by Defendant Barone. Defendant Barone testified that Plaintiff made this alleged request but Defendant Barone gave no explanation for waiting approximately eight months before raising this serious allegation in court in Dec 2022.

108.    Plaintiff testified that Defendant Francis forced R.S.  to slap her own face, that Defendant Francis threw garbage bag at R.S. and other similar incidents.  Defendant Francis testified that these incidents occurred and are supposedly fun games he played with R.S.

109.    Judge Bruno blocked Plaintiff from introducing several exhibits and suppressed narrative

explanations, while allowing broader leeway to opposing counsel.

110.    R.S.'s therapist Safia Khan testified and contradicted the Defendant Barone's accusations against Plaintiff about the India trip and causation of mental health issues; she confirmed Defendant Francis approved the trip and that R.S.'s mental health concerns predated the trip.  Safia Khan was allowed to testify only on her conversations with Defendant Barone.

111.    Kimberley Wesley, a school social worker, testified that she worked with R.S. from 2019 to 2022 on academic issues. She stated that Plaintiff was actively involved in R.S.'s education and that R.S.'s academic performance improved. Kimberley Wesley testified that she had no significant interaction with Defendant Francis.

112.    Defendant DCFS Jones testified that he may have discussed the "coaching" allegation with Defendant Barone on September 20, 2023, despite never having spoken to Plaintiff by that date and only having spoken to Defendant Barone, medical professionals and likely Defendant Francis.  Medical professionals did not connect Plaintiff to coaching and that left Defendant Barone and Defendant Francis as the key influencers on Defendant DCFS Jones' statement.  He also testified that he had sent texts (in Dec 2022) to Plaintiff where he confirmed that he has not concluded that R.S. is lying nor did he conclude that Plaintiff coached R.S.  See FedComplaint – Appendix O for these text messages

113.    Defendant DCFS Jones' report is a cherry-picked report which omits critical information on R.S.' diagnosis and her trauma connection to Defendant Francis and omits what R.S.' many therapists would have shared on this front. However, his report repeatedly states Defendant Barone called him and provided him a lot of information about Plaintiff - which is

demonstrably false. Defendant DCFS Jones failed to verify the information he received from Defendant Barone and instead aligned himself with Defendant Barone. He also assisted Defendant Barone by including false and misleading statements in his report—statements that targeted Plaintiff while minimizing or omitting concerns about Defendant Francis. Notably, the only individual who supported Defendant Francis's position at this time was Defendant Barone; none of R.S.'s medical professionals corroborated with the claims against Plaintiff. It should be also noted that Defendant DCFS Jones allowed Defendant Barone to have access to R.S.' child advocacy interview or the video of this interview without any court order granting Defendant Barone such right or to be a part of DCFS investigation.

114. DCFS reports from two DCFS investigations on Defendant Francis were submitted as trial evidence. One DCFS report includes an observation by the first investigator (not Defendant DCFS Jones) stating, *"Writer did not feel father was being truthful; he paused and stuttered with his answer."* Additionally, R.S. disclosed to this DCFS investigator that *"there was a time when father motioned with his fist but did not hurt her mother,"* and she reported noticing that *"usually some of the times when father is aggressive she knows he has been drinking."* When asked whether she suspected alcohol abuse, R.S. responded, *"I don't know for sure."*

115. Judge Bruno favored Defendant Francis' counsel in several ways including allowing more time and broader questioning, while restricting Plaintiff's counsel. Judge Bruno frequently sustained objections against Plaintiff, while allowing Defendant Francis's counsel to exceed the scope of examination. For example, Judge Bruno allowed Defendant Francis' counsel to

question Plaintiff's witness about whether this witness had viewed the CAC video. Defendant Francis' counsel also pressed to examine Plaintiff's text messages on her physical phone and wanted to see Plaintiff's phone right there without warrant or legal basis. This continued until Plaintiff's counsel objected.

116. During closing, Defendant Francis's counsel sought all marital retirement assets for Defendant Francis and to leave no assets for Plaintiff. She also demanded attorney's fees, and a plenary OP barring Plaintiff from all contact with the children.

117. Judge Bruno relied on speculation and entertained lengthy discussions about potential violations of OP. Judge Bruno entertained the idea that Plaintiff should be implicated for a supposed violation of the OP based solely on a wellness check conducted on R.S. in April 2024, despite no evidence linking Plaintiff to that act. These speculative and prejudicial discussions also appeared in Judge Bruno's final judgment.

118. Judge interrupted Plaintiff over 35 times in just one day during Plaintiff's testimony and subjected Plaintiff to verbal hostility, including sarcastic remarks and improper judicial fact-finding. Judge Bruno vehemently challenged Plaintiff for not recalling the exact number of Plaintiff's updated salary after a recent pay increase—despite the fact that both Judge Bruno and Defendant Francis had already received the updated pay stubs. Even though Plaintiff offered to confirm the exact figure on the next trial date (the very next day), Judge Bruno was not satisfied and repeatedly rebuked Plaintiff for information that was already in Judge Bruno's possession.

119. Judge allowed rehashing of previously resolved issues (without any new evidence) and allowed it to be twisted to a new fabricated accusation against Plaintiff. One such example

is the claim that Defendant Francis was excluded from TK when in fact he had more contact with TK staff than Plaintiff. See FedComplaint-Appendix K that shows Defendant Francis's OFW message to Plaintiff describing his one-to-one conversation with R.S.'s TK therapist - a privilege that Plaintiff did not have. This was evidence submitted for the final trial.

120.    Judge Bruno admitted into evidence a letter from R.S.'s therapist, Olivia Orwitz, which contained highly customized content directly concerning the central issues of the case. Despite Defendant Barone labeling the letter as "unsolicited," no explanation was provided as to how such specific and case-aligned content could arise spontaneously. Moreover, Judge Bruno permitted this letter to be admitted into evidence despite its hearsay nature and despite the fact that no medical or school records were presented to substantiate its claims.

### F. Final Judgment and Immediate Post-Trial Orders

121.    On or around 06/04/2024, Judge Bruno approved a 2-year Order of Protection.  Judge Bruno falsely claimed that Plaintiff is responsible for R.S.' sexual abuse allegations in these words *"the Court feels this is a pattern of behavior by Miss George to cause not physical harm, but mental harm to these children by perpetuating this sexual abuse allegation without any sort of credible evidence".* Judge Bruno claimed in this hearing that Defendant Jones had testified a bunch of things against Plaintiff, which was not direct testimony from Defendant DCFS Jones. Judge Bruno further pathologized normal parenting behavior with A.S while ignoring the plethora of evidence of Defendant Francis' alienation and litigation abuse and other abuse against Plaintiff.  Judge Bruno had barred all witnesses who could

speak the truth and she barred medical records and medical professionals that inculpated Defendant Francis and exculpated Plaintiff. There was plethora of evidence that R.S. reported the sexual abuse to medical professionals after the suicide attempt and that no medical professional linked R.S. to her allegation and that the medical professionals linked Defendant Francis to R.S.'s allegations including a conclusion that Defendant Francis is a trigger for R.S. R.S.' letter had clarified that her mother has nothing to do with her sexual abuse allegation. Judge Bruno did not care that R.S. was on extremely high medications while under the care of Defendant Francis. Judge Bruno suppressed and inverted the truth through her numerous rulings including removing Plaintiff's email sent to Defendant Finn in Oct 2023 by declaring deadlines retroactively. Above all, Judge Bruno ignored credible evidence of perjured testimonies of Defendant Barone, Defendant Finn and Defendant Francis while barring all exculpatory, inculpatory, rebuttal and impeachment witnesses. Judge Bruno issued a plenary OP based on argumentative characterization without record support, speculative and inflammatory observations on Plaintiff and clearly erroneous findings predicated on inadmissible or unreliable material and in clear violation of IL Domestic Act Of Violence Act of 1986, 750 ILCS 60/101 et seq.

122. On 06/04/2024, while granting a plenary order of protection against Plaintiff, Judge Bruno made statements that unfairly and wrongly associated Plaintiff with R.S.'s suicide attempt while simultaneously acknowledging that she did not know the cause. Judge Bruno said: *"Do I think the agreed order was shown to R___? I absolutely do. I don't know why R___ attempted suicide. I don't know if it was because of the discussion regarding the patient. I don't know."* These assumptions were inaccurate and prejudicial attack on

Plaintiff's reputation since it has nothing to do with the truth. This assumption was not only illogical but an extremely reckless act as Judge Bruno was repeatedly informed that the suicide attempt occurred on 09/01/2022 (Verifiable through medical records too) and the Court session was on 09/02/2022 for which the order was not available to Plaintiff until later. By barring the medical records, excluding treating professionals, and declining to hear directly from R.S., the court foreclosed the very evidence necessary to determine causation, then speculated in a manner that stigmatized Plaintiff. The ruling thus relied on speculation and misstatements of fact, disparaged Plaintiff's caregiving during the most critical period of R.S.'s life, and inflicted harm on Plaintiff and her children without evidentiary foundation.

123.     On 07/16/2024, Judge Bruno entered the final judgement continuing the 11/17/2023 restrictions but now asserting MSBP diagnosis against Plaintiff and new claims of alienation against Plaintiff.  The allegation of MSBP was disproved even in the absence of testimony from R.S., in the absence of testimony from children's medical professionals, and despite the Court disregarding Plaintiff's psychologist's letter; since Defendant Finn testified that R.S.' symptoms were not falsified.  Judge Bruno not only suppressed critical evidence but also disregarded clear evidence of alienation and abuse directed against Plaintiff. This evidence included, among other things, Defendant Francis's efforts to share false information with medical providers even before he obtained sole custody.

124.     The judgment includes dedicated paragraph/s criticizing Plaintiff for allegedly requesting "restricted access" in her dissolution filing (language used in a paper document submitted by her former attorney) and Judge Bruno had actively prevented Plaintiff from giving clarification and making a record during trial. The judgment fails to acknowledge that initial

parenting proposal by Defendant Barone was close to signing off before Defendant Francis appointed a new counsel, Michone. Riewer. Judge Bruno focused extensively on the isolated use of the term "restricted" in Plaintiff's legal filing while completely omitting the extensive emergency motions by Defendant Francis to restrict or eliminate Plaintiff's parenting time, decision-making rights and access to records.

125. The judgment misstated that Plaintiff's request for a temporary order of protection during a DCFS investigation was denied. Plaintiff had filed for temporary order of protection on the advice of law enforcement. Civil court forwarded the matter to Judge Bruno. Plaintiff was advised by her counsel to withdraw the temporary order of protection petition which she did and this withdrawal is recorded in the court order issued by Judge Bruno.

126. Judge Bruno discounted medical professional Safia Khan's testimony and took no action on established perjury from Defendant Barone, Defendant Finn, and Defendant Francis. Judge deemed that Plaintiff is "not credible" as a blanket justification to dismiss all of her testimony and evidence even though she had zero evidence of any misrepresentation or false information coming from Plaintiff.

127. Judge Bruno declared in the judgement that Defendant Barone *"has no reason to lie"* while Plaintiff has *"myriad reasons to lie,"* without offering any explanation and evidence to support this claim.

128. Judge Bruno belittled safety concerns regarding "naked showering," and invented factual scenarios not in the record

129. Judge insinuated, without a shred of evidence, that Plaintiff caused her child's suicide attempt by showing her a court order. Without a scintilla of evidence, Judge Bruno

insinuated and fabricated that Plaintiff was responsible, employing a legally untenable rationale that 'a lack of evidence doesn't mean that it did not occur.' This arbitrary reasoning was applied in a discriminatory manner: while the absence of evidence was used to not discount an allegation against Plaintiff, the absence of evidence was used to discount a serious allegation against Defendant Francis. This absence of evidence against Defendant Francis was created by barring medical records, medical professionals, R.S., medical records and other rebuttal witness.

130. Judge Bruno relied on perjured testimony and allowed altered MMPI materials from Defendant Finn without sanction.

131. Normal parenting practices (rewards, small gifts, teaching A.S. not to keep secrets from family and trusted adults) were characterized as "manipulative" or "bribery," and used to punish Plaintiff while no such scrutiny was applied on Defendant Francis.

132. Judge Bruno referenced quotes from an exhibit not admitted into evidence and used this exhibit to influence its judgment.

133. Judgment falsely states that R.S. was literally locked in a room with her mother, eating all her meals there as well. R.S. was never locked up in any room or Plaintiff's bedroom. Plaintiff's bedroom, later weaponized in litigation by Defendant Francis, was originally the marital bedroom shared by both Plaintiff and Defendant Francis. R.S. ate meals in that room regularly in order to watch what she wanted as Defendant Francis let only A.S. watch TV during dinner time which was not R.S.'s age level. While it was still Defendant Francis's bedroom, this behavior was never questioned or labeled as "locked up" at the time. Once Ms. Riewer and Defendant Francis entered an attorney-client relationship, Defendant

Francis weaponized the same family dynamic falsely claiming that R.S. was 'locked in Plaintiff's bedroom.' It is also important to note that the bedroom was large and multifunctional, with a bed, couch, table, and space to move, making it more like a studio than a typical bedroom. Locked up goes even beyond stretch of imagination. Additionally, In September 2022, Judge Bruno made no "locked up" findings when this matter was initially litigated by Defendant Francis. Later, without any new evidence, Judge Bruno reversed her stance, adopting Defendant Francis's defamatory narrative.

134.    Judge Bruno awarded retroactive temporary child support to Defendant Francis while having denied Plaintiff's request for temporary support earlier and allocated a disproportionate share of marital assets to Defendant Francis as compensation for temporary support.

135.    Judge Bruno assumed the children were on Defendant Francis's insurance despite orders indicating coverage under Plaintiff's insurance and without addressing this at trial.

136.    In the judgement, Judge claimed the children were "well-adjusted" with Defendant Francis, while ignoring evidence of children's deteriorated state as given in R.S.'s letter, increased psychiatric medication of R.S., and R.S. police contact while in Defendant Francis's home etc. and having no credible evidence to support her "well-adjusted" claim.

137.    The final judgement repeatedly stated the false allegations against Plaintiff that were directly contradicted by the record.

138.    The judge acknowledged Defendant Francis's false pleadings in passing and treated them as irrelevant "gripes and complaints," imposing zero consequences.

139.    Judgement ordered Plaintiff to pay $59,000 in attorney's fees to Defendant Francis

despite his greater resources; the financial rulings contained inaccuracies and inconsistencies, and Plaintiff lacked sufficient time for discovery. Judge Bruno's financial rulings were marred by factual inaccuracies and internal inconsistencies, including exaggerated child support number benefiting Defendant Francis and including a failure to accurately assess Plaintiff's indebtedness and hence decreasing Plaintiff's debts thereby benefiting Defendant Francis.

140.     In the final judgment imposed a life insurance obligation exclusively on Plaintiff, with no reciprocal requirement imposed on Defendant Francis.  Against what IL case laws support, Judge Bruno also allowed Defendant Francis to claim both children on his tax returns while Plaintiff was ordered to pay roughly $2400 per month as child support and additional 55% for medical, school, extracurricular expenses. This child support order did not take into consideration her ability to maintain the living standards or the debts.

141.     On 7/16/2024, Defendant Barone was immediately dismissed as the GAL for the case. Defendant Barone then spent 1.5 hours with the new parenting coordinator who was brought into picture this very day. There was no court order that asked Defendant Barone to contact or influence the new parenting coordinator for any reason.


### G. Additional Incidents (May 17, 2024; Post Trial Pre Judgment)

142.     On 05/17/2024, Plaintiff requested Defendant Francis through her counsel to allow her to give small gifts to both children as May 17 was A.S.' birthday. It was also a trial date where all parties were present in court.  Defendant Francis rejected Plaintiff's gift to R.S. which was a small chain/necklace with a cross pendant despite having seen the receipt from

Kohl's. Defendant Francis had concerns with the cross pendant even though he himself is a Christian and has a history of wearing cross pendants himself. Further, Defendant Francis has a degree in Religious Studies and has worked as a staff member of Catholic Churches. Comparatively, Plaintiff does not have an education related to religious studies or work experience with religious organizations. Both minor children were raised in Christian faith.

143. On May 17, 2024, Judge Bruno accepted Defendant Francis's request to reject Plaintiff's gift for R.S and Judge Bruno added her own concerns on the cross-pendant gift and made comments on Plaintiff's Christian faith and comments on Christians. Judge Bruno also said that R.S. is 15 years old and should understand that she cannot get a gift on her brother's birthday. While saying this, Judge Bruno ignored the fact that both children did not get a gift from Plaintiff for Christmas in Dec 2023.

144. On 06/14/2024, Judge Bruno ordered that R.S.' Oversees citizen of India (OCI) card should be transferred from Plaintiff to Defendant Francis, contradicting a prior 2023 order that had already ordered Plaintiff to pass these materials to Defendant Barone. Subsequently, Defendant Francis filed a contempt petition against Plaintiff, even going so far as to request incarceration. After Plaintiff submitted a formal response rebutting the allegations and documenting her compliance with prior court orders, Defendant Francis withdrew his contempt petition on July 16, 2024. However, Defendant Francis and Defendant Barone did not get any consequence for these false allegations

145. On or around 06/14/2024, Judge Bruno entertained (without motion) allegations of non-payment to gatekeeper Pamela Rak, adopted the allegations without evidence, and made derogatory remarks about Plaintiff while threatening serious consequences if Plaintiff

questioned payment. Judge Bruno stated, "*If our GAL tells me there's an issue, there's an issue,*" and "*But Mr. Farooqi, we do know because that's what Caryn is here for—to tell us. So we're talking out of both sides of our mouth.*", improperly deferring to Defendant Barone opinion as binding and deferring adjudication to the Defendant Barone.

146.    On or around 06/14/2024, Judge Bruno not only allowed    mischaracterization of a valid request from Plaintiff for confirmation of    message delivery to her children as a "demand," but also supported it by saying that Plaintiff is "not in a position to make demands,". Plaintiff paid $130 per week to Pamela Rak for the review and transmission of two short messages, one to R.S. and one to A.S. Additionally, she was charged $260 per hour for any meetings, involving Ms. Rak and the children's therapists or Defendant Barone. Ms. Rak forwarded the messages to the children's therapists, who were responsible for content review and were given the discretion by Judge Bruno to decide whether to give messages to children.  Judge Bruno's other statements included: "*Do more work, but I'm not going to pay you. That is not going to happen. She's not in a position to make demands. I'm sure you would say it was a request, not a demand. I'm familiar with Miss Francis's mode of operation and generally her requests sound like demands, but I don't want to get lost in the semantics weeds zone.*" Here, Judge referred to Plaintiff as Miss Francis.

147.    On or around 06/14/2024, Plaintiff's counsel attempted to clarify that the alleged non-payment to therapist Pamela Rak concerned a session that had occurred just the night before. In reality, no invoice had been submitted to Plaintiff by Ms. Rak at that time. Despite this, Judge Bruno proceeded to have a hearing saying "*There's no motion on file. GAL Barone has brought it up because it seems silly not to.*"

148. On or around 06/14/2024, Judge Bruno not only gave credit to the unsubstantiated claims but also threatened Plaintiff with remarks such as: *"This business about questioning the fees needs to stop."*, *"If your client is going to question paying for Miss Rak to do it, it's a real simple answer: it's not going to happen. If she's going to stop questioning this money, I don't think it's unreasonable."* and *"She's not in a position to demand anything"* and *"However, I don't want to hear that she's questioning the payment because we're going to have some serious issues if she is."*

149. On or around 06/14/2024, Judge admitted about her order of separating children from Plaintiff as unreasonable by saying *"There is an order of protection in place. There is a fairly draconian order from November, very unusual, restricting basically every contact with your client and the therapist and the schools for a very valid reason."*

150. On or around 06/14/2024, Judge Bruno admitted to a new theory of her unjustly ordering forced treatment *"So I felt that it was important to stop the misinformation and to stop the manipulation until your client got therapy, which she's still refusing to do. I wasn't going to let her talk to the therapist.".* Judge Bruno's reason for forced treatment on Plaintiff had changed multiple times as recorded in court records.

151. On or around 07/08/2024, Judge Bruno refused Plaintiff's request for time to obtain new counsel, stating there was "nothing for an attorney to do," and announced judgment would be entered despite Plaintiff being unrepresented.

152. On or around 07/08/2024, Plaintiff proceeded as *pro se*

**H. Post Judgment Proceedings (Aug–Dec 2024; Jan–Mar 2025)**

153.    On or around 08/21/2024, Judge Bruno overruled Plaintiff's account of facts by reference to personal recollection and threatened to mute Plaintiff while she attempted to correct inaccuracies. Judge Bruno's statements included *"I don't want to mute you, but I will…"*

154.    In Aug 2024, Judge threatened jail time for Plaintiff preemptively on Defendant Francis's Rule to Show Cause before any hearing was even scheduled. In the hearing, it was proven that Plaintiff was not in contempt.

155.    On or around 08/30/2024, Judge Bruno denied Plaintiff remote access for an emergency motion, despite repeatedly allowing Defendant Francis remote emergency appearances.

156.    On or around 08/30/2024, after Judge Bruno indicated the session was over, Judge Bruno recommended opposing counsel to add adverse language (against Plaintiff) in the order after Plaintiff left for a personal emergency, raising ex parte concerns.

157.    On or around 08/30/2024, Judge Bruno *sua sponte* reprimanded Plaintiff for referring to Michone Riewer by her first name and instructed her to use "Ms. Riewer," despite no such request from Ms. Riewer herself. Ms. Riewer has repeatedly referred to Plaintiff by her first name without objection from anyone.

158.    On or around 09/18/2024, Judge Bruno refused to hear Plaintiff's emergency motion and continued it generally, admonishing Plaintiff for attempting to argue urgency and remarking, *"You do not run courtroom,"* while implying frustration at Plaintiff's appellate efforts.

159.    On or around 10/04/2024, Judge Bruno set Plaintiff's motion to compel messaging service to be heard on 11/04/2024 and declared that Plaintiff's motion was not an

emergency. Plaintiff, appearing pro se, was repeatedly muted, interrupted, and denied the opportunity to fully voice objections, including during discussion of her own Protected Health Information (PHI) and was at the receiving end of unnecessary comments from Judge Bruno.

160.    On or around 10/04/2024, Judge Bruno imposed a broad HIPAA protective order permitting opposing counsel's law firm staff access to Plaintiff's PHI over Plaintiff's objections and permitted opposing counsel uninterrupted speaking time during the hearing.

161.    On or around 10/21/2024, Judge Bruno excused opposing counsel from responding to a motion and stated delays in a withholding order were Judge Bruno's fault, while disregarding Plaintiff's claim of opposing counsel's contribution to delay.

162.    On or around 10/25/2024, Judge Bruno set the hearing date for Plaintiff's motion to send R.S. a birthday gift as 11/04/2024. She further excused delays in processing wage withholding from opposing party by taking personal responsibility.

163.    On 11/04/2024, Judge Bruno denied Plaintiff's motion to compel messaging service for lack of jurisdiction, repeatedly muted and interrupted the *pro se* Plaintiff while allowing opposing counsel uninterrupted speaking time. Judge Bruno refused to consider her own orders from the case and went along with false narratives such as TK's fees matter was settled previously in trial. Judge agreed with Ms. Riewer that there is no clarity on whose insurance the children were, even though Judge Bruno herself had previously issued a medical order (forcing Plaintiff's medical insurance plan to share information with Defendant Francis).  Opposing counsel was permitted to make inflammatory accusations of harassment against Plaintiff without presenting proof or facing objection, while Plaintiff was

denied opportunities to rebut.

164.    On November 4, 2024, Judge denied Plaintiff's motion to compel messaging service halted by the party appointed by Judge Bruno. Judge Bruno claimed lack of jurisdiction as the reason for denial. Judge Bruno granted Plaintiff's motion to send R.S. a gift with the following instruction *"Plaintiff may send a birthday gift to the party's daughter, R.S., in the form of an unwrapped Amazon gift card. Plaintiff shall not write anything on the gift card. Plaintiff shall have said gift card delivered to Defendant Francis's residence via USPS or any other delivery service. Plaintiff may send a birthday card to R.S. through Ms. Pemala Rak and is subject to the approval of Ms. Pamela Rak".* Ironically, the service through Ms. Rak was dysfunctional at this time and Judge Bruno had denied taking any action on the halted messaging service.

165.    On Nov 4, 2024, Judge Bruno denied Plaintiff's Amended Petition for Rule to Show Cause for Debt Payment regarding the July 16, 2024 Order saying that it does not have jurisdiction to enforce this portion of the Judgment, based on the pending appeal. Instead of continuing the petition to a later date, Judge Bruno heard the petition and then denied. Judge Bruno had assigned Defendant Francis's motions to be heard on Jan 10, 2025 anticipating the case to come out of appeal.

166.    On Nov 4, 2024, Defendant Francis through his counsel, withdrew his Emergency Motion for Injunctive Relief filed on November 1, 2024. In this motion, Defendant Francis had requested a temporary restraining order and permanent injunction to restrict Plaintiff, from filing any future pleadings in the case without prior court approval.  Defendant Francis also requested restricting the number of pages she can file in future pleadings and to order

Plaintiff to pay Francis's legal fees related to this motion. Plaintiff responded to Defendant Francis's motion and showed that it was Defendant Francis who consistently filed emergency motions which were heard in violation of due process and his motions outnumbered Plaintiff's motion by a large number. Later, Defendant Francis withdrew his motion seeking to restrict Plaintiff's future filings and pages and to recover fees.

167. On or around 12/04/2024, Judge Bruno silenced Plaintiff multiple times, dismissed her due process concerns without discussion, and ignored personal accusations from opposing counsel while repeatedly muting Plaintiff, including during key procedural moments. Judge Bruno ignored and stopped the rebuttal of a personal accusation made by opposing counsel.

168. On 12/04/2024, without prior notice or motion or any disclosure to Plaintiff, Judge Bruno unilaterally brought in Pamela Rak and let her be dismissed from her court-appointed role. After Pamela was dismissed, Judge claimed that she lacked jurisdiction to appoint a replacement for the messaging therapist that she just dismissed. Judge further mischaracterized Plaintiff's testimony in ways that suggested fabricated consent, creating a false record and undermining Plaintiff's legal position. See FedComplaint – Appendix N where Pamela Rak informs Plaintiff that she attended court session because Court invited her.

169. On 12/11/2024, Plaintiff sought emergency relief to correct the error from 12/4/2024, where Judge Bruno asserted jurisdiction to dismiss the messaging therapist but simultaneously claimed she lacked jurisdiction to appoint a new messaging therapist. Judge Bruno then appointed Defendant Francis as the decision maker to select a new messaging

therapist.

170.	Defendant Francis failed to meet court-imposed deadline to identify and appoint a new messaging therapist. He and his counsel attempted to impose highly paid medical professionals working closely with the family court system—professionals whose services were financially burdensome and inaccessible to Plaintiff. When Plaintiff proposed qualified, reasonable, and more affordable therapists, Defendant Francis refused to cooperate, deliberately obstructing the process. As a result, Plaintiff was forced to file another enforcement motion simply to exercise her limited right to send one message, a right already encumbered by multiple constraints and subject to the discretion of various therapists. Before the motion could be heard, Defendant Francis ultimately agreed to proceed with the most reasonable therapist proposed, but even then, the execution of that agreement was delayed by several days.

171.	On January 10, 2025, Judge Bruno heard Defendant Francis's motion seeking attorney's fees from *pro se* Plaintiff. Defendant Francis demanded that his counsel, Ms. Riewer, be awarded $50,000 in attorney's fees for anticipated future work, and additionally claimed $21,993.36 in costs allegedly incurred for work performed after the final judgment entered on July 16, 2024. He demanded that these fees be awarded without an evidentiary hearing and based on a motion filed on September 30, 2024. During this hearing, Judge Bruno repeatedly interrupted Plaintiff, preventing her from presenting arguments or fully explaining her objections using statements such as *"We are not going to play this the way you want to".* Judge Bruno further displayed open bias by accepting hearsay evidence, including a letter from Dr. Joseph, without requiring testimony, authentication, or the

opportunity for cross-examination.  Furthermore, Judge Bruno accepted without scrutiny a $63,000 invoice submitted by attorney Ronald Bell for only 2.5 months of representation, despite evidence that Bell failed to perform basic legal duties for Plaintiff—including disclosing witnesses, executing subpoena requests before the trial deadline, and withdrawing motions without Plaintiff's knowledge or consent.

172.    On March 17, 2025, Judge Bruno imposed *sua sponte* pre-filing restrictions, requiring prior leave to file any motion. In doing so, it improperly conflated enforcement actions (petitions for rule to show cause) with standard procedural motions, refusing to acknowledge the material distinction.  Plaintiff also had to re-file the debt enforcement motion which Judge Bruno had previously denied instead of continuing the hearing.

173.    On March 17, 2025, Judge Bruno declined to hold Defendant Francis in contempt for documented violations of multiple court orders or apply other sanctions. Judge Bruno merely admonished Defendant Francis to comply in the future, reasoning that a past violation could not be purged.

174.    Despite evidence that Defendant Francis failed to inform Plaintiff of out-of-state travel with the children, Judge Bruno ruled the original judgment's notice requirement applied only to vacations and not to all travel. Judge Bruno then modified the judgment, ordering that any future overnight out-of-state travel required advance notice to Plaintiff.

175.    Final judgement (16 July, 2024 order) required Defendant Francis to initiate payment arrangements for Plaintiff's debts (IRS and two credit cards) within two weeks. The March 19, 2025, order states that the original judgment contains no deadline for payment and did not hold Defendant Francis in contempt of court order even though no payment

arrangements were made by Defendant Francis. July 16, 2024 order says *"Sebastin Francis shall contact the IRS and applicable credit card companies within two weeks of the entry of this order to make arrangements to pay his stated share of the debt."*

176. March 19, 2025 order also contains clerical inaccuracies by listing previously adjudicated Plaintiff's motions in both the docket of matters presented that day and the schedule for future hearings, despite these matters having been resolved in prior proceedings.

177. On March 17, 2025, Judge Bruno denied Plaintiff access to Defendant Finn's report and subpoenaed materials even as a *pro se*. In the hearing, Plaintiff objected when opposing counsel made factually inaccurate statements. Plaintiff noted that the statements lacked foundation and were unsupported by evidence. Judge Bruno overruled the objection, stating it was not an evidentiary hearing. Judge Bruno did not require opposing counsel to correct or show evidence of the claims, nor clarify that unsupported assertions would not be treated as fact. In addition, the judge posed a leading question to Defendant Francis's counsel *"Are you not objecting to her getting a copy of the... report?"*

178. On March 17, 2025, when Judge Bruno introduced new legal grounds after both parties had finished their arguments, Plaintiff objected that these arguments were not raised by Defendant Francis's counsel. Judge Bruno overruled the objection and denied Plaintiff an opportunity to respond to the new argument presented by Judge Bruno.

179. On March 17, 2025, Judge Bruno suppressed Plaintiff's speech by repeatedly interrupting, muting, or threatening to mute her when raising objections or asserting constitutional rights.

180. In or around 2024, Defendant Finn refused to give detailed invoices when Plaintiff

requested detailed invoices.

**Current state on Plaintiff's messages to minor children**

181.   Court-ordered messaging service was halted and delayed for several months by court-appointed professionals and Defendant Francis. Once communication was reinstated, her messages to A.S. were again obstructed—this time for two weeks and Plaintiff was pressured to lie to A.S. that she could not write to him because of work matters. Plaintiff was informed that A.S. was told by Defendant Francis and his therapist that his mother was busy with work. When Plaintiff objected to this misrepresentation (and hurting A.S.) and raised the issue with Judge Bruno, the parties involved eventually conceded and ceased pressuring Plaintiff to lie to A.S.

182.   Despite these corrections, Plaintiff has continued to face excessive and unconstitutional restrictions on her communication with her children. For example: Plaintiff has been instructed that she may not mention extended family members in messages to R.S. or write about Charlie (Plaintiff's dog) to A.S. etc.

183.   Plaintiff anyways cannot say *"I miss you"* to her children as per Judge Bruno's order.

184.   These restrictions amount to a form of compelled silence and emotional censorship, violating both Plaintiff's First and Fourteenth Amendment rights and the children's right to maintain meaningful contact with their parent. These restrictions support and facilitate alienation of children from not only Plaintiff but also from Plaintiff's relatives.

**Appellate and IL Supreme Courts**

185.    IL Appellate Court refused to correct the constitutional violations from final judgment, OP and orders arising from March 17, 2025, hearings.

186.    Defendant Francis escalated his pattern of bad-faith litigation by asking the appellate court to sanction Plaintiff simply for exercising her constitutional right to file a Writ of Certiorari to the United States Supreme Court (Case No. 24-1226). His request was not grounded in any legal merit and instead reflected a broader effort to intimidate and punish Plaintiff for pursuing appellate and constitutional remedies. His appellate briefs were laced with false allegations and factual distortions, which the appellate court did not sanction.

187.    IL Supreme Court declined the petition for leave to appeal


**COMPLAINT COUNTS**

**Count 1 — Procedural Due Process (Fourteenth Amendment) (42 U.S.C. § 1983)**

188.    Defendants: Defendant Francis; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

189.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

190.    Defendants, acting under color of state law, engaged in a coordinated pattern of conduct that deprived her of her fundamental liberty interest in the care and custody of her children without the procedural protections guaranteed by the Fourteenth Amendment. Defendants jointly engaged in abrupt same-day conversion from pre-trial to emergency hearing, lack of adequate notice, reliance on a sealed evaluator report, exclusion of treating providers and medical records, retroactive evidentiary cutoffs, and use of Defendant Barone

as gatekeeper blocking access to materials. Judge Bruno entered pre-drafted orders and repeatedly ruled on numerous emergency motions filed by Defendant Francis without affording Plaintiff adequate notice or a meaningful opportunity to respond. Defendants permeated the case with perjury and false allegations while Judge barred Plaintiff from presenting critical exculpatory, inculpatory, rebuttal and impeachment evidence, including testimony from treating medical providers and medical records, while simultaneously blocking evidence against Defendant Francis. The court also imposed retroactive deadlines to exclude Plaintiff's timely submissions and allowed Defendant Barone to serve as an evidentiary gatekeeper, controlling access to key documents and communications in violation of basic fairness. These actions constitute a gross denial of due process, actionable under 42 U.S.C. § 1983.

191.  Plaintiff also alleges that Defendant Barone engaged in communications and conduct aimed at influencing, coercing, and dominating the children's treating professionals or treatment narratives to advocate outcomes.

192.  Judge Bruno also ignored Defendant Francis's harassing and intrusive conduct— including taking photographs of Plaintiff and her private property without consent—while simultaneously using that conduct as a pretext to impose restrictions on Plaintiff.

193.  Judge Bruno has directly threatened Plaintiff and met her inquiries with hostility, demonstrating a clear bias and further depriving her of a meaningful opportunity to be heard. Prior to the final trial, Judge Bruno engaged in prejudgment by threatening Plaintiff with forced treatment and announcing the likely outcome of the proceedings, thereby coercing Plaintiff and demonstrating a closed mind on the merits of the case

194.    The cumulative effect of these procedural deficiencies rendered the judicial process a mere sham, incapable of producing reliable results and which resulted in egregious violations of rights assured by the Constitution.

**Count 2 — Substantive Due Process (Familial Integrity) (Fourteenth Amendment) (42 U.S.C. § 1983)**

195.    Defendants: Defendant Francis; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

196.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

197.    Plaintiff asserts that Defendants, acting under color of state law, violated her fundamental right to familial integrity protected by the Fourteenth Amendment without any compelling state interest or lawful justification

198.    On November 17, 2023, Plaintiff's two children (then 15-year and 6-year) were removed from her custody during what was noticed as a pretrial hearing. The removal was based solely on a sealed report by Defendant Finn, which was never disclosed to Plaintiff or subject to cross-examination or medical confirmation or timely disclosure as per IL statues

199.    The removal and no-contact order were imposed without a full and fair evidentiary hearing. Plaintiff was never afforded a meaningful opportunity to confront her accusers, cross-examine Defendant Finn, or present witnesses and evidence in her defense before her children were seized with no parenting time for Plaintiff.

200.    Judge Bruno's decision was predetermined and not based on a neutral review of the

facts. Judge Bruno acknowledged on the record that she had drafted the approximately 11-page order effectuating the removal of the children before hearing all the evidence, demonstrating that the proceeding was a mere formality and the outcome was fixed.

201. At no time was Plaintiff adjudicated unfit, nor was any credible finding of abuse or neglect entered against her. Nevertheless, the court imposed a two-year no-contact order, eliminated all parenting time, and prohibited Plaintiff from accessing her children's medical or educational information.

202. The sealed report invoked Munchausen Syndrome by Proxy without medical evidence or forensic validity. Defendant Finn later testified the child had no falsified symptoms and admitted he was not qualified to diagnose the condition. Despite this, the court ordered Plaintiff into forced therapy with provider selected by Defendant Finn and conditioned likely contact with her children on completion of those sessions and further evaluation by Defendant Finn.

203. Plaintiff's daughter, R.S., mature minor who could express and write, repeatedly expressed hers and her little brother A.S.'s desire to return to Plaintiff and denied allegations of abuse against Plaintiff. Yet the court systematically silenced and misrepresented the children's expressed wishes. The court barred R.S. from testifying, ignored her written pleas, and credited Defendant Barone's contrary narratives over the child's own documented statement. Plaintiff is barred from accessing medical and educational records, leaving her unable to ascertain the true condition of her children.

204. Messages from Plaintiff to her children were restricted or blocked by gatekeepers assigned by the court, with absurd limitations such as prohibiting Plaintiff from saying *"I*

*miss you."* These limitations lacked any clinical or legal basis and served only to inflict emotional harm to minor children and Plaintiff.

205. The court's actions were not merely negligent but deliberate. By barring all exculpatory, inculpatory, rebuttal, and impeachment evidence, Judge Bruno ensured that no evidence challenging Defendant Francis's fitness or supporting Plaintiff could be considered, making the outcome a foregone conclusion.

206. Defendants' actions were arbitrary and lacked any relationship to a legitimate state interest. They exhibited zero concern for, and failed to act upon, documented litigation abuse and harassment by Defendant Francis even during R.S.'s critical medical crises. Simultaneously, they pathologized Plaintiff's healthy, normal parenting behaviors, such as implementing a reward system for her children. This inversion of concern—punishing protective parenting while excusing harmful conduct—shocks the conscience and underscores the arbitrariness of the state's intervention.

207. No emergency, threat, or imminent harm existed to justify such extreme measures. The state's interference was arbitrary, punitive, and grossly disproportionate to any legitimate governmental interest. The Defendants' actions shocked the conscience and violated Plaintiff's substantive due process rights to familial association.

208. The state actor's intervention directly harmed the children, proving it was not in their best interest and the state's actions does not align with the state's definition of best interests of children. After removal from Plaintiff's care, R.S. was hospitalized, placed on higher medications, and required police intervention at Defendant Francis's residence. Judge Bruno ignored this documented deterioration, barred credible records/witnesses on

children and instead declared the children "well-adjusted" with Defendant Francis without any credible evidence to support the "well-adjusted" claim.

209. Judge Bruno's bias and the punitive nature of her actions were further demonstrated before the final trial, when Judge Bruno threatened Plaintiff with forced treatment and pre-judged the case, announcing that unless "something dramatic comes out at trial," Plaintiff would have no option but the court-ordered therapist, coercing her to abandon her defense to go to trials.

210. The court ordered this compelled treatment in direct contradiction of medical evidence. Plaintiff's own treating psychologist submitted a letter to the court, stating that Plaintiff did not have Munchausen Syndrome by Proxy and that the court-ordered treatment would be harmful. The court ignored this medical opinion from a treating professional in favor of the unsupported allegations of a non-treating evaluator.

211. These arbitrary restrictions extended to prohibiting Plaintiff from mentioning her extended family or the family pet in messages, deliberately severing the children's connections to their larger familial support system and compounding the emotional isolation and alienation.

212. Such conduct constitutes a violation of Plaintiff's constitutional rights and is actionable under 42 U.S.C. § 1983.


**Count 3 — First Amendment: Parent–Child Speech and Intimate Association (42 U.S.C. § 1983)**

213. Defendants: Defendant Francis; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

214.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

215.    Plaintiff alleges that Defendants, acting under color of state law, violated her First Amendment rights by unconstitutionally restricting her ability to communicate with her children and to maintain an intimate familial relationship. Following the November 17, 2023 removal order, Plaintiff was subjected to no-contact order without evidence of abuse or imminent harm, and her speech to her children was censored by court-appointed third parties and private parties hired by Defendant Francis. She was prohibited from sending meaningful messages such as "I miss you," and repeatedly barred from mentioning the family pet, Charlie, or her extended family to her children and asked to modify simple words with no rationale (example - change from addressing R.S. as brave to strong).  Critically, Plaintiff was explicitly threatened that she had only one choice: to change her messages to the content and wording dictated by the Defendants-appointed gatekeepers, or the messages would be withheld from her children entirely. This constitutes state-compelled speech in violation of the First Amendment.

216.    All communications were subject to pre-screening and approval by individuals chosen by Judge Bruno or Defendant Finn or Defendant Francis, including children's therapists and a messaging gatekeeper. These restrictions were imposed without a compelling state interest, were not narrowly tailored, and served no legitimate purpose beyond isolating and alienating minor children from Plaintiff. These gatekeepers and therapists, whether chosen directly by the court or unilaterally appointed by Defendant Francis and subsequently ratified by the court's enforcement, were all acting as agents of the state for the purpose of

enforcing the judicial order that censored Plaintiff's speech. The combination of court-appointed and privately selected actors functioning under state authority created a unified system of censorship. This state-imposed censorship and severance of expressive, emotional communication between a parent and child violates the First Amendment rights to freedom of speech and intimate association and is actionable under 42 U.S.C. § 1983.

**Count 4 — Free Exercise / Religious Discrimination (First & Fourteenth Amendments) (42 U.S.C. § 1983)**

217.    Defendants: Defendant Francis and declaratory, prospective and other possible relief against Judge Bruno

218.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

219.    Plaintiff alleges that Defendants, under color of state law, infringed her First and Fourteenth Amendment rights by discriminating against her religious expression and practices in parenting. Defendants restricted Plaintiff from sending her child R.S. a simple cross pendant as a gift, and the judge made disparaging remarks about Plaintiff's Christian faith. Judge Bruno further justified the denial by inventing an arbitrary rule, stating that R.S., a 15-year-old, needs to understand that she cannot get a gift on her brother's birthday, while ignoring the context that both children had been deprived of gifts from their mother for months and for last Christmas. These actions were not supported by any legitimate state interest and were selectively enforced in a manner that burdened Plaintiff's free exercise of religion and demonstrated viewpoint discrimination. Such conduct constitutes a violation of

Plaintiff's constitutional rights and is actionable under 42 U.S.C. § 1983.

**Count 5 — Equal Protection: Sex Discrimination (Fourteenth Amendment) (42 U.S.C. § 1983)**

220.    Defendants: Defendant Francis; Defendant DCFS Jones; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

221.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

222.    Plaintiff alleges that Defendants, acting under color of state law, violated her rights under the Equal Protection Clause of the Fourteenth Amendment by engaging in sex-based discrimination against her as a mother and female litigant in family court proceedings. Throughout the litigation, Plaintiff was held to a harsher standard than the father, Defendant Francis. Defendant Barone, Defendant Finn and Judge Bruno consistently credited and advanced unverified allegations from Defendant Francis while excluding or disregarding Plaintiff's evidence, even when supported by treating professionals. Plaintiff's caregiving and protective conduct was pathologized or labeled manipulative, while similar or more egregious conduct by Defendant Francis—such as unauthorized surveillance, physical hurt and trauma link to R.S., out-of-state travel with the children, and repeated emergency filings to remove Plaintiff's parenting or decisioning making rights, was excused and ignored. Defendants imposed punitive financial measures on Plaintiff, including disproportionate attorney's fees and pre-filing restrictions. Father was given procedural leniency and superiority including excusing him from contempt of court orders when evidence showed that he was in contempt while Plaintiff was subjected to incarceration

threats without hearing and to be thrown out of court room for speaking and was repeatedly muted in countless court sessions. Defendant Finn and Judge Bruno accused Plaintiff of MSBP while ignoring and barring exculpatory evidence and by barring evidence against Defendant Francis. Defendants accused Plaintiff of alienation based on proven perjured testimonies and by suppressing and ignoring evidence of alienation from Defendant Francis, including direct evidence (letter) from R.S. that clearly showed alienation and threats to children.

223.    Defendants engaged in unconstitutional sex discrimination by applying gender-based stereotypes that:

(a) Pathologized Plaintiff's normal parenting as "overbearing" or "manipulative" while excusing Defendant Francis's aggressive/unsafe conduct to R.S. – conduct that multiple professionals linked to R.S.'s trauma. For example: they ignored that Defendant Francis forced R.S. to hit herself and he threw garbage bag at her, yet accused Plaintiff of "bribing" A.S. by buying him age-appropriate toys, while raising no such concerns about Defendant Francis purchasing toys or expensive gifts for the children.

(b) Credited Defendant Francis's allegations without proof while systematically ignoring and barring proof from Plaintiff.

(c) Applied the "Munchausen by Proxy" diagnosis without medical evidence, a theory predominantly applied to mothers to manipulate child custody outcomes.

(d) Ignored court order violations by the father while fabricating or exaggerating alleged violations by the mother.

(e) Excused and ignored abusive conduct by the father towards Plaintiff and the children

while fabricating abuse allegations against Plaintiff.

(f) Disproportionately penalized Plaintiff for legal advocacy that would be viewed as appropriate and protective if undertaken by a father.

(g) Denying Plaintiff temporary child support while granting Defendant Francis retroactive child support.

(h) Applied a grossly disproportionate standard of scrutiny to parenting behaviors. Defendants obsessively pathologized Plaintiff's normal and healthy parenting (such as using a reward system) as "manipulative" or "bribery," while simultaneously ignoring and excusing Defendant Francis' demonstrably harmful conduct, including his extensive litigation abuse and harassment during the children's medical crises. This double standard also exemplified when Judge Bruno excused Defendant Francis' harassing and intrusive conduct, including taking photographs of Plaintiff and her private property without consent, while pathologizing her reasonable security measure as problematic while ignoring the father's invasive actions

224.    These disparities reflect institutional gender bias and discriminatory treatment, resulting in unequal treatment based on Plaintiff's sex. This conduct violated Plaintiff's constitutional right to equal protection and is actionable under 42. U.S.C. § 1983.  Plaintiff was intentionally treated differently from similarly situated Defendant Francis without any rational basis, as demonstrated by asymmetric application of procedural rules and deadlines, disparate credibility determinations despite comparable evidence, punitive financial measures imposed only on Plaintiff and different standards applied to similar parenting behaviors.

**Count 6 — Denial of Access to Courts / Retaliation (First & Fourteenth Amendments) (42 U.S.C. § 1983)**

225.    Defendants: Defendant Francis; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

226.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

227.    First Amendment secures the right to petition the government for a redress of grievances. The Fourteenth Amendment secures the right to due process of law and equal protection. A fundamental component of these rights is meaningful access to the courts.

228.    Defendant Judge Bruno, with the active assistance of other defendants, erected insurmountable barriers that prevented Plaintiff from presenting a complete and meaningful defense in the underlying state court proceedings. These actions included:

a. Exclusion of Critical Witnesses: Barring Plaintiff from calling at least 18 of her properly disclosed witnesses, including all of R.S.'s treating medical professionals who could have refuted the allegations of MSBP and corroborated Plaintiff's appropriate care

b. Exclusion of Material Evidence: Suppressing R.S.'s medical records, which contained exculpatory evidence for Plaintiff and inculpatory evidence regarding Defendant Francis's impact on R.S.'s mental health

c. Silencing the Key Witness: Barring R.S., the central figure in the case and a mature minor, from testifying or being interviewed by the court, thereby excluding the most relevant evidence regarding her own well-being and her brother and her wishes. She has also been

threatened by Defendant Barone and Defendant Francis that her mother, Plaintiff will go to jail if she wrote to Plaintiff. R.S.'s access to outside world and help is also controlled by Defendant Francis through controls on her devices and the unjust OP put on Plaintiff.

d. Precluding Rebuttal and Impeachment: Preventing Plaintiff from recalling herself as a witness, presenting rebuttal experts, and cross-examining Defendant Finn using a prior custody report to show his bias, thereby crippling her ability to challenge the State's case

e. Retroactive Evidentiary Cutoffs: Imposing a retroactive evidentiary cutoff to exclude a critical email from Plaintiff to Defendant Finn, which responsibly addressed the sexual abuse allegation and demonstrated her logical and non-inflammatory approach

f. Withholding the Central Accusation: Sealing from Plaintiff the primary document— Defendant Finn's report—used to justify the seizure of her children and the imposition of order of protection, rendering her unable to confront the "evidence" against her

229.    Defendants engaged in a pattern of punitive and adverse actions designed to, and having the effect of, punishing Plaintiff for exercising her right to access the courts, defend herself, and advocate for her minor children. These retaliatory acts include:

a. Punitive Financial Sanctions: Ordering Plaintiff to pay $59,000 of Defendant Francis's attorney's fees without a legal basis and despite the fact that Defendant Francis is the one who was filing non-stop motions with false allegations and dragged the litigation. Denying Plaintiff temporary child support while granting Defendant Francis retroactive child support.

b. Retaliatory Seizure of Children: Converting a pretrial conference into an emergency hearing and ordering the immediate seizure of Plaintiff's children without adequate notice

c. Imposition of Pre-Filing Restrictions: Sua sponte imposing a pre-filing review requirement

on Plaintiff, restricting her future access to the court, as a direct response to her filing of

motions to expose the falsehoods in the case and defend children and her rights

d. Judicial Hostility and Threats: Subjecting Plaintiff to verbal hostility, repeated

interruptions, threats of removal from courtroom, and mocking comparisons (e.g., "the

little boy who cried wolf") when she attempted to speak to correct the record

e. Punitive and Coerced Treatment: Ordering Plaintiff to undergo 26 sessions of court-

mandated therapy as a precondition to any contact with her children, a punitive measure

imposed in response to her defense against the unfounded MSBP allegations

230.     These acts—cumulatively and deliberately—constitute unlawful denial of court access

and retaliation for protected activity, in violation of the First and Fourteenth Amendments

and actionable under 42 U.S.C. § 1983.


**Count 7 — ADA Title II and Section 504 (Access-to-Courts; Associational Discrimination)**

231.     Defendants: Defendant Francis; and prospective, declaratory and other possible relief

against Judge Bruno, Defendant Barone and Defendant Finn

232.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set

forth herein.

233.     Title II prohibits public entities, including state court systems and their agents, from

discriminating against individuals with disabilities. The actions of Judge Bruno, Defendant

Barone, and Defendant Finn, collectively denied R.S. equal access to the court's programs

and services and resulted in her unlawful segregation from her primary support system.

234. Judge Bruno systematically silenced R.S. This includes refusing to conduct an in-camera interview, barring her from testifying at trial, and dismissing her written communication. Judge Bruno further violated her rights by ordering the release of her protected health information without seeking her input, despite her being a mature minor with expressed preferences.

235. Judge Bruno issued orders that effectively segregated R.S. from her mother, who was documented as her primary emotional support system. This removal was based not on credible evidence of harm but on stereotypes and an unsupported theory (MSBP) that pathologized both R.S.'s disability and her mother's advocacy and healthy parenting. Judge Bruno and its agents explicitly acknowledged that removing R.S. from her mother would cause clinical deterioration, yet proceeded with the removal, leading directly to R.S.'s immediate hospitalization and escalation of her condition.

236. Defendants actively interfered with R.S.'s medical treatment. Defendant Barone advocated removal of therapist who stood up for R.S., dictated that R.S. remain in a specific eating disorder program against the advice of her long-term doctors, and disseminated Defendant Finn's biased report to treatment providers to deliberately shift her diagnosis away from trauma. Furthermore, Defendant Barone influenced medical professionals to disbelieve R.S.'s accounts and control R.S.'s treatment.

237. Defendants' actions were motivated by a discriminatory intent to punish Plaintiff for her association with R.S. and her advocacy for R.S.'s proper medical and therapeutic care. This includes opposing Defendant Francis's and Defendant Barone's attempts to place R.S. in inappropriate schools and treatments

238. Defendants, acting under color of state law, took extreme and unprecedented actions to sever the relationship between Plaintiff and her daughter:

- Defendant Finn authored a report falsely accusing Plaintiff of MSBP, pathologizing her protected association and advocacy for R.S.

- Defendant Bruno, relying on this report, ordered the seizure of Plaintiff's children from their school and imposed a no-contact order

- Defendant Barone directly alienated R.S. from Plaintiff by telling R.S. that Plaintiff had abused her, a direct attack on their relationship

239. Defendant Bruno imposed a series of punitive orders specifically targeting Plaintiff because of her association with R.S.:

- Ordering Plaintiff to undergo forced psychological treatment as a condition of any contact with her children, despite the absence of a valid clinical diagnosis

- Enforcing draconian communication restrictions, including censoring Plaintiff's messages and prohibiting her from saying "I miss you" to her own children

- Appointing a messaging gatekeeper to monitor and block Plaintiff's communication with her minor children, thereby denying her the benefits of a parental relationship

- Excluded Plaintiff from participation in R.S.'s treatment planning and educational decisions by barring all contact with medical and school professionals.

- Reframing Plaintiff appropriate advocacy and healthy parenting as pathological behavior, because of her close association and diligent care for her daughter.

- Using the false MSBP label as a pretext to restrict and ultimately terminate her involvement in R.S.'s care.

- Excluding Plaintiff from medical decision-making for R.S.

240. In summary, the court system, through its officials and appointees, failed to accommodate R.S.'s disability, unlawfully segregated her from her support system based on that disability, and interfered with her medical care. The totality of these actions represents a severe and continuous pattern of discrimination against R.S. in violation of the ADA. The discriminatory and retaliatory actions of the Defendants were undertaken because of Plaintiff's known association with R.S.

**Count 8 — Unlawful Disclosure/Handling of PHI and Mental Health Records**

**(Declaratory/Equitable Relief)**

241. Defendants: Defendant Francis; Defendant DCFS Jones; and declaratory, prospective and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

242. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

243. Plaintiff alleges that Defendants unlawfully disclosed and mishandled her child's protected health information (PHI) and mental health records in violation of federal and state confidentiality laws, including HIPAA and the Illinois Mental Health and Developmental Disabilities Confidentiality Act (MHDDCA).

244. In September 2022, Judge Bruno ordered release of R.S.'s PHI without considering her confidentiality rights as a mature minor or seeking her input, despite her expressed preferences.

245.  Defendant Barone viewed R.S.'s Child Advocacy Center (CAC) forensic interview without a valid court order, months before judicial authorization was granted. She was allowed by Defendant DCFS Jones to view or be part of the CAC interview without a valid court order, gaining unauthorized access to the most sensitive aspects of the child abuse investigation.

246.  Most egregiously, on November 21, 2023, Defendants disseminated the sealed custody evaluator report to R.S.'s treatment providers. This dissemination was explicitly requested by Defendant Francis's counsel, who stated on the record that treaters had asked for the report because they saw Defendant Francis as "the perpetrator" and needed the report to "change the story" and stop treating R.S. for sexual abuse. Judge Bruno granted this request over Plaintiff's objection, thereby authorizing the use of sealed report to deliberately reframe the child's diagnosis and course of treatment.

247.  Defendant Finn's report includes an alleged diagnosis (MSBP) of Plaintiff, yet the report remains sealed from Plaintiff while being disseminated to the children's treatment providers, including Dr. Chinni and possibly additional recipients unknown to Plaintiff. Defendant Barone circulated this report without providing notice to Plaintiff and without establishing any court record documenting who received it.

248.  As a direct and proximate result of these unlawful disclosures and the improper handling of PHI, constitutional right to informational privacy was grossly violated, and the children's therapeutic relationships and treatment plans were severely disrupted and manipulated by Defendants.

**Count 9 — § 1983 Conspiracy / Joint Action to Deprive Rights**

249. Defendants: Defendant Francis; Defendant DCFS Jones; Dr. Chinni; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

250. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

251. Defendants, acting under color of state law, reached a meeting of the minds and formed an agreement to deprive Plaintiff of her fundamental constitutional rights to due process, familial integrity, and equal protection. This agreement is evidenced by a coordinated pattern of conduct, including but not limited to:

- The pre-hearing coordination between Defendant Francis and Defendant Finn, demonstrated by Defendant Francis's Pretrial Memorandum mirroring the themes and specific recommendations of Defendant Finn's then-sealed and undisclosed custody evaluation weeks before its release.

- Defendant Barone's premature investigation into removing R.S. from Plaintiff's care, evidenced by her inquiries to R.S.'s medical professionals about the consequences of such separation months before the November 2023 seizure.

- The ex parte communication between Defendant Finn and Defendant Francis, wherein Defendant Finn forwarded Plaintiff's confidential materials to Defendant Francis for review and response without affording Plaintiff the same opportunity. This communication also shows Defendant Francis giving instructions to Defendant Finn on what to include in the report

- The improper, pre-authorization access to the Child Advocacy Center (CAC) forensic interview by Defendant Barone in concert with Defendant DCFS Jones, months before any court order permitted such access

- The explicit judicial facilitation of the conspiracy by Judge Bruno, who, on the record, suggested to Defendant Francis's counsel how to file simultaneous motions to effectuate the removal of the children, thereby integrating her judicial authority into the conspiratorial plan.

- The functional alliance between Defendant Finn and Dr. Chinni, wherein Defendant Finn, who is not an MSBP expert, mandated Plaintiff undergo treatment with a specific therapist (Dr. Chinni) to "assess and confirm" his own unsupported allegation, creating a self-reinforcing loop to legitimize the false narrative. This arrangement, where the diagnosing evaluator also selects the confirming treater, created a closed system designed to legitimize the false narrative without independent medical rigor.

- The systematic exclusion of rebuttal evidence, including barring Plaintiff's psychologist and the court's refusal to incorporate evidence from this psychologist's letter (admitted as trial evidence) which stated Plaintiff did not have MSBP and that the compelled treatment would be harmful.

- Judge Bruno's imposition of a retroactive evidentiary cutoff that excluded Plaintiff's timely submission of exculpatory evidence to Defendant Finn, ensuring the evaluator's report would align with the conspiratorial narrative.

- A pattern of one-sided procedural rulings by Judge Bruno that systematically disadvantaged Plaintiff while benefiting Defendant Francis, demonstrating alignment with the conspiratorial objectives.

- The process by which Plaintiff was deprived of her medical decision-making rights for R.S. in Dec 2022 was itself a violation of due process, engineered to prevent any correction of the initial error. In early 2023, Defendant Barone indicated she would recommend reinstating Plaintiff's medical decision-making, but she never did so. Instead, Judge Bruno repeatedly postponed hearings on Plaintiff's motion to reinstate those rights, ultimately postponing it indefinitely pending Defendant Finn's report. This created an unjust procedural loop: Judge Bruno did not wait for Defendant Finn's report to *remove* Plaintiff's rights in December 2022 but then used the *pending* report as a pretext to indefinitely delay restoring them. Defendant Finn then used the *fact* of Plaintiff's lack of decision-making authority, an authority Judge Bruno had wrongfully stripped, as a justification in his evaluation of why she should not have it restored.

- Judge Bruno enabled this tainted process by refusing for five months to compel Defendant Finn to comply with a subpoena for his underlying data, also allowing Defendant Finn to produce the accurate MMPI-2 results on the day of his final testimony at trial

- FedComplaint – Appendix E further shows extensive proof of Defendant Francis's egregious false allegations against Plaintiff and ex parte communications which reveal a functional alliance between the private and state actors. These

communications show Defendant Francis thanking his co-conspirators for their efforts; Defendant Barone guiding the manufacturing of an Order of Protection violation against Plaintiff; and Defendant Finn coordinating strategy with Defendant Francis's counsel. Critically, Defendant Finn and Defendant Barone's active participation in this scheme with Defendant Francis—despite their access to police and medical records and medical professionals that disproved his central fabrications about Plaintiff—demonstrates a meeting of the minds to willfully ignore objective evidence and advance a false narrative, thereby transitioning their roles from neutral state actors to knowing participants in the joint objective to deprive Plaintiff of her constitutional rights

- Defendant DCFS Jones' alignment with Defendant Barone's version of stories without independent verification of the information coming from Defendant Barone including allowing Defendant Barone to watch CAC video or be part of the CAC interview without a court order

252.   In addition, the Defendants committed the following acts:

(a) Defendant Finn produced a custody evaluation report accusing Plaintiff of Munchausen Syndrome by Proxy without a proper medical foundation, while omitting exculpatory evidence for Plaintiff and inculpatory evidence for Defendant Francis.

(b) Judge Bruno, relying on the sealed report, converted a noticed pretrial conference into an emergency merits hearing on November 17, 2023, and ordered the immediate seizure of Plaintiff's children without providing Plaintiff notice or a meaningful opportunity to be heard.

(c) Defendant Barone and Defendant Francis went to Plaintiff's daughter's school immediately after the seizure and told the 15-year-old child that her mother had abused her, an act intended to alienate the children and solidify the conspiracy's false narrative.

(d) Defendants systematically excluded all evidence that would disprove their false narrative. Judge Bruno barred Plaintiff's 18 medical professional witnesses, excluded medical records, prevented R.S. from testifying, excluded Plaintiff's psychologist, excluded rebuttal expert witness, denied time for discovery or continue trial. Judge Bruno denied to give adequate time for the rebuttal expert to finish his report while ignoring Defendant Finn's lack of compliance to subpoena for several months, and retroactively imposed deadlines to exclude Plaintiff's evidence.

(e) Defendant DCFS Jones selectively compiled his DCFS report, excluding evidence from medical professionals to support an "unfounded" finding that benefited Defendant Francis.

(f) Defendant Finn altered Plaintiff's MMPI-2 psychological test results and submitted the fraudulent data to the court.

(g) Prior to the final trial, Judge Bruno engaged in prejudgment by threatening Plaintiff with forced treatment and announcing the likely outcome of the proceedings if Plaintiff proceeded to a trial.

(h) Defendant Francis took photographs of Plaintiff and her private property without consent and used them in a court filing. Judge Bruno ignored this intrusion and used it as a pretext to impose further restrictions on Plaintiff

(i) Defendant Finn and Defendant Barone provided testimony and reports that systematically excluded and ignored R.S.'s true medical diagnoses and the plethora of

documented evidence against Defendant Francis, while knowingly presenting false accusations against Plaintiff.

(j) Judge Bruno refused to impose any legal consequence for Defendant Finn's forensic fraud and perjury, Defendant Barone's perjury, or Defendant Francis's perjury, litigation abuse, and parental alienation, thereby ratifying their misconduct.

(k) Judge Bruno adopted the perjured testimony and false accusations as the factual basis for her final judgment and repeatedly citing these false accusations to justify the severance of the parent-child relationship.

(l) Judge Bruno ordered Plaintiff to undergo treatment with Dr. Chinni, a therapist lacking specific expertise in MSBP and operating under an insulated, self-pay model that eliminates external scrutiny. This order enforced the self-validating loop established by Defendant Finn and furthered the deprivation of Plaintiff's rights under the guise of therapy.

(m) Defendant Francis, and others acting in concert with him, actively alienated the children from Plaintiff by telling them false and misleading information. This included telling A.S. that Plaintiff was "busy with work" when messaging service was stalled, when in fact the court-appointed messaging service was being obstructed by parties other than Plaintiff. Defendant Francis also told R.S. about the false "Munchausen by Proxy" diagnosis and informed the children that Plaintiff needed to "work on being a better mother," thereby poisoning the parent-child relationship and solidifying the conspiracy's false narrative. The success of this alienation is documented in a letter from R.S., which implies the child believed Plaintiff was not doing what was necessary to regain custody.

253. The object and result of the conspiracy was the deprivation of Plaintiff's constitutional rights.

**Count 10 — Fraud upon the court**

254. Defendants: Defendant Francis; Defendant DCFS Jones; Dr. Chinni; and prospective, declaratory and other possible relief against Judge Bruno, Defendant Barone and Defendant Finn

255. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

256. This Court possesses the inherent equitable power to vacate a state court judgment that was procured by a "fraud upon the court." A fraud upon the court occurs where officers of the court participate in a scheme to subvert the judicial process through deliberate deception, such as relying on known perjury or forged evidence.

257. Nov 17, 2023, order, July 16, 2024, final order, Order of Protection and other orders in Lake County Case No. 20D 905 and Case No. 2023OP002596 are the product of a massive fraud upon the court, perpetrated by its own officers and their agents.

258. Defendant Judge Bruno: As the presiding judicial officer, she abandoned her neutral role and became a direct participant in fraud upon the court. Her actions demonstrate a deliberate pattern to predetermine the outcome by embracing a fraudulent narrative and systematically suppressing all evidence that would expose it. Her conduct includes

(i) Pre-Determination and Secret Collaboration:

- Converting a pre-trial into emergency hearings in violation of due process

- Issuing pre-drafted orders severing the parent-child relationship before hearing all evidence.

- Making on-record suggestions to Defendant Francis's counsel on how to file motions to effectuate the removal.

- Ignoring the critical evidence that Defendant Francis's pre-trial memorandum mirrored the themes of Defendant Finn's then-sealed report or ignoring the exhibit that showed extensive ex-parte communication between Defendant Francis

(ii) Active Reliance on and Concealment of Fraudulent Evidence:

- Basing the removal of the children on a sealed, fraudulent report, in direct violation of due process and Illinois statute governing the timely disclosure of custody evaluations.

- Refusing to sanction Defendant Finn for his forensic fraud in altering the MMPI-2 test results.

- Allowing into evidence an alleged letter from R.S.' therapist without verification and without requiring cross-examination.

(iii) Systematic Suppression of the Truth and Obstruction of Discovery:

- Categorically excluding all evidence (children's medical reports) and witnesses (18 children's professionals, Plaintiff's psychologist, R.S. herself, new rebuttal expert) that would expose the fraud and bring the truth

- Categorically excluding the testimony of the child, R.S., a mature minor who was the central figure in the case and who sought to testify.

- Ignoring and dismissing R.S.'s heartfelt written pleas to the court, which explicitly denied the allegations against Plaintiff and described her distress, instead baselessly speculating the letter was fabricated.

- Appointing Defendant Barone—a co-architect of the fraud—as the gatekeeper of evidence.

- Imposing retroactive evidentiary deadlines to exclude Plaintiff's key submissions.

- Refusing for months to compel Defendant Finn to comply with a valid subpoena, and refusing a trial continuance for Plaintiff's rebuttal expert, thereby sabotaging the defense's preparation.

- Removing Plaintiff's access to medical records, school records, medical professionals, school professionals, to DCFS and to children

(iv) Willful Blindness to Perjury and Procedural Abuse:

- Refusing to sanction known perjury from Defendant Francis, Defendant Barone and Defendant Finn and refusing to bar or sanction Defendant Finn in any way when he submitted falsified MMPI results on Plaintiff

- Arbitrarily discrediting the direct testimony of medical professional Safia Khan in favor of Defendant Barone's hearsay.

- Consistently hearing and granting Defendant Francis's emergency motions in violation of due process.

- Ignoring and failing to hold Defendant Francis in contempt for documented violations of court orders, while threatening Plaintiff with incarceration based on unsubstantiated claims.

- Weaponizing the Order of Protection process by entertaining and encouraging baseless allegations of violations, such as the frivolous attempt to link Plaintiff to an unknown individual's wellness check on R.S., despite a complete absence of evidence. The petition for OP contained countless false, incoherent, and purely imaginative allegations, rendering the filing a complete mockery of the judicial process and a clear abuse of legal proceedings.

- Ignoring and failing to hold Defendant Francis in contempt for documented violations of court orders, while simultaneously threatening and ruling against Plaintiff based on unsubstantiated claims and without evidence.

- Creating judgements based on false allegations and hearsays

- Retroactively declaring deadlines to remove key evidence from Plaintiff

- Creating financial orders that subject Plaintiff to financial distress and unjustly deprive her of the assets

(v) Discriminatory Application of Law and Creation of a Hostile Tribunal:

- Creating a two-tiered system of justice that credited perjured testimony while excluding truth.

- Subjecting Plaintiff to hyper-scrutiny over minor details while ignoring monumental evidence against Defendant Francis including hitting R.S, litigation abuse and false allegations on Plaintiff, children's distress after separation from Plaintiff, R.S' increased medications, out-of-travel of minor children with no permission from Plaintiff or valid court order), including the children's severe distress post-separation.

- Making punitive financial orders that furthered the aims of the conspiracy.

- Mocking and insulting Plaintiff in court, creating a hostile environment that intimidated her and undermined her ability to present her defense.

259. Defendant Barone: As a court-appointed officer, she committed a fraud on the court through several actions and are not limited to: (i) providing repeated, material perjured testimony; (ii) gaining and using unauthorized, ex parte access to sensitive evidence (the CAC video); and (iii) disseminating the fraudulent Finn report to third parties (iv) giving false information to DCFS and children's medical professionals and (v) threatening and silencing R.S and (vi) misrepresenting both children and (viii) influenced and controlled DCFS investigation and (ix) influenced medical treatment and recommended medical treatment with no medical qualification and (x) made false medical allegations on Plaintiff without any medical qualifications and (xi) changing her parenting proposal dramatically and drastically after Michone Riewer became Defendant Francis' counsel and (xii) ignoring evidence against Defendant Francis while supporting /creating false allegations against Plaintiff etc. Instead of acting as her role of being a trusted representative of the children's interests, she acted as a covert agent for Defendant Francis.

260. Defendant Finn: Defendant Finn was recommended by Defendant Francis and has out-of-court association with Defendant Francis's counsel. Defendant Finn failed to disclose this association and did not uphold the ethical standards of American Psychological Association (APA). Defendant Finn scientifically frauded the court by altering the raw data of a standardized psychological test (the MMPI-2), removing the part that showed Plaintiff was more trustworthy, and then submitting the tampered results. This isn't just bias; it's forensic

fraud. Defendant Finn's assertion of Munchausen Syndrome by Proxy was not just an "opinion"; it was a knowingly false medical claim made without the requisite expertise and while admitting the foundational symptom (symptom fabrication) was absent.

261.    A key element of fraud on the court is that it is successfully hidden from Plaintiff through a multi-layered strategy: sealing of Defendant Finn's report; exclusion of evidence that could have revealed the fraud; and by appointing Defendant Barone as the gatekeeper to evidence.

262.    The fraud upon the court was not a victimless procedural violation; it inflicted severe and foreseeable harm on the minor children. Defendant Judge Bruno, along with her co-conspirators, knowingly allowed R.S. to escalate and be hospitalized by transferring custody to a parent and environment that medical evidence indicated was harmful.  Defendants continue to suppress the truth by actively concealing the true psychological and emotional state of the minor child, A.S., from Plaintiff. By barring all access to his medical and educational professionals and records, they prevent Plaintiff from discovering evidence that would expose the harm to both children caused by their fraudulent scheme.

263.    A judgment procured by such a fraud upon the court is void *ab initio* (from the outset).


**Count 11 — Misuse of Illinois Domestic Violence Act (Declaratory/Equitable Relief)**

264.    Defendants: Defendant Francis; Defendant Barone; Defendant Finn; declaratory, prospective and other possible relief against Judge Bruno

265.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

266. Defendants, acting under color of state law, conspired to weaponize and misuse the IDVA, corrupting its protective purpose into a tool of litigation strategy and parental alienation. They used the OP process not to prevent abuse, but to effectuate the predetermined goal of severing the parent-child relationship between Plaintiff and her children, in direct contravention of the IDVA's intent and in violation of Plaintiff's fundamental due process rights.

267. The emergency OP petition filed by Defendant Francis was fundamentally defective on its face. It lacked the specific, factual allegations of "abuse" as defined by the IDVA, and instead relied on inflammatory rhetoric, distortions, and outright falsehoods.

268. Judge Bruno granted the emergency Order of Protection on November 17, 2023, based *solely* on the sealed report and testimony of Defendant Finn. She did so without requiring Defendant Francis to testify under oath or be subject to cross-examination, and without any competent evidence meeting the statutory definition of abuse

269. The allegations in the OP petition were logically incoherent and directly contradicted by existing evidence, including police reports that consistently advised Plaintiff to seek an order of protection against Defendant Francis—not the other way around. The petition set forth countless false, incoherent, and purely imaginative allegations, rendering the filing a complete mockery of the judicial process and a clear abuse of legal proceedings.

270. Judge Bruno subsequently granted a two-year plenary Order of Protection, relying on the perjured testimony of Defendant Barone and Defendant Francis and the biased, medically unsupported opinions of Defendant Finn

271.    In granting the plenary OP, Judge Bruno made findings that were factually and legally untenable, including:

a. Falsely claiming that Plaintiff was responsible for perpetuating R.S.'s sexual abuse allegations without any sort of credible evidence. This claim ignored direct statement from R.S. that Plaintiff had nothing to do with her allegation, ignored the fact that R.S. made the allegation directly to medical professionals and ignored that no medical professional linked Plaintiff to the allegation

 b. Insinuating, without a scintilla of evidence, that Plaintiff caused R.S.'s suicide attempt by showing her a court order, while simultaneously acknowledging she did not know the cause.

272.    Order of Protection was the primary legal instrument used to enforce the separation of Plaintiff from her children. It also helped with the justification for denial of parenting time, and the continued surveillance of Plaintiff's limited communications, thereby institutionalizing the alienation of the children from their mother under the false and stigmatizing guise of her being an "abuser."

273.    By using the OP process in a manner that lacked any factual or legal basis, and by employing it for the ulterior purpose of depriving Plaintiff of her fundamental parental rights, the Defendants acted in the clear absence of all jurisdiction and violated Plaintiff's clearly established Fourteenth Amendment rights to due process and familial integrity.


**Count 12 — Illinois Abuse of Process (Common Law)**

274.    Defendants: Defendant Francis; Defendant Barone; Defendant Finn, declaratory, prospective and other possible relief against Judge Bruno

275. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

276. Defendants instituted and improperly used judicial process through a pattern of misconduct, including but not limited to:

a. Weaponizing Emergency Motions: Defendant Francis filed more than 16 emergency motions on inadequate notice, all heard and granted immediately, seeking to strip Plaintiff of parenting time and decision-making authority. These motions were filed during periods of critical family stress, such as when R.S. was critically ill or when Plaintiff was mourning the death of her father, demonstrating their use for harassment rather than genuine emergency.

b. Misusing the Order of Protection Process: Defendant Francis filed a fundamentally defective petition for an Order of Protection under the Illinois Domestic Violence Act. This was not done to prevent actual abuse, but to use the OP as a procedural weapon to effectuate the immediate and total removal of the children from Plaintiff.

c. Corrupting the Custody Evaluation: Defendant Finn, in concert with Defendant Francis, perverted the custody evaluation process by engaging in ex parte communications, withholding and altering evidence (the MMPI results), and producing a biased report designed to support the predetermined outcome of removing the children from Plaintiff.

d. Misusing the GAL's Authority: Defendant Barone abused her court-appointed role by acting as an advocate for Defendant Francis rather than the children. She used her position to present unsubstantiated hearsay, make unqualified mental health diagnoses, and make false allegations against Plaintiff to further the ulterior purpose of harming Plaintiff's case.

e. Filing a Frivolous Contempt Petition: Defendant Francis filed a contempt petition against Plaintiff, even requesting her incarceration, regarding the OCI card transfer, despite the fact that Plaintiff had complied with prior court orders.

277. Plaintiff alleges that Defendant Francis committed abuse of process under Illinois common law by repeatedly misusing judicial procedures to achieve improper and ulterior purposes unrelated to any legitimate claim for protection or child welfare.

**Count 13 — Defamation (Illinois Common Law)**

278. Defendants: Defendant Francis; Defendant DCFS Jones; Defendant Barone; Defendant Finn

279. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

280. Defendant Finn authored a custody evaluation report falsely stating that Plaintiff met the criteria for Munchausen Syndrome by Proxy (MSBP), a severe and stigmatizing mental disorder that implies she systematically abused her child by fabricating or inducing illness. Defendant Finn further defamed Plaintiff by falsely accusing her of "sensualizing" her child by using the word "naked" in a clinical context, thereby falsely imputing deviant sexual behavior to her. These false statements were published to third parties, including but not limited to the parties in the case, and subsequently to children's treatment providers and to court-ordered therapists. Defendant Finn knew these statements were false or acted with reckless disregard for their truth, as he admitted under oath that R.S. had no falsified symptoms (a prerequisite for MSBP) and that he is not an MSBP expert.

281. Defendant Barone repeatedly published false statements to the court and to third parties, under oath, making several false allegations against Plaintiff and were proven to be false during trial. She made false statements to R.S.'s medical providers, including the false and diagnosis of MSBP and coaching allegation on Plaintiff. Defendant Barone made defamatory and unsubstantiated accusation that Plaintiff writing to her son A.S. about their family dog constituted "abuse". Defendant Barone made the false statement to the 15-year-old R.S. that Plaintiff had abused her, a direct communication that caused severe emotional distress to both R.S. and Plaintiff.

282. Defendant Francis repeatedly filed emergency motions and gave testimony under oath containing false allegations, such as accusing Plaintiff of canceling R.S.'s medical appointments and manipulating communications, which were proven to be false.Defendant Francis stated the false and defamatory statement to R.S. and other medical professionals that Plaintiff had been diagnosed with "Munchausen by proxy" and needs to work to be a better mother.

283. Defendants acted with actual malice or with reckless disregard for the truth, as they (i) had access to the contradictory evidence but ignored it; (ii) repeated the allegations after being presented with refuting evidence; and (iii) were motivated to harm Plaintiff's parental relationship to gain a tactical advantage in litigation.

**Count 14 — Intentional (or Reckless) Infliction of Emotional Distress (Illinois Common Law)**

284. Defendants: Defendant Francis; Defendant Barone; Defendant Finn; declaratory and other possible relief against Judge Bruno

285. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

286. Plaintiff alleges that Defendants engaged in a sustained course of extreme and outrageous conduct, intended to cause or carried out with reckless disregard for causing severe emotional distress. Defendants were able to do this through coordinated efforts to violate Plaintiff's constitutional rights. Acting jointly and under color of law, Defendants orchestrated the removal of Plaintiff's children and enforced a no-contact order by relying on a sealed evaluator report that Plaintiff was denied access to, preventing her from defending against false allegations. Defendants disseminated stigmatizing claims that Plaintiff suffered from MSBP, accused her of fabricating illness, endangering the children, and committing psychological abuse—allegations contradicted by medical records and other witnesses. These statements were shared with mental health providers, school officials, and even the children themselves, causing emotional harm to Plaintiff and minor children. Defendants further blocked Plaintiff's benign messages and religious expressions, including a cross pendant and expressions of love and comfort, and sought to fabricate violations of the protective order.

287. Defendant Barone went to R.S.'s school immediately after this seizure and told the 15-year-old child, who was in a fragile mental state, that her mother had abused her, directly causing the child to suffer immediate emotional distress.

288. Judge Bruno and Defendant Francis forced Plaintiff into a "catch-22" move-out situation. Plaintiff was ordered to move out of her home within four days while simultaneously designating that very weekend as her parenting time and prohibiting her from moving in

front of the child without the agreement of Defendant Francis—creating a set of logistically impossible and psychologically harmful conditions.

289. Defendant Francis filed numerous emergency motions on minimal notice during periods of extreme family distress, including when R.S. was critically ill and when Plaintiff was mourning the death of her father, using the judicial process as a tool for harassment and psychological torment.

290. Defendant Finn falsely accused Plaintiff of having Munchausen Syndrome by Proxy, a deeply stigmatizing accusation that pathologizes and criminalizes a mother's care for her genuinely ill child, and then used this false accusation to justify destruction on children through forceful separation from Plaintiff.

291. This pattern of conduct was excessive, malicious, and intended to inflict emotional suffering by isolating Plaintiff from her children, damaging her identity as a mother, and undermining her dignity.

292. Defendants' conduct was so extreme and outrageous as they used the legal system as a weapon to inflict emotional harm and continue with the unconstitutional orders that shock conscience

**Count 15 — Title IV-D Misuse (Constitutional Framing; Declaratory/Equitable Relief)**

293. Defendants: Defendant Francis; prospective, declaratory and other possible relief against Judge Bruno and relevant state IV-D administrators

294. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

295. Plaintiff alleges that Defendants exploited the federal Title IV-D child support

enforcement program through constitutional violations, including retaliation for petitioning and denial of equal protection.

296.    Following the unlawful custody transfer, Defendants initiated IV-D enforcement against Plaintiff, designating her as the "non-custodial parent" despite her historical role as primary caregiver. This designation was based on court orders obtained through the fraudulent and unconstitutional process detailed in previous counts.

297.    Plaintiff was targeted for enforcement specifically because she earned more than Defendant Francis, making her the more financially advantageous obligor for the state IV-D program, which receives enhanced federal funding based on collection performance.

298.    This misuse of IV-D processes resulted in:

(a) Retaliation: Using child support enforcement to punish Plaintiff for exercising her constitutional rights to legal advocacy and petitioning

(b) Due Process Violations: Initiating enforcement based on orders obtained through fraudulent means without adequate procedural safeguards

(c) Equal Protection Violations: Applying IV-D enforcement in a gender-discriminatory manner, as the program was weaponized against the mother despite the father's litigation misconduct. Judge Bruno denied temporary child support to Plaintiff while she approved retroactive child support to Defendant Francis. Her judgement has calculation errors which also benefit Defendant Francis.

299.    This exploitation of the IV-D program violated its statutory purpose and Plaintiff's constitutional rights.

**Count 16 — Compelled Medical/Mental-Health Treatment Without Competent Evidence or Due Process (Prospective Declaratory and Injunctive Relief)**

300. Defendants: Defendant Francis; Defendant Barone; Defendant Finn; declaratory, prospective and other possible relief against Judge Bruno

301. Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

302. Plaintiff has a fundamental liberty interest under the Fourteenth Amendment in bodily autonomy, in directing her own medical and mental health care, and in the care, custody, and control of her children.

303. The State's interest in imposing medical treatment on an individual without their consent is strictly limited and must be supported by compelling circumstances, a valid medical justification, and rigorous procedural protections.

304. On or about November 17, 2023, Defendant Judge Bruno, acting in her judicial capacity and relying exclusively on the recommendations of Defendants Barone and Finn, issued an order compelling Plaintiff to undergo a mandatory course of 26 therapy sessions with Dr. Chinni, a therapist selected by Defendant Finn, as a precondition for any potential restoration of contact with her children.

305. This order, and its subsequent reaffirmations, were issued in violation of Plaintiff's fundamental due process rights because:

a. Lack of a Valid Medical Basis: The order was not based on any competent medical evidence. It cited no clinical diagnosis of Plaintiff, no supporting medical testimony, and no explanation of what condition the treatment was intended to address.

b. Reliance on a Fundamentally Flawed Report: The sole purported justification was the sealed report of Defendant Finn, which advanced the theory that Plaintiff "met the criteria" for Munchausen Syndrome by Proxy (MSBP) without actually diagnosing her, and which Defendant Finn later admitted was not a diagnosis and for which he was not an expert.

c. Contradiction by Plaintiff's Own Expert: The order ignored a letter from Plaintiff's own psychologist, submitted to the court and later admitted as a trial exhibit, which stated that Plaintiff did not have the alleged condition and that the compelled treatment with Dr. Chinni would be harmful

d. Absence of Procedural Protections: Plaintiff was afforded no meaningful opportunity to challenge the factual or medical basis for the forced treatment. The hearing was based on a sealed report she could not access, and her objections and requests for a clinical rationale were repeatedly overruled and mocked by Defendant Judge Bruno.

306. The order for compelled treatment remains in effect, continuously violating Plaintiff's bodily autonomy and constitutional liberty interests. Plaintiff faces the ongoing, irreparable injury of being forced into unwanted, stigmatizing, and harmful psychological treatment.

307. The compelled unlawful treatment mandate burdens Plaintiff's bodily autonomy and parent-child association, risking irreparable harm to Plaintiff's health and her relationship with her children.

**Count 17 — Reliance on Unilaterally Retained Therapist for children who considered Undisclosed Evaluator Materials Without Parental Participation**

308. Defendants: Defendant Francis; Defendant Barone; declaratory, prospective and other

possible relief against Judge Bruno

309.    Plaintiff realleges and incorporates by reference Paragraphs 1 through 187 as if fully set forth herein.

310.    The Due Process Clause of the Fourteenth Amendment guarantees fundamental fairness in judicial proceedings, particularly those affecting parental rights. This includes the right to know the evidence against oneself and to have a meaningful opportunity to contest it.

311.    Following the seizure of the children on November 17, 2023, Defendant Judge Bruno issued orders that appointed Defendant Francis as sole custodian and granted him unilateral authority to select therapists for the minor children, including A.S.

312.    Defendant Francis exercised this authority to unilaterally retain therapists for A.S. and R.S. who have never communicated with Plaintiff, thereby excluding her from participation in her children's therapeutic care and denying her fundamental right to make medical decisions for her children.

313.    These therapists, selected and controlled by the opposing party, is being permitted to consider and base treatment recommendations on materials that were deliberately withheld from Plaintiff, including Defendant Finn's sealed report and other evaluator materials.

314.    These therapists are being influenced and controlled by Defendant Francis and Defendant Barone who have been proven to have given perjured testimonies and clearly acting against the best interests of children and against Plaintiff's truth.

315.    This created a fundamentally unfair and unconstitutional process where:

a.  One parent was given exclusive control over the child's mental health treatment.

b. The treating professional was exposed to secret evidence (the sealed report) that formed the basis for the court's orders but was denied to Plaintiff.

c. Plaintiff, who had been the child's primary caregiver, is completely excluded from the therapeutic process.

d. The therapist's opinions, influenced by the secret report and Defendant Francis false stories, could then be used to justify harm to Plaintiff and her children, creating a self-reinforcing and unjust cycle.

316. This scheme violates fundamental due process by allowing a critical decision—the mental health treatment of a child and the assessment of the parent-child relationship—to be made based on a one-sided, secretive process, false narratives that precludes meaningful challenge or participation by the affected parent.

317. The ongoing use of these therapists, and any reliance on their opinions by the court, perpetuates a continuing violation of Plaintiff's due process rights and her fundamental liberty interest in the care, custody, and management of her children.

318. The Defendants, acting under color of state law, have established and maintained a process that deprives Plaintiff of her parental rights without due process of law.

**Request For Referral To Federal Criminal Investigative Authorities**

319. Plaintiff respectfully requests that this Court, pursuant to its inherent authority and obligations to uphold the rule of law, refer the evidence and findings developed in this action to the United States Department of Justice and the Federal Bureau of Investigation for investigation of potential federal criminal violations, including but not limited to:

a) Conspiracy Against Rights (18 U.S.C. § 241) - Based on the coordinated pattern of conduct between Defendants to deprive Plaintiff of her constitutional rights to familial association and due process through a scheme involving perjury, forensic fraud, and abuse of judicial process.

b) Deprivation of Rights Under Color of Law (18 U.S.C. § 242) - Based on state actors' willful deprivation of constitutional rights through proceedings that violate due process, pre-drafted orders, and systematic exclusion of evidence while acting under color of state law.

c) Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343) - Based on the scheme to defraud Plaintiff of her parental rights and financial assets through fraudulent court filings, altered psychological testing data, and interstate electronic communications, including the use of email and electronic court filing systems that inherently transmit data across state lines, and the electronic transmission of the fraudulent custody evaluation to an out-of-state treatment facility in Connecticut.

d) Perjury and Obstruction of Justice (18 U.S.C. §§ 1621, 1503, 1505) - Based on multiple instances of material false testimony under oath by Defendants and the systematic obstruction of federal rights through the exclusion of witnesses and evidence in state judicial proceedings.

320. Federal courts have inherent authority to refer evidence of criminal conduct to appropriate federal investigative authorities. Referral is essential here because the state judicial machinery has been corrupted, leaving no adequate means within the state system to investigate or prosecute this conduct.

321. A federal criminal investigation is necessary to uncover the full scope of the conspiracy, including potential witness tampering and the coercion of the minor children, and to determine if violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) have occurred.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court enter judgment in her favor and award the following relief:

**A. Declaratory Relief**

Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Plaintiff requests the Court to:

- Declare that the Defendants engaged in a conspiracy to deprive Plaintiff of her constitutional rights

- Declare that the state court proceedings were corrupted by a fraud upon the court, perpetrated by the Defendants, and that the resulting judgments and orders are therefore void *ab initio*

- Declare the state court proceedings violated Plaintiff's constitutional rights, rendering the resulting orders constitutionally invalid. Specifically, the Court should declare that the following orders or actions are unconstitutional:

  o November 17, 2023 order seizing Plaintiff's children and imposing a no-contact order.

- o Plenary Order of Protection

- o Order compelling Plaintiff to undergo mental health treatment with Dr. Chinni.

- o All orders imposing unconstitutional restrictions on Plaintiff's speech and communication with her children.

- o July 16, 2024 final judgment on custody, parenting time, and decision-making

- o Court's reliance on, and delegation of authority to, therapists (i) who has never or sufficiently interacted with Plaintiff; or (ii) who has received Defendant Finn's materials or other false information from Defendant Francis and/or Defendant Barone; or (iii) who has not reviewed the full case history, including the severe impact of the court's unconstitutional orders on the children; or (iv) does not provide a detailed medical analysis of their recommendations, including the standards and tests used.

- Declare that Defendants violated Plaintiff's rights

  - o Under the Fourteenth Amendment's Due Process Clause through systematic denial of procedural due process and violation of her fundamental right to familial integrity,

  - o Under First Amendment through unconstitutional restrictions on parent-child speech, intimate association, and the Free Exercise of religion.

  - o Under Equal Protection Clause through gender-based discrimination in the judicial proceedings.

  - o Under Title II of the Americans with Disabilities Act through discrimination against R.S. based on her disability and against Plaintiff based on her association with R.S.

**B. PROSPECTIVE INJUNCTIVE RELIEF**

Plaintiff requests this Court to issue Permanent Injunctions as follows:

- Against Defendant Judge Bruno, in her official capacity:

  o Enjoin Defendant Judge Bruno from enforcing the constitutionally invalid orders

  o Enjoin Defendant Judge Bruno from taking any action to enforce the no-contact provisions, custody arrangement, or compelled treatment mandate arising from the unconstitutional proceedings.

  o Order Defendant Judge Bruno to take all necessary steps to restore Plaintiff's parental rights, including but not limited to:

    ▪ Entering an order terminating the no-contact order between Plaintiff and her children.

    ▪ Entering an order restoring Plaintiff's parenting time and decision-making authority.

    ▪ Entering an order vacating all unconstitutional restrictions on Plaintiff's communication with her children.

    ▪ Entering an order restoring Plaintiff's access to her children's medical and educational records and professionals.

  o Enjoin Defendant Judge Bruno or any other state actor from any further reliance on evidence, reports, or testimony that was obtained or used in violation of Plaintiff's constitutional rights in any future proceedings in this matter.

- Against All Defendants:

- Enjoin all Defendants from further disseminating Defendant Finn's sealed report or any other confidential materials obtained through the unconstitutional process.

- Enjoin Defendants Francis, Defendant Barone, and Defendant Finn from any further interference with Plaintiff's constitutional relationship with her children.

- Enjoin all Defendants from engaging in any retaliatory conduct against Plaintiff for exercising her constitutional rights in this action.

- Order the expungement of the fraudulent custody evaluation (the Finn report) from the state court record and from any medical or therapeutic records of the children.

- Issue a mandatory Injunction requiring the state court to enter orders restoring the *status quo ante*—returning custody and parenting time to the arrangement in place prior to the fraudulent November 17, 2023 order

- An order granting Plaintiff the right to record: To ensure transparency, prevent further fraud, and create a verifiable record given the extensive pattern of misconduct by the Defendants, Plaintiff shall be permitted to make audio and/or video recordings of any and all interactions that occur pursuant to any court order, including but not limited to:

  a. Any therapeutic or counseling sessions she is compelled to attend.

  b. Any sessions with a custody evaluator, parenting coordinator, or any other court-appointed therapist

  c. Any therapeutic process compelled by Court or unilaterally by Defendant Francis, involving Plaintiff and her children.

**C. COMPENSATORY RELIEF**

Award compensatory damages against Defendants Francis, Defendant Barone, and Defendant Finn, in their individual capacities, for:

- Severe emotional distress, mental anguish, and loss of enjoyment of life.

- Damage to reputation and standing in the community.

- All financial losses, including but not limited to: attorney's fees paid in the state court proceedings, costs of court-appointed professionals, and other litigation expenses.

- The profound loss of parental companionship, care, and familial relationship.

**D. PUNITIVE DAMAGES**

Award Punitive Damages against Defendants Francis, Defendant Barone, Defendant Finn and Defendant DCFS Jones, in their individual capacities, as their conduct was willful, malicious, undertaken with deliberate indifference to Plaintiff's constitutional rights, and shocks the conscience.

**E. ATTORNEY'S FEES AND COSTS**

Award Plaintiff her reasonable attorney's fees, litigation expenses, and all costs of this action, pursuant to 42 U.S.C. § 1988 and other applicable statutes. Specifically, award Plaintiff the funds necessary to retain legal counsel to represent her in further proceedings, as the Defendants' conduct has rendered her unable to afford representation despite the clear necessity for it.

**F. CRIMINAL REFERRAL**

Refer this matter to the United States Department of Justice and the Federal Bureau of

Investigation for investigation of potential federal criminal violations, including but not limited

to Conspiracy Against Rights (18 U.S.C. § 241), Deprivation of Rights Under Color of Law (18

U.S.C. § 242), Mail and Wire Fraud (18 U.S.C. §§ 1341, 1343), Perjury and Obstruction of Justice

(18 U.S.C. §§ 1621, 1503) and RICO.

## G. RETAINED JURISDICTION AND OTHER RELIEF

- Retain Jurisdiction over this matter to ensure compliance with all injunctive orders and to

  address any necessary implementation issues.

- Grant Pre- and Post-Judgment Interest as provided by law.

- Grant Such Other and Further Relief as the Court deems just and proper to fully vindicate

  Plaintiff's constitutional rights and prevent ongoing harm to Plaintiff and her children.

## H. OTHER RELIEF

- Plaintiff reserves the right to add additional claims, counts, or parties as discovery reveals

  further evidence of conspiracy and constitutional violations.

- Any other legal or equitable relief the Court deems just and proper or revealed during

  discovery.

## I. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**Respectfully submitted,**

**Dated:** 11/25/2025

*(Originally submitted on November 17, 2025, and refiled on November 25, 2025, after the Clerk*

*instructed Plaintiff to combine the complaint and appendix. Plaintiff did not receive the Court's email*

*communication and received instructions through follow-up via phone)*

**Sossamma George Sebastin, Plaintiff Pro Se**

13268 West Heiden Circle

Lake Bluff, IL 60044

sossammag@yahoo.com

347 722 2820

**APPENDIX TABLE OF CONTENTS**

| Appendix Title | Exhibit Description | Reference in Complaint |
|---|---|---|
| FedComplaint – Appendix A | Defendant Barone's initial parenting proposal before Michone Riewer represented Defendant Francis | ¶3 |
| FedComplaint – Appendix B | Police report from the 911 call that R.S. made | ¶97 |
| FedComplaint – Appendix C | R.S.' letter after over 6 months of no contact with Plaintiff | ¶39, 61 |
| FedComplaint – Appendix D | Letter from Plaintiff's psychologist contradicting forced treatment | ¶54,55, 69, 251 |
| FedComplaint – Appendix E | Ex parte communication between Defendant Finn, Defendant Barone and Defendant Francis | ¶44,45,46, 47,251 |
| FedComplaint – Appendix F | Plaintiff's Motion to dismiss temporary OP issued in Nov 2023 | ¶38, 134, 251 |
| FedComplaint – Appendix G | Plaintiff's Motion to bar Defendant Finn showing forensic fraud | ¶72 |
| FedComplaint – Appendix H | Plaintiff's Motion In Limine shows that Dec 2022 ruling was unjust | ¶12, 251 |
| FedComplaint – Appendix I | Association between Defendant Francis' counsel and Defendant Finn | ¶7, 251 |
| FedComplaint – Appendix J | Dr. Chinni's website profile | ¶78, 251 |
| FedComplaint – Appendix K | OFW message showing Defendant Francis's communication with TK therapist | ¶119 |

| | | |
|---|---|---|
| FedComplaint – Appendix L | Plaintiff's counsel's email to Defendant Barone | ¶17, 19 |
| FedComplaint – Appendix M | R.S.'s therapist Safia Khan's email expressing concerns | ¶6 |
| FedComplaint – Appendix N | Messaging therapist, Pamela Rak stating that she was invited by Court ex-parte | ¶168 |
| FedComplaint – Appendix O | Defendant DCFS Jone's text messages to Plaintiff | ¶112, 113 |

# FEDCOMPLAINT - APPENDIX A

Defendant Barone's initial parenting proposal before Michone Riewer represented Defendant Francis

**From:** cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com> <cbaronesjtpalaw@gmail.com>
**Sent:** Monday, April 25, 2022 1:58 PM
**To:** Todd Warren <TWarren@kgwlaw.com>; Jerry Lazar <jerroldlazar@comcast.net>
**Subject:** Francis Minors

Good afternoon,

I apologize for the delay, I had an emergency at my child's school. My recommendation is that Sebastian and R██████ begin family therapy. I can find a therapist, but would prefer for the parties to work together to find a family therapist that is possibly covered by their insurance within 14 days.

Assuming that the two of you can work out finances so that Sebastian can leave the marital residence I am proposing that we start with two nights during the week from after school until 7:30 p.m. for parenting time and then every other weekend from 9:00 a.m. until 8:00 p.m. on Saturdays and 9:00 a.m. until 6:30 p.m. on Sundays. I would be reserving on overnights with A████ until I was able to see where Sebastian was living and that it had suitable space for him to be in. Once I did a home visit with Sebastain and A████ and if it went well I would want to increase to overnight visits.

Where R█████ is concerned I would want to increase to overnights in accordance with the therapist's recommendations.

To address some concerns, I would also like language in a temporary order that neither parent will consume alcohol to the point of intoxication before or during their parenting time and that neither parent will engage in corporal punishment. I also think it is appropriate that the minor children sleep in their own bedrooms.

Please let me know if you have any follow up questions, as there are some moving parts to this recommendation.

Best,
Caryn

**CARYN A. BARONE, ARDC 6292343**
**SOFFIETTI, JOHNSON, TEEGEN**
**ARGUETA, BAWCUM & BARONE, LTD.**

--

209 N. West St.

Waukegan, IL 60085

Ph: (847) 249-1640 Fax: (847) 249-1693

cbarone@sjtpom.com

# FEDCOMPLAINT - APPENDIX B

Police report from the 911 call that R.S. made

Case: 1:25-cv-14471 Document #: 6 Filed: 12/04/25 Page 113 of 267 PageID #:384

FOIA
2023-124



Village of

754 Lakeview Parkway, Vernon Hills IL 60061 847-247-4896
Fax: 847-549-8028          Email: vhrecords@vhills.org

## FREEDOM OF INFORMATION REQUEST (FOIA) FOR POLICE RECORDS

REQUESTORS INFO:

Name: Sossamma George

Address: 13268 W Heiden Circle, Lake Bluff, IL

Telephone: 347-722-2820          Email: sossammag@yahoo.com

I WISH TO RECEIVE A COPY: ☐ Via Mail  ☑ Via Email  ☐ Via Fax  ☐ Pick up at PD

REQUESTED INFORMATION:

VERNON HILLS CASE # (IF KNOWN) _____ 22-22253 _____

IF CASE # IS UNKNOWN:  Please identify specific persons, locations, addresses, dates, documents and other information in detail

_____

_____

_____

_____

Submit this request to the Vernon Hills Police Department, 754 Lakeview Parkway, Vernon Hills, Illinois, 60061 or via the email address or fax number listed above. The Vernon Hills Police Department will respond to your request within 5 working days unless the Police Department invokes one or more of the seven (7) reasons for an extension of time provided for in Section 3(d) of the Freedom of Information Act.

Date: 03/24/2023

*****************FOR OFFICE USE ONLY*****************

Date Received: 03/24/23          5 Day extension letter sent: _____

Date Due: 03/31/23 _____          New Due Date: _____

Attachment B

**VILLAGE OF VERNON HILLS POLICE DEPARTMENT**

**REQUEST FOR PUBLIC RECORDS**

To:

Sossamma George

On ___March 24th___, 20_23 the Village of Vernon Hills received your written request for inspection, copying, or certification of the following Village public records:

22-22253

1.    **Decision on Request**

___    Your request is hereby denied in its entirety. Those records for which your request is denied are identified in Section 2 below.

X
___    Your request is approved in part and denied in part. The records for which your request is approved are attached. Those records for which your request is denied are identified in Section 2 below.

2.    **Denial of Request**

Your request is denied as to the following records or redacted information contained in those records:

A.    <u>Responsible Official.</u> The Village's FOIA Officer is the official responsible for this denial.

B.    <u>Notice of Right to Review by Illinois Attorney General.</u> You have the right to file a request for review of your request and this Notice of Denial by the Public Access Counselor of the Office of the Illinois Attorney General. The Public Access Counselor may be contacted at 500 South 2nd Street, Springfield, Illinois 62706, or by telephone at (217) 558-0486.

C.    <u>Notice of Right to Judicial Review.</u> Under Section 11 of the Illinois Freedom of Information Act, 5 ILCS 140/11, you have the right to seek judicial review of this denial. The Village cannot advise or represent you in this matter. You should consult your own legal counsel.

D.    <u>Justification for Denial.</u> Your request is being denied with respect to the specified records because the specified records are exempt from disclosure pursuant to the Illinois Freedom of Information Act for the following reason or reasons (references are to sections of the Act):

___    The Village does not have any public records in its possession or control, or in the possession of a party with whom the Village has contracted to perform a government function and that directly relate to the government function, that are responsive to your request. §1, §2(c), § 7(2)

Applies to:_____

___    The records do not pertain to the transaction of public business. §1, §2(c)

Applies to: _____

____ The records are chronologically maintained arrest or criminal history information, the disclosure of which would interfere with pending or actually and reasonably contemplated law enforcement proceedings. §2.15(c)

Applies to: _____

____ The records are chronologically maintained arrest or criminal history information, the disclosure of which would endanger the life or physical safety of any person. §2.15(c)

Applies to: _____

____ The records are chronologically maintained arrest or criminal history information, the disclosure of which would compromise the security of a correctional facility. §2.15(c)

Applies to: _____

____ Your request, couched in categorical terms, is unduly burdensome because the burden on the Village of complying with your request outweighs the public interest in providing the records, and efforts to reduce your request to manageable proportions have not sufficiently reduced the burden of your request. §1, §3(g)

Applies to: _____

____ Your request is unduly burdensome because you have repeatedly requested the records or similar public records, which records are unchanged or identical to records previously provided or properly denied pursuant to the Act. §3(g)

Applies to: _____

____ Disclosure of the records is specifically prohibited by the following federal or state law, rule, or regulation: _____, §7(1)(a)

Applies to: _____

_X__ The records are private information. § 2(c-5), §7(1)(b)
Applies to: home & personal telephone numbers, homes addresses, zip codes
_____

____ The records are maintained by one or more law enforcement agencies and are specifically designed to provide information to one or more law enforcement agencies regarding the physical or mental status of one or more individual subjects. §7(1)(b-5)

Applies to: _____

_X__ Disclosure of the records would constitute a clearly unwarranted invasion of personal privacy. §1, §7(1)(c)

date of birth, race, third party information, names of individuals not arrested

**Applies to:** _____

___ The specified records are exempt from disclosure under Section 8-11-21 of the Illinois Municipal Code. § 7.5(x)

**Applies to:** _____

___ Other:

_____

**Applies to:** _____

*Disclosure of personal and private information is a clearly an unwarranted invasion of privacy. Unless the disclosure is consented to in writing by the individual subject(s) of the information, releasing this information is an invasion of privacy due to the highly personal and objectionable events.

Dated: __March 28th_____, 20_23_

Method of Service: __email_____

Village of Vernon Hills

Signed _~~Jayca Wologn~~_

       FOIA Officer

# Vernon Hills Police Department

## Summary

| | | |
|---|---|---|
| **Print Date/Time:** | 03/24/2023 14:35 | Vernon Hills Police Department |
| **Login ID:** | vhpd.kvanderwesthuizen | **ORI Number:** IL0492600 |
| **Case Number:** | 2022-00022253 | |

## Case

| | | | |
|---|---|---|---|
| **Case Number:** | 2022-00022253 | **Incident Type:** | 9059 Other Public Complaint |
| **Location:** | 700 N MILWAUKEE AVE 121 | **Occurred From:** | 09/28/2022 13:13 |
| | VERNON HILLS, IL 60061 | **Occurred Thru:** | 09/28/2022 13:13 |
| **Reporting Officer ID:** | 3623 - Hill | **Disposition:** | |
| | | **Disposition Date:** | |
| | | **Reported Date:** | 09/28/2022 13:13 Wednesday |

## Offenses

| No. | Group/ORI | Crime Code | Statute | Description | Counts |
|---|---|---|---|---|---|

## Subjects

| Type | No. | Name | Address | Phone | Race | Sex | DOB/Age |
|---|---|---|---|---|---|---|---|
| Complainant | 1 | | | | | F - Female | 13 |
| Other Person | 1 | | | | | M - Male | 44 |
| Other Person | 2 | GEORGE, SOSSAMMA | 14253 OAKWOOD CT GREEN OAKS, IL 60048 | (347)722-2820 | A - Asian | F - Female | 02/11/1976 46 |
| Other Person | 3 | | | | | M - Male | 5 |

## Arrests

| Arrest No. | Name | Address | Date/Time | Type | Age |
|---|---|---|---|---|---|

## Property

| Date | Code | Type | Make | Model | Description | Tag No. | Item No. |
|---|---|---|---|---|---|---|---|

## Vehicles

| No. | Role | Vehicle Type | Year | Make | Model | Color | License Plate | State |
|---|---|---|---|---|---|---|---|---|
| 1 | Other Vehicle | Passenger Car | 2014 | Toyota | Sienna | Black | E106991 | IL |

**OfficerID: ahill, Narrative**

This interaction was captured on Body Worn Camera, tagged "Juvenile". I did not review the recording prior to completing this report.

On the above date and time, multiple officers and myself, Ofc. Hill #01, responded to the area of Hawthorn Hills reference a female who was afraid that a male who had sexual assaulted her in the past was attempting to enter her vehicle. En route the subject advised that the suspect left in their own vehicle.

Upon arrival I spoke with                                           and her mother Sossamma George (DOB 02/11/1976).          was visibly upset and explained that
was the one who sexually assaulted her and was attempting to enter the vehicle that she was in. Sossamma, the mother, was sitting in the drivers seat next to her daughter during the entirety of the incident.          never entered the vehicle and left prior to officers arrival.

Sossamma provided the following summary of the history behind the incident.          attempted suicide earlier in the month and had just been released in order to check in to a residential facility for further treatment. Her daughter has began to state that          sexually assaulted her multiple times while she was younger. LCSO is investigating this report.          and Sossamma met in the parking lot of Hawthorn Hills so that          could say goodbye to                          , before she is admitted to Timberline Knolls in Lemont.          then insisted on going with for the admittance, but for obvious reasons was not okay with that plan.

Sossamma had paperwork showing that a judge denied a restraining order against          She was advised to reattempt obtaining an OOP after this latest incident. Her and          did not request any other assistance at this time and were going to leave the scene and drive to Lemont.

No crime occurred and LCSO is already aware and investigating the crimes that were alleged during the encounter.

End of report.

# FEDCOMPLAINT - APPENDIX C

R.S.' letter after over 6 months of no contact with Plaintiff



M Gmail

Sossamma G <sossammas@gmail.com>

## Fw: Last email - this one has more information

------ Forwarded Message --------
From: R███ S██████ <███.s██████@lhswildcats.org>
Date: 4/23/2024 11:16:04 AM
Subject:
To: sossammag@yahoo.com

Hi it's R███. Please listen,
on November 17, 2023 when the GAL showed up at my school, I was really scared. I had a really bad panic attack after they told me I can't see my mom and I have to live with my dad. I was really upset that I couldn't see my mom and I kept asking them why. they kept saying that they don't think it's good for me to know right now considering my state of mind. I kept telling them keeping me in the dark would make me feel worse. They told me that it would not be good for me to be with my mom right now and basically implied that she was being mentally abusive to me. I kept telling them and crying and begging them and saying that she was not mentally abusive and that, I love her and she does not do any of that stuff to me. they also presented me with the evidence that as soon as I moved into my mom's house by myself, that I started going to hospitals and having mental health issues. I told them that that had nothing to do with her and had everything to do with my personal mental health and school, and even flashbacks I had of my dad and trauma. I kept asking them if my mom was OK and they said yes physically she is. Then I asked if she was emotionally. OK they said I don't know. We're not your mom. I got really. I got really angry and kept asking that why. They wouldn't give me a straightforward answer, and I was really panicking. I was really really scared and didn't wanna go. I kept asking if I could just go home and trying to prove to them that she is a good mother but they said I had no other choice. They said I had to go home with my dad right now. I can go to the ER and get evaluated.
since I didn't wanna go with my dad, I chose to go to the ER. I wasn't feeling suicidal or the need to harm myself in anyway, but I just didn't want to go with my dad was, I was scared. After going to the ER, I frantically explained what happened at school to one of the ER doctors and begged her to not let my dad see me. She agreed and advised that the best thing for me to do would be to go to the psych ward because I would be safe and have a place to process all the big things that happened. I wasn't too excited because I didn't wanna go home with my dad and was really scared. When I was in the psych ward, I kept pushing to try and go to foster care because I didn't want to go home with my dad. what caused me to finally agree to go home with my dad was the fact that I knew if I went I wouldn't be able to bring my brother or be with him. I didn't like the idea of my brother being alone with my dad because I didn't trust my dad. And I knew that the foster care system wasn't great and people kept warning me about the system. All my mental health workers there were told the GAL side of the story,

about how I was brainwashed into thinking the abuse that happened happened and that it didn't really happen. They were told that it didn't happen since there was apparently no evidence and I had been brainwashed by my mom, which was not true at all. I told my mom that's the only way she found out I told a mental health worker at a hospital when I was 13 before I told anyone else. I agreed to go back home with my dad along that he gave me space, never touched me, and that there would be cameras in the house. They decided that I needed more time to process these big changes in my life and sent me to residential. I wanted to go to a residential in Florida since it would be further from my dad, but my dad canceled my opening in Florida and wanted to send me to Connecticut since it's close to New York and he would be able to visit. I didn't like that and was upset that he canceled the opening, but it was too late to get the opening back so I ended up going to Connecticut. My aunt ended up coming with us on the flight since I wasn't comfortable being alone with my dad. I was told I couldn't have my phone. at Connecticut I worked on stuff mostly communication with my dad and ended up "getting comfortable with him". I didn't really feel comfortable with him. I just created an alternative version of my dad and my mind to protect me from having flashbacks and being scared all the time. I don't think I did this consciously, but more subconsciously as a defense mechanism. The court and everyone who talked bad about my mom including my dad corrupted my happy memories with her and i will never forgive them for that. I don't want her to be sad and really miss her.

I was told that me and my brother couldn't see my mom because she was unwell and needed therapy. After getting out of residential, I found out that my mother had been diagnosed with a mental health illness that I had never heard of before. After researching, I thought that she did not have it and that was absolutely absurd and crazy. I was very upset and tried telling people that she didn't have that and she was an amazing mother. I tried explaining that she never exaggerated my symptoms, but sometimes I was too scared to tell people on my own, so I had her speak for me. A███ was told that Mom is sick and that's why he can't see him. He's too young to know. I was told Mom would go to jail if I tried contacting her two times. Th GAL told me that first then my dad reinforced it.

I wasn't told much about the court process and was mostly kept in the dark. When I asked my dad for certain privileges, he said he was asking the court, but after a while, I found out that he was lying about some of that. I found out that some of the rules he had for me wasn't because of the court and was because of him. I knew that the court process was still going on and at first they told me that if my mom did everything she was supposed to that i would see her in five months. then that changed to "i don't know". I was occasionally told that mom isn't doing any of the stuff she's supposed to do in therapy. I was also told that my mom isn't allowed to send me letters about charlie because she's using that to emotionally blackmail me or make me miss them more. That is totally insane and bullshit. Why or how much i miss my dog isn't going to be easily effected by a letter. I am a strong person. If anything, it made me smile hearing about the cute things charlie would do. I was never told by anyone from the court or my dad that my mom went to the hospital. I was very upset and worried when i found out. it's so unfair that she had her kids taken for her because of some whack jobs that said "yup i 100% know this mother better than her own daughter who's been with her for 15 YEARS". I may not be a professional, but i know a good amount from the mental health facilities i've gone to and my own research i used to do for fun. I also have something called a GUT FEELING and fucking INTUITION. I never had any of these bad feelings about my mom EVER. I started dissociating a lot after coming home with my dad. I was constantly numb and couldn't feel or cry even when i wanted to. I instead got upset over small things bc i couldn't let my sadness or anger out. People think i'm doing much better when really i would love nothing more than to just sleep for the rest of eternity. i literally feel dead inside, like nothing is real i'm i'm already dead somehow. A███ doesn't know how to process his feelings and ends up throwing a lot of tantrums. He cries a lot more when he's hurt because he misses mom. He gets very upset when people get mad at him or push him away. He's more shy and quiet now. He's also pretty uptight and hates any type of change. He clings to me a lot more now. I really just wanna go home. Home to mom's house with my brother. I wanna go home and go back to

how things were and be a family with mom again. I love my mom so much and really miss everything and my dog and my real home. I was told i can't contact mom and she can't contact me. The only contact i was told i could have were sending her gifts for her birthday and mother's day and letters necks and forth. I was told she can send a letter once a week. I begged them to let me at least have a phone call with my mom for Christmas but they said no. I didn't even get a letter from her for Christmas. I had no contact with her during Christmas. It was very depressing. I've basically been coping with living with my dad by separating his abusive past from him now to almost create a fabtasy like world. To protect my brain from trauma and flashbacks. I didn't do it on purpose but more so it just happened as a defense for myself. I see him as a completely different person as him abused him to help myself. I still know what happened and how he abused me no matter what anyone said. I remembered things all on my own and nobody told me anything about memories i had or "made" me remember things. It was all me.

I still feel uneasy when he touches me and sleep most of the time with my door locked. I am tired and drained a lot now and it's really hard. I just wanna live with my mom again please.

-R█████ Sebastin

ID: ██████

# FEDCOMPLAINT - APPENDIX D

Letter from Plaintiff's psychologist contradicting forced treatment

## Positive Outcomes Consulting

847-845-2092      800 E. NW Highway, Ste. 707, Palatine, IL 60074

January 26, 2024

Dear Judge Bruno,

My name is Dr. Lisa Kohut and I'm writing this letter on behalf of my client, Sossamma George, per my discussion with Attorney Ronald Bell about the diagnosis and treatment orders given by the court.

Mrs. George has been a client of mine for the past 2 years, since June 21st of 2021 and has been treated for symptoms of trauma and anxiety related to her divorce and the custody case. Since beginning treatment, she has also lost her father.

According to Attorney Ronald Bell, Mrs. George has allegedly been diagnosed with Munchausen By Proxy by Dr. Finn and has been ordered to receive treatment for this condition with Dr. Chinny.

Your Honor, I'm very uneasy and strongly concerned about this diagnosis and the treatment orders, considering that although, Dr. Finn's office and I made efforts to connect, we never connected and consequently, my clinical impressions were not considered in the findings.

I have been an independently licensed clinical counselor for over 20 years, 9 of those have been in private practice and 13 of those years have been in a therapeutic day school as a School Psychologist, which has allowed me the opportunity to interact with parents who allegedly had symptoms of Munchausen by Proxy. Based on my 2 years of experience with Mrs. George and several years of experience in the mental health field, I would respectfully disagree with the current diagnosis and I'm extremely concerned about the adverse side effects (both short and long term) that this order to be treated for this condition could have on Mrs. George. Mrs. George has already experienced a significant amount of adversity going through the divorce, losing contact with her children, having an Order of protection filed against her and now being given a diagnosis and treatment order that arguably has very little if any support.



EXHIBIT

B

My observations and impressions of Mrs. George are that she is a loving, attentive and hard working mother, who has made every effort to address her children's needs as well as her own as they have come up.

For that reason, I'm proposing that the order for Mrs. George to be treated for Munchausen By Proxy by a treating therapist, who she has not developed a rapport with be dismissed and that Mrs. George continue her treatment with me. Mrs. George's symptoms of trauma and anxiety need to continue to be treated.

Thank you in advance for your cooperation regarding this matter and for taking the time to read and understand this request. Please feel free to contact me with any questions or concerns regarding this matter.


Sincerely yours,



Dr. Lisa Kohut,

Ed.D, Ed.S., LCPC

My observations and impressions of Mrs. George are that she is a loving, attentive and hard working mother, who has made every effort to address her children's needs as well as her own as they have come up.

For that reason, I'm proposing that the order for Mrs. George to be treated for Munchausen By Proxy by a treating therapist, who she has not developed a rapport with be dismissed and that Mrs. George continue her treatment with me. Mrs. George's symptoms of trauma and anxiety need to continue to be treated.

Thank you in advance for your cooperation regarding this matter and for taking the time to read and understand this request. Please feel free to contact me with any questions or concerns regarding this matter.

Sincerely yours,

Dr. Lisa Kohut,

Ed D. Ed S., LCPC

# FEDCOMPLAINT - APPENDIX E

Ex parte communication between Defendant Finn, Defendant Barone and Defendant Francis

**Michone Riewer**

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Monday, April 29, 2024 12:55 PM |
| **To:** | David Finn, Psy.D; cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com> |
| **Cc:** | Michone Riewer |
| **Subject:** | RE: Updates: March & April |

Hi Dr. Finn & Caryn,

Further to below, I had a conversation with R▮▮▮ this weekend (Saturday night) about the emails, and asked about her cousin, Juanna passing on information to R▮▮▮ from mom. During the conversation, she admitted that Juanna spoke to her, and that her cousin/Juanna in fact told her that "it would help" if she sent this email, giving "her side of the story." Though she denied that Sossamma/mom told Juanna to pass on this message, R▮▮▮ does say that Juanna would have known these things from Sossamma since they speak regularly. I was able to extract the audio from the security camera that was in the living room at the time, and here's the link to that portion of the conversation (FYI, "Ammachi" means grandma...i.e., Sossamma's mom):

🗋 TalkwithR▮▮▮ AboutEmail_04272024.mp3

**Caryn,**

Officer Kincaid got back to me on Saturday morning and told me that his Deputy Chief authorized him to take my report for the violation of the Order of Protection, and that he'll connect with me today to collect all required information to complete the report. I've already emailed him all the screenshots I found below to Office Kincaid, and have also left him a voicemail this morning to connect. Just waiting for him to call me back so that we can complete the report. Will keep you posted once I've completed the report with Officer Kincaid.

Regards,
Sebastin

**From:** Sebastin Francis (s)
**Sent:** Friday, April 26, 2024 3:35 PM
**To:** David Finn, Psy.D <dfinn@ahdcllc.com>; cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com> <cbaronesjtpalaw@gmail.com>
**Subject:** Updates: March & April

Hi Dr. Finn & Caryn,
My apologies that it's been a while since my last update! Here are some updates on the children from the past month or so:

- **Spring Break/Easter in NY:** I took the children to New York for their Spring Break (Mar 26 – April 1st). Both A▮▮ and R▮▮▮ was counting down days, and looking forward to it; R▮▮▮ mentioned to her therapist, Olivia that it's one of the highlights that she was looking forward to, and in fact was only upset about the fact that we weren't spending more time there with their cousins and family (R▮▮▮ even asked if they could skip school the Friday before and fly out on Thursday evening! 😊 ). She spent most of the time hanging out with her cousin sisters, going to the gym with them, shopping, having late-night movies and girls night etc. A▮▮ enjoyed all the extra attention, pampering, and special food (as the youngest cousin) from her cousins, aunts and uncles. Besides wanting to spend more time, the

1

IRMO Francis Exhibit 103 - 000001

only other complaint was there was "too much church" that week! Here's a photo from Easter day:



- **Positive signs/progress in relationship with R████:**
  - The weekend after we returned home from NY, R████ joined the Monopoly game that As██r and I were playing, and had a very spirited game (lost of trash talk, bargaining, play fighting etc.). An hour into the game, R████ asked if she can talk to me and get some advice on a situation she was having with a close friend of hers. That ended being an hour and half (close to 2 hours), where she shared quite a bit of stories, concerns, details about her friends, and other confidential things ("don't tell her mom, but...", even reading of text exchanges between her friends verbatim. She wanted my take on the situation, and how to proceed with some tricky friendship dynamics. I see this as a huge breakthrough in our relationship, and big step towards rebuilding trust and healing.
  - Over the past couple of months, I've also seen quite a bit of softening of attitude towards me from Re████ I can only recall couple of instances of her outbursts over the past couple of months (it used to be more

2

IRMO Francis Exhibit 103 - 000002

frequent back in January & February). She's more open to disciplining (even if she doesn't agree, or like it) when I'm firm with her or say no to things. R███ has been also sharing bit more things about school and friends, playing pranks on me and sharing jokes/TikTok videos. She's also been less resistant to helping me out at home with small things. We're currently planning her summer activities, and she expressed that she'd like to try taking on a summer job (I'm working with Olivia and her support team at LHS on some appropriate options).

- ○ R███ asked if we can switch our church and go to the one where her friends and the youth group attend. Since I know a few people there (including the couple who run the youth group that R███ attends on Tuesdays), I agreed. We've been going there for the past 3 weeks and both the children are enjoying it (A███'s friend Abby goes to that church as well). Couple of weeks ago, the youth group leaders took them to the beach there after the church service (it was lovely day), and I let R███ go with her friends (as I knew the youth pastors/leaders supervising them). She had a great day, and later that evening she actually told me "thank you for letting me go, dad!"

- A███ is still doing well at school. During the parent-teacher conferences, I've only heard great things from all his teachers (best-behaved, respectful, eager to participate despite his shy nature). He's thrilled that he can now read books on him with minimal help from me! I also see him being less timid, making more friends and playing with more friends at school, and in the neighborhood. On the flip side, I'm also seeing some tantrums. I've been working on these with his therapist, Michelle, and she assured me that's only expected/natural, given the situation, and the fact that he's turning 7 next month. For the summer, he'll be attending the summer program at the Lake Bluff park district with his best friend, Isabella (she lives in our neighborhood as well).

- R███ finally wrote a letter to her mom about a month ago; based on Olivia, this is the only letter she sent to Sossamma. She's asked about seeing mom for Mother's Day. A███ has asked about mom, especially wondering if she can come for his birthday next month. I told them that they can make something for mom for Mother's Day, and we can mail it (like we did for Sossamma's birthday in February). Both the therapists were ok with this, and thought this would be good.

- R███'s email to mom: Dr. Finn, you may not have heard this yet, since this just happened earlier this week. It appears that R███ sent 3 emails to mom (same email from three different email addresses). Once I learned of this from Michone, I looked more into it and it appears that Sossamma had her niece (Sossamma's brother's daughter, Juanna) contact R███ and pass on the message to send this email.
  - ○ I found a draft of this email on the Journal/Notes app on her phone
  - ○ Also found the email in the sent items on her school/LHS email account, and her Gmail. The third one ("Little Angel") iCloud account is from her friend, Aylynn.
  - ○ I also found a text she sent to her friend Aylynn this Monday, asking her to send this email to her mom, and that her cousin told me "I gotta....for a court date" (see photos of these texts from her phone below).
  - ○ As you can see from the attached email, it appears to be addressed to or talking to a third party (i.e., not mom), and clearly has several items and information that R███ could not have known on her own (about the letters, court details etc.). I've seen her writing, and so I can also confidently say that most of the writing is also not her style or vocabulary.
  - ○ During my meeting with the therapists and Pamela Rak, Olivia mentioned that though R███ and Olivia made some great progress in their rapport, the last couple of session she's been feeling that R███ has been

more shut off, withholding, and making less eye contact.



4

IRMO Francis Exhibit 103 - 000004



IRMO Francis Exhibit 103 - 000005



IRMO Francis Exhibit 103 - 000006



7

IRMO Francis Exhibit 103 - 000007



Here's the full text of the actual email the R⬛⬛ sent (also attached):

"Hi it's R⬛⬛. Please listen,
on November 17, 2023 when the GAL showed up at my school, I was really scared. I had a really bad panic attack after they told me I can't see my mom and I have to live with my dad. I was really upset that I couldn't see my mom and I kept asking them why. they kept saying that they don't think it's good for me to know right now considering my state of mind. I kept telling them keeping me in the dark would make me feel worse. They told me that it would not be good for me to be with my mom right now and basically implied that she was being mentally abusive to me. I kept telling them and crying and begging them and saying that she was not mentally abusive and that, I love her and she does not do any of that stuff to me. they also presented me with the evidence that as soon as I moved into my mom's house by myself, that I started going to hospitals and having mental health issues. I

8

told them that that had nothing to do with her and had everything to do with my personal mental health and school, and even flashbacks I had of my dad and trauma. I kept asking them if my mom was OK and they said yes physically she is. Then I asked if she was emotionally. OK they said I don't know. We're not your mom. I got really. I got really angry and kept asking that why. They wouldn't give me a straightforward answer, and I was really panicking. I was really really scared and didn't wanna go. I kept asking if I could just go home and trying to prove to them that she is a good mother but they said I had no other choice. They said I had to go home with my dad right now. I can go to the ER and get evaluated.

since I didn't wanna go with my dad, I chose to go to the ER. I wasn't feeling suicidal or the need to harm myself in anyway, but I just didn't want to go with my dad was, I was scared. After going to the ER, I frantically explained what happened at school to one of the ER doctors and begged her to not let my dad see me. She agreed and advised that the best thing for me to do would be to go to the psych ward because I would be safe and have a place to process all the big things that happened. I wasn't too excited because I didn't wanna go home with my dad and was really scared. When I was in the psych ward, I kept pushing to try and go to foster care because I didn't want to go home with my dad. what caused me to finally agree to go home with my dad was the fact that I knew if I went I wouldn't be able to bring my brother or be with him. I didn't like the idea of my brother being alone with my dad because I didn't trust my dad. And I knew that the foster care system wasn't great and people kept warning me about the system. All my mental health workers there were told the GAL side of the story, about how I was brainwashed into thinking the abuse that happened happened and that it didn't really happen. They were told that it didn't happen since there was apparently no evidence and I had been brainwashed by my mom, which was not true at all. I told my mom that's the only way she found out I told a mental health worker at a hospital when I was 13 before I told anyone else. I agreed to go back home with my dad along that he gave me space, never touched me, and that there would be cameras in the house. They decided that I needed more time to process these big changes in my life and sent me to residential. I wanted to go to a residential in Florida since it would be further from my dad, but my dad canceled my opening in Florida and wanted to send me to Connecticut since it's close to New York and he would be able to visit. I didn't like that and was upset that he canceled the opening, but it was too late to get the opening back so I ended up going to Connecticut. My aunt ended up coming with us on the flight since I wasn't comfortable being alone with my dad. I was told I couldn't have my phone. at Connecticut I worked on stuff mostly communication with my dad and ended up "getting comfortable with him". I didn't really feel comfortable with him. I just created an alternative version of my dad and my mind to protect me from having flashbacks and being scared all the time. I don't think I did this consciously, but more subconsciously as a defense mechanism. The court and everyone who talked bad about my mom including my dad corrupted my happy memories with her and i will never forgive them for that. I don't want her to be sad and really miss her.

I was told that me and my brother couldn't see my mom because she was unwell and needed therapy. After getting out of residential, I found out that my mother had been diagnosed with a mental health illness that I had never heard of before. After researching, I thought that she did not have it and that was absolutely absurd and crazy. I was very upset and tried telling people that she didn't have that and she was an amazing mother. I tried explaining that she never exaggerated my symptoms, but sometimes I was too scared to tell people on my own, so I had her speak for me. A█ was told that Mom is sick and that's why he can't see him. He's too young to know. I was told Mom would go to jail if I tried contacting her two times. Th GAL told me that first then my dad reinforced it.

IRMO Francis Exhibit 103 – 000009

I wasn't told much about the court process and was mostly kept in the dark. When I asked my dad for certain privileges, he said he was asking the court, but after a while, I found out that he was lying about some of that. I found out that some of the rules he had for me wasn't because of the court and was because of him. I knew that the court process was still going on and at first they told me that if my mom did everything she was supposed to that i would see her in five months. then that changed to "i don't know". I was occasionally told that mom isn't doing any of the stuff she's supposed to do in therapy. I was also told that my mom isn't allowed to send me letters about charlie because she's using that to emotionally blackmail me or make me miss them more. That is totally insane and bullshit. Why or how much i miss my dog isn't going to be easily effected by a letter. I am a strong person. If anything, it made me smile hearing about the cute things charlie would do. I was never told by anyone from the court or my dad that my mom went to the hospital. I was very upset and worried when i found out. it's so unfair that she had her kids taken for her because of some whack jobs that said "yup i 100% know this mother better than her own daughter who's been with her for 15 YEARS". I may not be a professional, but i know a good amount from the mental health facilities i've gone to and my own research i used to do for fun. I also have something called a GUT FEELING and fucking INTUITION. I never had any of these bad feelings about my mom EVER. I started dissociating a lot after coming home with my dad. I was constantly numb and couldn't feel or cry even when i wanted to. I instead got upset over small things bc i couldn't let my sadness or anger out. People think i'm doing much better when really i would love nothing more than to just sleep for the rest of eternity. i literally feel dead inside, like nothing is real i'm i'm already dead somehow. A███ doesn't know how to process his feelings and ends up throwing a lot of tantrums. He cries a lot more when he's hurt because he misses mom. He gets very upset when people get mad at him or push him away. He's more shy and quiet now. He's also pretty uptight and hates any type of change. He clings to me a lot more now. I really just wanna go home. Home to mom's house with my brother. I wanna go home and go back to how things were and be a family with mom again. I love my mom so much and really miss everything and my dog and my real home. I was told i can't contact mom and she can't contact me. The only contact i was told i could have were sending her gifts for her birthday and mother's day and letters necks and forth. I was told she can send a letter once a week. I begged them to let me at least have a phone call with my mom for Christmas but they said no. I didn't even get a letter from her for Christmas. I had no contact with her during Christmas. It was very depressing. I've basically been coping with living with my dad by separating his abusive past from him now to almost create a fabtasy like world. To protect my brain from trauma and flashbacks. I didn't do it on purpose but more so it just happened as a defense for myself. I see him as a completely different person as him abused him to help myself. I still know what happened and how he abused me no matter what anyone said. I remembered things all on my own and nobody told me anything about memories i had or "made" me remember things. It was all me.
I still feel uneasy when he touches me and sleep most of the time with my door locked. I am tired and drained a lot now and it's really hard. I just wanna live with my mom again please.
-R███ Sebastin"


**Caryn,**
Per our conversation, I contacted Officer Kincaid and he told me to file a complaint with the City of North Chicago (per the jurisdiction of our home address). I went in to the City of North Chicago, and despite all these printouts and

IRMO Francis Exhibit 103 - 000010

explaining things to them at length, they said they need more evidence and could not file a violation report. They were really busy and advised me that this is a civil matter now and should be addressed in court.

I'm also planning to search for any potential contact with Michael Volpe on R████'s phone as well.

Officer Kincaid contacted the LHS IT dept, called me back and told me that as the legal guardian, I can get access to the proof of the email sent from the school email server; he's going to send me the contact info for the person to whom I need to send the request. I also informed him how the City of North Chicago PD did not take action, and whether he can file the police report since that email was sent from the school email address, during the school hours. He's going to talk to his supervisor on jurisdiction, and will let me know if he can do that. I'll keep you posted once I have an update from Officer Kincaid, and the records from the LHS school IT dept.

FYI, I already had a lot of restrictions in place for R████'s phone via the ScreenTime settings (limited most of the app, the times she can access them, blocked some of the websites etc.). I will be installing additional parental control apps such as Bark and Life360 app tonight/tomorrow morning on R████'s phone for additional security. On Bark, I'll be setting up additional keyworks and flags to notify me of any other attempts from Sossamma to contact R████. I'll be also monitoring her phone usage daily.

As you can see from the above on the great progress that R████ and I've been making, this email from R████ (and what Olivia said) just didn't add up. And now with what I found out, it makes sense, and I'm extremely concerned that Sossamma continues to use and manipulate R████ for her own benefit. I'll be extra vigilant in protecting her from further trauma and abuse.

Please let me know if you have other questions, or need more information.

Thanks!
Sebasitn

**Sebastin Francis**
**eLearning Development Manager, CAP Learning**
**College of American Pathologists**
325 Waukegan Road, Northfield, IL 60093
sfranci@cap.org
**Tel:** 800-323-4040 ext. 7979 **Dir:** 847-832-7979 **Fax:** 847-832-8979
cap.org | @Pathologists | CAPconnect

**Education by the Experts**

11

IRMO Francis Exhibit 103 - 000011

## Michone Riewer

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Wednesday, March 13, 2024 12:04 PM |
| **To:** | cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com>; David Finn, Psy.D |
| **Subject:** | Updates on AS & RS and a Question |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Hi Caryn and Dr. Finn,

Here are a few updates on the children since my last email:

- R████ is adjusting well to the school, though she still has a hard time waking up in the mornings (she was tardy couple of times). Her school counselor John told me that she appears to be doing well at school, and has actually made up/completed all required school work from the first semester! Now, she just needs to keep up with the work from this semester.
- As expected, she continues to rebel against my limits and boundaries that I've set for her. Over the last couple of weeks, she's had a few outbursts and tantrums, mostly around my rule about not allowing her to hang out at friends' house (especially if I do not know the parents, nor her friends). Last week, the one friend Brenna she wanted to hang out with was actually babysitting her younger siblings as her dad worked (her mom passed away), and there was not going to be any adult supervision (and this one was an absolute no, but she didn't want to understand my reasons and concerns). Apparently, Sossamma had let her go to Brenna's house all the time, even when her dad was at work. R████ is testing my boundaries and is figuring out things with me.
- Related to above, I've been slowly building trust with her, having discussions and giving her some of the privileges as appropriate. I let her go to the to the Winter Dance at school couple of weeks ago; took her shopping for the dress and shoes that Saturday as well (she looked lovely, and had a great time!). I've also been letting her hang out with friends at home. Her friend Nadia, who lives in this same subdivision has been hanging out with her here on the weekends and even yesterday (I was glad to see that Nadia even got R████ to go biking...I bought her a bike, but R████ hadn't used it yet until yesterday!).
- A████ has started mimicking some of the bad behavior from R████ and has been having a few tantrums. I'm working with his therapist, Michelle. He's doing really well with Michelle, and she has been very helpful to me, providing me with excellent advice, skills and coping skills to help the children navigate through this transition.
- As far as the letters from Sossamma, the therapists and I have not seen any adverse effects on the children. As of today, R████ has not written a card or letter back to Sossamma yet. A████ has sent two cards thus far (but none in the last 3 weeks or so).
- We're going to New York for Spring Break/Easter. I was waiting until we adopted a dog to decide, but since we still haven't found the right dog yet, I went ahead and planned it. R████ is very excited about the trip and told her therapist, Olivia that's she's looking forward to spending time there and with her cousins.

Caryn,

I'd like to take the children with me this summer when I go on a work trip to Whistler, Canada. The way this program is designed, I'm only working until noon each day, and the rest of the time is free for us to explore the place. My other colleagues traveling with me usually bring their family/spouses and children, and I know them well (couple of them have offered to keep an eye on the children during the mornings). We'll be staying at the Four Seasons Resort, and the sessions/program is held in the same hotel/venue (so, I'll be in the same building). I think this would be a good break for the children (and I only need to pay for the children's airfare, as everything else is covered for me!). I wanted to check whether you would be ok with this, or if you had any concerns.

Regards,
Sebastin

1

IRMO Francis Exhibit 103 - 000012

**Sebastin Francis**
**eLearning Development Manager, CAP Learning**
**College of American Pathologists**
325 Waukegan Road, Northfield, IL 60093
sfranci@cap.org
**Tel:** 800-323-4040 ext. 7979 **Dir:** 847-832-7979 **Fax:** 847-832-8979
cap.org | @Pathologists | CAPconnect

**Education by the Experts**

2

IRMO Francis Exhibit 103 - 000013

## Michone Riewer

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Friday, February 23, 2024 3:39 PM |
| **To:** | cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com>; David Finn, Psy.D |
| **Subject:** | Updates on RS & AS – 02/23 |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |
| **Categories:** | Lauren Took Care Of |

Hi Caryn & Dr. Finn,

Here are the latest updates on R█████

- R█████ has had a good transition to school thus far. Last Friday was her first, full day. And this week, she's been going full time as well.
- **Compass IOP:** R█████ went to after school IOP to Compass after school yesterday, and today after school would be her last. She would be officially discharged from the program at Compass today. Per Heather (her therapist at Compass), R█████ has some anxiety around leaving Compass, and not being in the program anymore (she's had the same concerns last time she was at program there as well). She just really likes Compass, and the people there, but the team there agreed that she was ready to transition back to school full time.
- **Outpatient therapist:** R█████ has started with Olivia Orwitz of Parkside Psychological Services, Lake Forest. She's had her 2nd session this week, and now has regular appointments set up on Wednesdays after school. R█████ likes Olivia, and the initial goal from Olivia is to build rapport and trust with her, before tacking and challenging some of R█████ current beliefs on her trauma, and what she things happened to her. We're also planning on having a regular check ins with me, so that Olivia and I are on the same page.
- Last night, R█████ had been in a bad mood and irritable since the time I picked her up from Compass. At dinner time, she got upset over something mundane about the food, and she called the police telling them that she doesn't want to stay here (at my place) yesterday night. She mentioned to them that court is not allowing her to go to mom's house, and refused to come back in the house. The officers were able to calm her down, and convince her to come back inside. Later, she appeared regulated, and I gave her dinner and meds, and she went to bed.
  - I spoke to Heather at Compass this morning, and she felt this has mostly do with her anxiety around finishing her program at Compass. I specifically asked whether this has something to do with the letters from mom, or whether something about mom was discussed yesterday. She didn't think so, as the letters more the same as before, just general "I love you." I've informed Olivia as well.
- During lunchtime, R█████ called me from school and asked me to send her some Apple Cash immediately, saying that she forgot her ID/lunch card, and she needed money (I already put money in her lunch account). I reminded her that I had already set up and sent her $65 in Apple Cash, but she said she didn't want to use her "Christmas money," and to send me more money asap. I told her I couldn't at the moment, and to use the money she has, and that we'll discuss adding more funds later. Just before she hung up, she told me, "you better give me that money when I come home, or else I'll run away." I had been tracking her location on my phone since I dropped her off at school, based on what happened last night (her location has been at school all day).
- **Dog:** We still have not found the right fur baby for our family (at least, according to R█████ There were several that we saw over the last couple of weeks that A█████ and I liked, but R█████ was not sure yet. We're going to see a labradoodle tomorrow/Saturday, and hope he's the one! 🐶
- Last weekend, R█████, As█████ and I also worked on the "cloud ceiling" project in R█████'s room (LED lights on the ceiling with polyfill stuffing to simulate a cloud...a trend from TikTok). I was happy to see R█████ fully engaged, taking charge of most of the work, designing exactly what she wanted. Took quite a few hours, but it came out well, and R█████ was pleased with it. She couldn't wait to share pictures and videos of it with her friends. Unfortunately, it

1

IRMO Francis Exhibit 103 - 000014

came down after a couple of days.....so this weekend, we're figuring out some better methods of making it stay up there!

- A████s doing well with his therapist, Michelle. This week was his 3rd session, and he did well with just Michelle (I dropped him off and went with R████ to get some coffee and some quality time). He's had couple of playdates last weekend with friends, and has another one coming up this weekend as well.


Regards,
Sebastin

**Sebastin Francis**
**eLearning Development Manager, CAP Learning**
**College of American Pathologists**
325 Waukegan Road, Northfield, IL 60093
sfranci@cap.org
**Tel:** 800-323-4040 ext. 7979 **Dir:** 847-832-7979 **Fax:** 847-832-8979
cap.org | @Pathologists | CAPconnect

**Education by the Experts**

IRMO Francis Exhibit 103 - 000015

## Michone Riewer

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Wednesday, February 7, 2024 2:16 PM |
| **To:** | cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com>; David Finn, Psy.D |
| **Cc:** | Michone Riewer |
| **Subject:** | A Question & Updates on RS |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Hi Caryn,

Sossamma's birthday is coming up this Sunday, Feb 11th, and the children asked me about sending her something. When I checked with Michelle and Heather, Michelle suggested that if it's something the children make on their own (crafts etc.) as opposed to me ordering something on Amazon and having it delivered, that may be appropriate. Heather also thought that was appropriate, and good for P████ to be able to do something special for mom. The children and I went to Michael's art store and picked up a few items, and they worked on them over the past weekend (A████ painted and glued flowers on a wooden picture frame, R████ is thinking of making a bracelet with charms, and also a tiny glass bottle with some small flowers inside). Once they complete them, I'm planning to mail them via UPS/FedEx to Sossamma. **Would you be ok with this plan?**

Dr. Finn,

I know it's been a while I included you in on the updates, so my apologies. R████ has been doing really well at Compass, and in fact **today** was her first transition day back to high school. She attended school in the morning (actually woke up earlier and WANTED to take the bus, though I offered to drop her for this very first day back!), and I just dropped her off at Compass for the 2nd half (so that they can help her process the day, and transition back successfully). We'll be doing the same tomorrow, and likely the same on Friday as well. I met with the therapeutic team at Compass, along with the Libertyville High School (LHS) support team yesterday (social workers and the school counselors) to plan the transition. We agreed to slightly amend her accommodations in her IEP to allow for more flexibility and comfort for her (e.g., telling teachers not to "cold call" on her, unless she has her hand up, letting her step out for a walk, water break, or to go to the support team as needed etc.). R████ felt comfortable with these plans. If these transition days go well, she'll start attending LHS full time next week, and she will step down to IOP at Compass (4-6PM).

**Therapists/Sessions:**

From all the lists of referrals I received, I have one trauma-informed outpatient therapist lined up for R████ for an initial consult this afternoon (to see if this is a good fit for R████. Her name is Olivia Orwitz. I had a conversation with her already, and have provided a brief background and what we were looking for in R████s new therapist.

A████ started meeting with his therapist, Michelle Costello (Evanston) yesterday, and had a good, first session.

**Letters from mom/Sossamma:**

Heather shared the first letter (vetted and approved by Pamela Rak) from Sossamma with R████ast Friday, and it appeared to have gone well. R████ was pleased to see the letter (Heather told me she had smile on her face). Michelle shared the letter with A████ last night during the first session, and As████ was happy to get a card as well. He told Michelle that he "feels happy" to see mom's card, and that he's working on a card for mom. He's planning to bring the card to her next week.

**Activities:**

IRMO Francis Exhibit 103 - 000016

On Tuesdays, I got R⬛⬛⬛ started with the youth group that she loves attending couple of weeks ago. Caryn, I vetted out the group and found out that this is at a different church (not mom's), and that Sossamma has only been there once or twice (R⬛⬛⬛ was getting rides from Katie, one of the youth leaders). I know the couple of runs the group very well. I've filled in both of them on our current family situation, made them aware of the order of protection and they are fully supportive. I stayed back/attended both weeks to see what they did there. It's all good, positive messages, activities, discussions, and meaningful friendships that she's receiving there (well, and also getting to hang out with some friends...especially some boys!). A⬛⬛⬛ loves going there as well, since he gets to hang out with one of his friends, Abby (the couple's youngest daughter who is closes to his age).

Tomorrow (Thursdays), R⬛⬛⬛ is also starting volunteering at this equine therapy place, Partners for Progress in Wauconda, IL. I took her to an orientation session couple of weeks ago, and she liked the idea of working with horses (side-walking, and perhaps being a handler later). Now that she's back at school, she's also interested in exploring some groups/clubs or sports there as well. Oh, and we're still on our search for a dog to adopt. We visited couple of shelters/adoptions events, but haven't found the right dog yet. R⬛⬛⬛ wants a BIG dog, and A⬛⬛⬛ wants a small one...we may end up having two at this rate! 🐶

Please let me know if you have any questions.

Regards,
Sebastin

**Sebastin Francis**
**eLearning Development Manager, CAP Learning**
**College of American Pathologists**
325 Waukegan Road, Northfield, IL 60093
sfranci@cap.org
**Tel:** 800-323-4040 ext. 7979 **Dir:** 847-832-7979 **Fax:** 847-832-8979
cap.org | @Pathologists | CAPconnect

**Education by the Experts**

IRMO Francis Exhibit 103 – 000017

## Michone Riewer

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Tuesday, January 16, 2024 11:51 AM |
| **To:** | cbarone@sjtpom.com |
| **Cc:** | David Finn, Psy.D |
| **Subject:** | RE: Updates on RS & AS - Discharge & Return to Illinois |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Adding Dr. Finn for the updates

Hi Caryn,

Sorry for the delayed response! We all had a day off yesterday, and were mostly catching up on cleaning/chores to prepare for the week and hanging out at home. A⬛'s got an "eLearning day" today at school due to the weather (boy, that is NOT fun for the parents! 😩).

Regarding the travel, we were VERY lucky to still arrive on the original flight with just a half hour of delay! We got have Saturday night, and have been settling in.

R⬛ is settling in well. I am working on getting her into our normal, healthy routines that A⬛'s already onboard with (e.g., her bedtime and morning routines!). She's slowly settling into the "house rules" and our family dinner, family prayer and bedtime schedules. We've worked out/made some and agreements for her new cell phone usage. As expected, she doesn't like some of my restrictions and parental control apps, but she's learning to adjust (apparently, she had "full access and freedom, and almost no restrictions" with the phone mom gave her). We did some shopping over the weekend for some essential and non-essential items for her (since she's starting from scratch here at my house with nothing of hers here). R⬛ wanted to have a friend over yesterday, since I've made it clear that I'm ok with her having friends over at our house, but at this time, I'm not okay with her going to anyone else's house. We negotiated a time and had this boy over (thus diving back into my "dad to a teenage daughter" experience....interesting indeed! ☺ ).

A⬛'s been very excited to have R⬛ home...giving her the "tour" of the house, showing her where everything is, wanting to hang out/play with her, even brush his teeth with her, and in her bathroom every morning and night! ☺ I'm learning that R⬛'s routines were not appropriate, and need some course-corrections (eg, apparently, she only brushed once a day...even with braces! And she had not been taking her contact lenses out at bedtime, and apparently had them in for days at a time!).

FYI, based on the recommendations from Michelle, and R⬛'s therapist at Discovery (Emma), I've had a conversation with both A⬛ and R⬛ about mom (since the hearing on OP was extended to March 19, and most likely to a later date). I used messaging and ideas provided by both therapists (Michelle had met with Pamela Rak), and the individual conversations went better than expected. The only question A⬛ had was "I wonder when mom is going to send me a card." R⬛, as expected, wanted to know more and asked about what it is that mom has that makes it unsafe/unhealthy for mom to be around the kids etc. At the end, she appears to have understood...or accepted the reality as is.

R⬛ started her PHP program at Compass Health, Northbrook this morning. After our intake yesterday, they recommended PHP for two weeks, and then step down to IOP and partial school. I'm checking in periodically with the school support team (Sam & John) and keeping them in the loop. I have several other appointment scheduled for her this week and the next (orthodontist, pediatrician for a check up, psychiatrist).

1

IRMO Francis Exhibit 103 - 000018

I sent a message to Sossamma via OFW on Sunday to give her updates on the kids (as usual, I see she's read the message, but no reply).

Please let me know if you have any questions. Hope you're keeping warm in this arctic winter weather! ☻

Regards,
Sebastin

**From:** cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com> <cbaronesjtpalaw@gmail.com>
**Sent:** Monday, January 15, 2024 12:23 PM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Subject:** Re: Updates on RS & AS – Discharge & Return to Illinois

---

**This Message Is From an External Sender**

This message came from outside your organization.

**This banner is provided by CAP IS**

Hi Sebastin,

I am following up to see if you were able to fly back from New York yesterday with this insane weather both here and there. If you can give me an update on things I would appreciate it. I did connect with A████s therapist and had a very long conversation with her on Friday.

Best,
Caryn

On Sun, Jan 7, 2024 at 4:55 PM Sebastin Francis (s) <SFRANCI@cap.org> wrote:

Hi Caryn & Dr. Finn,

R████ is now scheduled to be discharged from the residential program at Discovery this Wednesday, January 10th. She wanted to spend couple of days here in NY with her cousin sisters. Since her new therapist (Emma Tuozzoli) was ok with it, I've booked our **return trip for this Saturday, Jan 13th back to Illinois.**

Per Emma, R████ has been doing well, participating fully in the program, groups etc. and have been a positive role model to other girls there (especially the younger ones) in the program. Emma praised her leadership skills, especially in taking couple of the younger girls who were new to the program under her wings and help them onboard. Emma did not have any safety concerns for R████ (she has denied any suicidal ideation or self harm thoughts since was admitted to Discovery). We had the visitation with her yesterday, and as per R████s wishes, she came here to Long Island to spend a "cousins/girls day" with her cousin sisters (had lunch with the cousins, got their nails done and did some shopping). She spent some time playing with A████ and then the three of us (A████ R████ and I) talked/debated about the breed and size of dog that we're planning to adopt during our drive back to Stamford.

R████ has been telling me and the therapist that she's ready to come home, and get back to her "normal life" in the school, especially to talk to her friends. She'll be attending the PHP program at Compass Health at Northbrook for 2

2

weeks, then per their usual process step down to IOP, and then after care. The Libertyville High School support team (social worker and school counselor) have been very supportive and helpful, checking in with me and the staff at Discovery periodically.

Per recommendations from the staff at Discovery, I will be looking for a more experienced, trauma-focused outpatient therapist for R█████ as well (to start working with R████ after she's done with the IOP and after school program at Compass). R████ had already expressed her concern about her current outpatient therapist (Angel Arnold) as not being a good fit. I'm also in the process of scheduling various other appointments for R████ (with the pediatrician for a regular check up, orthodontist for adjusting her braces, with the psychiatrist for meds etc.). Also, I've reconsidered our plans to relocate to NY, and have told Michone to put it on hold for now (mostly due to the practical reason such as me not being able to afford a place in NY, find good PHP and trauma-focused programs for R████ etc.).

A█████ is having/has had a fantastic holiday here with his cousins, aunts and uncles. Over the past couple of weeks, he did a few "firsts" such as taking a NY city bus, subway, visiting the "gigantic tree" at the Rockefeller Center, the Winter Village at Bryant Park, window shopping on 5th Avenue, going bowling with his cousins, his first movie at a movie theater, going to see the drive-in "Magic of Lights" show on Jones Beach, staying up super late for his first real New Year's Eve party at our Indian Church etc. Though he's reluctant to end his holiday and head back, he's still excited to have R████ home. I've also been meeting with his therapist, Michelle Costello to do the parent sessions with her first, before we introduce her to A████ slowly, once we're back in Illinois.

Hope this helps. Please let me know if you have questions or concerns.

Regards,

Sebastin

From: Sebastin Francis (s)
Sent: Thursday, December 28, 2023 10:36 AM
To: David Finn, Psy.D <dfinn@ahdcllc.com>; cbaronesjtpalaw@gmail.com on behalf of Caryn Barone <cbarone@sjtpom.com> <cbaronesjtpalaw@gmail.com>
Subject: Updates on RS & AS - Christmas Eve/day & Visitation

Hi Caryn & Dr. Finn,

Here are some updates from the holiday these past week.

3

IRMO Francis Exhibit 103 - 000020

- **Saturday Visitation, Christmas Eve & Christmas day:** Christmas Eve and Christmas day went great with both the kids spending time with each other and my family. I was able to negotiate with Discovery for a longer time on the Christmas day for R█████ (we picked up R████ around 9:30AM and dropped her back around 4PM). I heard from a nurse the next day that R█████ enjoyed her time on Christmas day with my family. My sister arranged the whole day/family celebration around R████'s timing (opening the gifts, Christmas family meal, photos etc.). R████ liked reconnecting and spending time with her cousins. My nephew Chris (24) and Amy (20) suggested that they pick up R████ on Christmas day morning, along with my other niece Neha and A████ so they can have "just the cousins" and have some "cousin talk" without a grown up! R████ and A████ loved this idea. I checked with Discovery and authorized Chris & Amy to pick up R████ When I dropped her back on Christmas day, she told me to check whether they would allow another "pass" for another day this week. I checked, and unfortunately, they did not. We can still visit her during the regular visitation hours on Saturday (around 4 hours, and can take her off-site as well).

Last Saturday, we (me, A████ and my niece A███) visited with R████ in Stamford, and stayed locally there for the visitation time. We took R████ out to lunch, then to an animal shelter per her request to spend some time with the dogs (she misses Charlie, her dog). We also took her shopping for the things she wanted. R████ talks to me more or less on a regular basis, after she talks to A████. For instance, she called me this morning to "vent" about her frustrations with the therapist, and yesterday she called me to vent about how upset she was that they moved her from their blue track (older children's group, 16 & 17) to the red track (younger children, 12-15). She also has been telling me that she's ready to go home to me, and that she feels like it's a waste of time there.

I'm attaching some photos from the Christmas Day at my sisters (couple with the cousins).

- **Discovery therapist/treatment plan:**

  o **Therapist:** The I've been asking for a new theory that may be a better fit for our family. Unfortunately, their other therapists do not have any availability as of now. The 2nd session with the same therapist went a bit better, as R████ nd I are getting a bit more used to her approach and style. However, I still have some concerns (more on this below), and have raised my concerns with Sydney, the senior therapist today, who in turn will discuss with the clinical director. R████ was admitted to Discovery on 12/9, but I only received a treatment plan from the therapist (attached) last Thursday, 12/21.

  No updates on a discharge date yet. Given that they only came up with a treatment plan last Thursday, I'm not sure if she would be discharged over the next couple of weeks. This is one of the agenda items for me for the next family session on Friday. The family session last week/Friday went a bit better than the first, since I came prepared with couple of my own objectives and items that I wanted to discuss, and felt like I mostly drove the session (based on the lack of preparation and focus from the therapist the first session). These were based on guidance I received from my own therapist, and from my parent sessions with A████'s therapist. Michelle (A████'s therapist) has been helping me understand more about Munchausen/pathogenic parenting and the impact on the children. Though she's primarily A████'s therapist, she has been helping me with ideas for R████ in terms of helping her process all the changes, court decisions etc. (more helpful than the therapist at Discovery!). Michelle would be reaching out to Caryn, and to Pamela Rak to connect with them over the next couple of weeks, as she wanted to ensure there's consistency in the approach and messaging.

  o **Dr. Finn's 604 report:** Discovery intake staff confirmed to me last week (Tuesday, 12/19) that they have the report from Caryn. However, when I asked the therapist on Friday (12/22), she

4

still hadn't read the report yet. This is part of my concerns with the staff. I outlined my concerns today to Sydney about the level of care that R█████ is receiving. It took more than 2 weeks for me to get a treatment plan from them as well. If I don't get resolutions to these by the end of the week, I will be escalating these issues with the director and others in charge.

Hope these help. Please let me know if you have any questions or concerns.

Regards,

Sebastin

**Sebastin Francis**

**eLearning Development Manager, CAP Learning**

**College of American Pathologists**

325 Waukegan Road, Northfield, IL 60093

sfranci@cap.org

**Tel:** 800-323-4040 ext. 7979 **Dir:** 847-832-7979 **Fax:** 847-832-8979

cap.org | @Pathologists | CAPconnect

**Education by the Experts**

—

*CARYN A. BARONE, ARDC 6292343*

*SOFFIETTI, JOHNSON, TEEGEN*

*ARGUETA, BAWCUM & BARONE, LTD.*

209 N. West St.

Waukegan, IL 60085

5

IRMO Francis Exhibit 103 - 000022

Ph: (847) 249-1640 Fax: (847) 249-1693

cbarone@sitpom.com

6

IRMO Francis Exhibit 103 – 000023

## Michone Riewer

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Tuesday, November 21, 2023 10:16 AM |
| **To:** | David Finn, Psy.D; Caryn Atwood; Michone Riewer |
| **Cc:** | Lauren Wu; Violeta Suarez; Michone Riewer |
| **Subject:** | RE: Update |

Hi Dr. Finn,

After speaking with the providers at Linden Oaks (R████s therapist there, Crystal, and other staff), I strongly feel that it would be extremely helpful for R███s providers to have access to your report to formulate an effective treatment plan for her. If you're open to this, would you be able to sign any necessary releases/affidavits please? I understand if this is not possible due to the confidential nature of the report, but thought to ask.

In addition to the providers at Linden Oaks, I also feel it would also be beneficial to her outpatient therapist, Angel Arnolds, and Pamela Rak (in my conversation with her, I found out she also specializes in reunification therapy, and is open to expanding her role).

On other updates on R████, I've been checking in with the therapists, nurses and the psychologist on duty at Linden Oaks and hear the she's doing well there, denies having any self-harm/suicidal thoughts, socializing and engaging in groups and such. In fact, her therapist told me that apart from her refusing to talk to me and saying she feels unsafe going home with me, they're questioning and thinking through whether or not the inpatient care is justified for her (especially for insurance purposes, as her current stay is covered until Saturday and they would need to put in a request for an extension). R████ mentioned to Crystal that she's open to going to some family friends' place (mentioned two families that I'm familiar with).

I've been having A███ call her daily, and get to overhear the conversations between them. During yesterday's call with A███, R███ told A███, "Don't worry, this time I won't be here long!" She has been in touch with her school friends and I feel that this time around, there's a lot of reasons for her to get back to her school/normal routines.

Regards,
Sebastin

**From:** Sebastin Francis (s)
**Sent:** Sunday, November 19, 2023 11:10 AM
**To:** David Finn, Psy.D <dfinn@ahdcllc.com>; Caryn Atwood <cbaronesjtpalaw@gmail.com>; Michone Riewer <mriewer@strategicdivorce.com>
**Cc:** Lauren Wu <Lwu@strategicdivorce.com>; Violeta Suarez <vsuarez@ahdcllc.com>
**Subject:** RE: Update

Hi Dr. Finn,
Sure, I'll have a release on file at Linden Oaks for you so that you're able to talk (and they're able to share info with you). And I'll be sure to get records from Linden Oaks for you when the time comes.

Regards,
Sebastin

**From:** David Finn, Psy.D <dfinn@ahdcllc.com>
**Sent:** Sunday, November 19, 2023 9:44 AM
**To:** Caryn Atwood <cbaronesjtpalaw@gmail.com>; Michone Riewer <mriewer@strategicdivorce.com>

1

IRMO Francis Exhibit 103 - 000024

Cc: Sebastin Francis (s) <SFRANCI@CAP.ORG>; Lauren Wu <l.wu@strategicdivorce.com>; Violeta Suarez <vsuarez@ahdcllc.com>
Subject: Re: Update

---

**This Message Is From an External Sender**

This message came from outside your organization.

**"This banner is provided by CAP IS"**

Michone, as you might want to ask me about R████ current treatment when I testify at the OP hearing, can I ask for any records Sebastin can obtain? I can also call over to Linden Oaks – Sebastin, can you sign a release and ask R████ to do so and send that release to Violeta?

Dr. David Finn, Psy.D
Associates in Human Development Counseling, LLC
1625 W. Colonial Parkway, Inverness, IL 60067
2nd Floor

847-483-0800
www.ahdcllc.com

**Please Note New Address**
**Please copy my assistant Violeta Suarez (vsuarez@ahdcllc.com) on all emails regarding Court Ordered evaluations or intervention.**

This message may be confidential and privileged. If you have received this communication in error (you are not the addressee or authorized to receive for the addressee), you may not use, copy or disclose the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

**From:** Caryn Atwood <cbaronesjtpalaw@gmail.com>
**Date:** Sunday, November 19, 2023 at 9:30 AM
**To:** Michone Riewer <mriewer@strategicdivorce.com>
**Cc:** Sebastin Francis (s) <sfranci@cap.org>, David Finn, Psy.D <dfinn@ahdcllc.com>, Lauren Wu <Lwu@strategicdivorce.com>
**Subject:** Re: Update

None from me

Sent from my iPhone

> On Nov 19, 2023, at 9:17 AM, Michone Riewer <mriewer@strategicdivorce.com> wrote:
>
> Right now while I can't provide, Lindan oak with Dr. Finn's report, I would like you to sign a release so that he can talk to him.
>
> Caryn,
> Any objection?

2

IRMO Francis Exhibit 103 - 000025

Michone J. Riewer
Sent from my iPhone

On Nov 18, 2023, at 8:09 PM, Sebastin Francis (s) <sfranci@cap.org> wrote:

Adding Dr. Finn, Michone and Lauren for a status update

Hi Caryn,
Further to our conversation this morning, R███ was transferred and admitted to Linden Oaks in Naperville (as of 20 mins ago). I've bought her a few items of clothes and other items like books. Both at Condell this morning and once at Linden Oaks she denied to see me.

I've signed releases for you, Pamela Rak, and her outpatient therapist Angel. Linden Oaks also has the court orders on file and I've filled them in on the history and relevant items needed for their treatment plan.

A few encouraging signs:

- R███ signed a release for me without any issues
- Per the nurses at Condell, and the nurse who assessed her at Linden Oaks, she's emotionally regulated, denies having any suicidal or self harm thoughts, and generally doing well
- Linden Oaks was R███'s first preference (so grateful a bed opened up!), and she recognized a few of the staff and appeared to engage with them well. She had mentioned to the social worker at Condell that she had liked the psychologist and the therapists there

Once the therapist and the doctor are in tomorrow, they will call me to set up family therapy sessions, and to go over the treatment plan. A███ is doing well, hanging out with the former nanny and family this afternoon. Please let me know if any questions.

Thank you for all that you've done!

Regards,
Sebastin

**From:** Caryn Atwood <cbaronesjtpalaw@gmail.com>
**Sent:** Saturday, November 18, 2023 6:56 AM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Subject:** Update

**This Message Is From an External Sender**
This message came from outside your organization.
**This banner is provided by CAP IS**

3

IRMO Francis Exhibit 103 - 000026

## Michone Riewer

| | |
|---|---|
| **From:** | Sebastin Francis (s) <SFRANCI@CAP.ORG> |
| **Sent:** | Thursday, October 5, 2023 12:09 PM |
| **To:** | David Finn, Psy.D |
| **Subject:** | RE: Document for Review - Timeline for R.S. |
| **Attachments:** | Timeline for R█████.docx |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Hi Dr. Finn,

I'm attaching a timeline relevant especially for █████ I hope it helps as you prepare your report.

And thanks for sending the notes from Sossamma (26 pages!) for me to review. I reviewed it, and am shocked and in disbelief. Though I can respond to each and every one of these allegations from her with details, I feel that this may not be the best use of your time. Hence, I'd like to respond with my main impressions:

- Most of these are based on actual dates/events, and though there are a rare few that are true, the others have distorted facts, grave omissions, inaccuracies, and outright lies.
- Many of these (especially examples of messages/texts, events) have been taken out of context to fit her side/version of the (one-sided) narrative.
- I see examples of gaslighting that I underwent for more than 12 years from her. Many of the allegations she makes are ironically what I experienced (as the victim).

If you do have questions about specific allegations she makes, or need any details, I would be happy to provide them to you.

Thanks!
Sebastin

**From:** David Finn, Psy.D <dfinn@ahdcllc.com>
**Sent:** Wednesday, October 4, 2023 8:47 PM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Subject:** Document for Review

---

**This Message Is From an External Sender**

This message came from outside your organization.

**This banner is provided by CAP IS**

In reviewing your file I realized I do not believe I sent this for your review. Please review and respond as you see fit.

Thank you,

Dr. David Finn, Psy.D
Associates in Human Development Counseling, LLC
**1625 W. Colonial Parkway, Inverness, IL 60067**
**2nd Floor**

1

IRMO Francis Exhibit 103 - 000027

847-483-0800
www.ahdcllc.com

**Please Note New Address**
**Please copy my assistant Violeta Suarez (vsuarez@ahdcllc.com) on all emails regarding Court Ordered evaluations or intervention.**

This message may be confidential and privileged. If you have received this communication in error (you are not the addressee or authorized to receive for the addressee), you may not use, copy or disclose the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

2

IRMO Francis Exhibit 103 - 000028

October 4, 2023

- **July 13, 2020:** Petition for Dissolution filed
- **August 26, 2021:** Lake Forest Pediatrics, Sossamma reported that dad has a substance abuse issue
- **January 15, 2022:** Sossamma called police (1st instance) to the house alleging she "smelled" something on me (drugs): I had the drug test done on 1/17/2022 and sent the results to Sossamma the week after. I have a copy of the police report from their visit.
- **February 16, 2022:** I met with Caryn for the first time
- **Mid-March, 2022:** Sossamma met with Caryn for the first time
- **April 22 - 24, 2022:** R████ was taken the ER for COVID, where they first found the self-inflicted wounds/marks. It was sometime in April that there was the first DCFS allegation against me (me allegedly slapping R████, throwing garbage)
- **April 2022:** Safia Kahn becomes involved
- **May 11 – May 20, 2022:** R████ attended Compass Health (PHP, stepped down to IOP, then after school)
- **May 20 – June 1, 2022:** Admitted to Highland Park (NorthShore) after R████ disclosed suicide plans to Safia Khan
- **June 2 – June 16, 2022:** PHP at Compass
- **June 16 – August 29, 2022:** Travelled to Mumbai, India with Sossamma and A████ with very limited interactions/calls with me
- **September 3 – September 6, 2022:** Advocate Christ Children's Hospital (Oaklawn) inpatient treatment for overdosing on Tylenol (suicide attempt)
- **September 6 – September 28, 2022:** Highland Park Hospital (NorthShore)for treatment for attempted suicide/OD. This is where the 2nd DCFS allegation against me (sexual assault) took place. The first two weeks she was admitted, she spoke to me and visited with me every day during visitation. Then very abruptly, she stopped seeing me during visitation, and a couple of days later called me around 10:30PM asking me to drop off something to her that instant and when I told her the hospital timings are over for that day and that I would bring it the next day, she got mad and told me for the first time, "You raped me!" and just hung up. She stopped taking my calls or denied seeing me during visitation timings after that.
  September 28th is when I last saw R████ in person, during the transfer from Highland Park Hospital to Timberline Knolls where the incident in the parking lot happened where Sossamma had R████ call the police on me since she didn't want me to ride together with them to TK.
- **September 28 – Nov 3, 2022:** Inpatient at Timberline Knolls. On Nov 1 or 2nd I got the call from James Jones/DCFS with the no contact instructions, since Sossamma reached out to DCFSwith her "grave concern" that R████ seeing me during/after discharge would trigger further trauma for her, and that I would create a scene during discharge.
- **October 1, 2022:** Sossamma called the police on me (2nd instance) since I followed the court order and set up a toddler bed in my room for A████

IRMO Francis Exhibit 103 - 000029

- **October 11, 2022:** Sossamma moved out of the marital residence. The judge ordered Sossamma to move out, giving me exclusive access to the marital residence. The house was on the market to be sold, but Sossamma was not only uncooperative for the sale, but was making it difficult by leaving the house in a mess.
- **November 6 – November 18, 2022:** Compass PHP program
- **November 19, 2022 – November 28, 2022:** Inpatient program at Rogers Behavioral Health (Brown Deer, WI) following self-harm
- **November 29 – December 9, 2022:** Rogers PHP/outpatient eating disorder program (Skokie). This is where Sossamma claims that R█████ refused to go for a couple of days (she knew their policy that after 3 absences, they discharge her from the program).
- **December 14, 2022– April 5, 2023:** Compass PHP, then stepped down to IOP, then after school. R█████ made a lot of good progress during this time.
- **April 6, 2023 – May 2, 2023:** Inpatient at Linden Oaks Behavioral Health, Naperville, IL following suicidal ideation (anxiety around discharge from Compass)
- **May 2 – July 14, 2023:** Inpatient/residential treatment at Midwest Center, Valparaiso, IN
- **July 17 – August 31, 2023:** Compass PHP, then IOP program
- **September 7, 2023 – Current:** Weekly/as needed sessions with current outpatient therapist, Angel Arnold. Also has the support team at Libertyville High School (LHS), Sam Avila (Social Worker), and John Mortillaro (School counselor).

IRMO Francis Exhibit 103 - 000030

# FEDCOMPLAINT - APPENDIX F

Plaintiff's Motion to dismiss temporary OP issued in Nov 2023

**FILED**
**5/10/2024 1:00 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

STATE OF ILLINOIS )
) SS
COUNTY OF LAKE )

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

SEBASTIN FRANCIS, )  20D 00000905
Petitioner, )
)
-vs- )  GEN. NO.   2023 OP 2596
)
SOSSAMMA GEORGE-SEBASTIN, )
Respondent. )

## MOTION TO DISMISS

NOW COMES the Respondent, SOSSAMMA GEORGE-SEBASTIN, by and through her attorney, DWAYNE DOUGLAS of DOUGLAS LAW, A PROFESSIONAL CORPORATION, and pursuant to section 2-615 of the Code of Civil Procedure, moves to strike and dismiss Petitioner's Petition for Order of Protection.

In support of this Motion, Respondent deposes and states as follows:

1. On November 17, 2023, Petitioner, SEBASTIN FRANCIS (hereinafter "SEBASTIN") petitioned for the issuance of an Order of Protection against the Respondent, SOSSAMMA GEORGE-SEBASTIN (hereinafter "SOSSAMMA"). *See*, Exhibit A.

2. Said Petition sets forth allegations that have no bearing on whether an Order of Protection should issue and they are purportedly offered to provide a timeline, for example, on page 5, "R█ attended Compass? PHP, then IOP program," and "Inpatient program at Rogers Behavioral Health (Brown Deer WI) following self-harm," on page 6, "Compass PHP program," and so on. *See*, Exhibit A.

1

3. To the extent that one can follow what is being alleged, it appears that the Petition makes two principal claims: 1) the content of the report of Dr. David Finn supports the issuance of an Order of Protection, and 2) that Sossamma's actions are not in the child's best interests, citing actions such as "brainwashing," creating "a false narrative," lying, manipulation, "attempts to alienate," creating a "false narrative," etc. *See, Exhibit A.*

4. A Petition for Order of Protection within the meaning of the Illinois Domestic Violence Act of 1986 (hereinafter "IDVA") "shall be in writing and verified or accompanied by affidavit and shall allege that petitioner has been abused by respondent, who is a family or household member." 750 ILCS 60/203 (West 2023).

5. Whether a "petitioner has been abused" is not left undefined and open ended. "'Abuse' means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in loco parentis." 750 ILCS 60/103(1) (West 2023).

6. Physical abuse, harassment, intimidation of a dependent, and interference with personal liberty or willful deprivation are also not left undefined and open ended.

7. "'Physical abuse' includes sexual abuse and means any of the following: (i) knowing or reckless use of physical force, confinement or restraint; (ii) knowing, repeated and unnecessary sleep deprivation; or (iii) knowing or reckless conduct which creates an immediate risk of physical harm." 750 ILCS 60/103(14) (West 2023).

8. "'Harassment' means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances; would cause a reasonable person emotional distress; and does cause emotional distress to the petitioner. Unless the presumption is rebutted by

2

a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:

(i) creating a disturbance at petitioner's place of employment or school;

(ii) repeatedly telephoning petitioner's place of employment, home or residence;

(iii) repeatedly following petitioner about in a public place or places;

(iv) repeatedly keeping petitioner under surveillance by remaining present outside his or her home, school, place of employment, vehicle or other place occupied by petitioner or by peering in petitioner's windows;

(v) improperly concealing a minor child from petitioner, repeatedly threatening to improperly remove a minor child of petitioner's from the jurisdiction or from the physical care of petitioner, repeatedly threatening to conceal a minor child from petitioner, or making a single such threat following an actual or attempted improper removal or concealment, unless respondent was fleeing an incident or pattern of domestic violence; or

(vi) threatening physical force, confinement or restraint on one or more occasions." 750 ILCS 60/103(7) (West 2023).

9. "'Intimidation of a dependent' means subjecting a person who is dependent because of age, health or disability to participation in or the witnessing of: physical force against another or physical confinement or restraint of another which constitutes physical abuse as defined in this Act, regardless of whether the abused person is a family or household member." 750 ILCS 60/103(10) (West 2023).

10. "'Interference with personal liberty' means committing or threatening physical abuse, harassment, intimidation or willful deprivation so as to compel another to engage in conduct

3

from which she or he has a right to abstain or to refrain from conduct in which she or he has a right to engage." 750 ILCS 60/103(9) (West 2023).

11. "'Willful deprivation' means wilfully denying a person who because of age, health or disability requires medication, medical care, shelter, accessible shelter or services, food, therapeutic device, or other physical assistance, and thereby exposing that person to the risk of physical, mental or emotional harm, except with regard to medical care or treatment when the dependent person has expressed an intent to forgo such medical care or treatment. This paragraph does not create any new affirmative duty to provide support to dependent persons." 750 ILCS 60/103(15) (West 2023).

12. The allegations of the Petition of Order of Protection do not constitute an act of "abuse" within the meaning of the IDVA because the Petitioner has not alleged physical abuse, harassment, intimidation of a dependent, or interference with personal liberty or willful deprivation as defined as noted above.

13. Further, under the guise of protecting a minor child, a proceeding under the IDVA may not lie merely because the opposing party and/or the Court deem the granting of relief to be important.

14. The primary purpose of the Domestic Violence Act is to aid victims of domestic violence and to prevent further violence. 750 ILCS 60/102 (West 2002); *Wilson v. Jackson*, 312 Ill.App.3d 1156, 245 Ill.Dec. 750, 728 N.E.2d 832 (2000). Obtaining an order of protection is not the proper procedure for resolving child custody or visitation issues. Those issues should be resolved under the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 et seq. (West 2002)). *Wilson*, 312 Ill.App.3d 1156, 245 Ill.Dec. 750, 728 N.E.2d 832 (*citing In re Marriage of Gordon*, 233 Ill.App.3d 617, 175 Ill.Dec. 137, 599 N.E.2d 1151 (1992)).

4

*Radke ex rel. Radke v. Radke*, 347 Ill. App. 3d 1123, 268–69, 812 N.E.2d 9, 13 (3d Dist. 2004) (wherein the Court found that using the IDVA to attempt to alter visitation constituted misuse of the Act), *see also, In re Marriage of Potenza & Wereko*, 2020 IL App (1st) 192454, ¶ 56.

15. A Petition for Order of Protection, if deficient, is subject to dismissal per section 2-615 of the Code of Civil Procedure as "[a]ny proceeding to obtain, modify, reopen or appeal an order of protection, whether commenced alone or in conjunction with a civil or criminal proceeding, shall be governed by the rules of civil procedure of this State." 750 ILCS 60/205(a) (West 2023).

16. "All objections to pleadings shall be raised by motion. The motion shall point out specifically the defects complained of, and shall ask for appropriate relief, such as: that a pleading or portion thereof be stricken because substantially insufficient in law, or that the action be dismissed, or that a pleading be made more definite and certain in a specified particular, or that designated immaterial matter be stricken out, or that necessary parties be added, or that designated misjoined parties be dismissed, and so forth." 735 ILCS 5/2-615(a) (West 2023).

17. Whether petitioner would like or prefer to have the protections of IDVA apply to the alleged circumstances at hand, the Act provides as it provides. It provides that an Order of Protection may issue for "abuse," not serious endangerment or to account for a child's best interests.

18. In construing a statute, a court must "look to the statutory language itself and give that language its plain and ordinary meaning." *Pence v. Illinois Human Rights Comm'n*, 2020 IL App (3d) 190384, ¶ 25, 157 N.E.3d 1027, 1033. The language of the relevant provisions of the IMDMA refer and relate to the best interests of children and restricting parenting time due to serious endangerment. The language of the IDVA contains no such provisions. The desire of the

5

Petitioner to claim that this is an urgent matter does not change the language of the IDVA. The General Assembly could have had the IDVA provide for an Order of Protection to issue for serious endangerment instead of "physical abuse," but it does not.

19. "The relevant inquiry is whether the well-pleaded facts of the complaint, taken as true and construed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief may be granted. *Loman v. Freeman*, 229 Ill.2d 104, 109, 321 Ill.Dec. 724, 890 N.E.2d 446 (2008). The plaintiff is required to allege facts, and not simply conclusions, sufficient to bring its claim within a legally recognized cause of action. *Marshall v. Burger King Corp.*, 222 Ill.2d 422, 429–30, 305 Ill.Dec. 897, 856 N.E.2d 1048 (2006)." *LaSalle Bank Nat. Ass'n v. City of Oakbrook Terrace*, 393 Ill. App. 3d 905, 910–11, 913 N.E.2d 130, 136 (2d Dist. 2009).

20. Whether the allegations of the Petition for Order of Protection inartfully state a claim under the IMDMA is of no moment. The allegations do not fall within what constitutes an act of "abuse" within the meaning of the IDVA.

WHEREFORE, Respondent, SOSSAMMA GEORGE-SEBASTIN, respectfully requests that this Honorable Court strike and dismiss Petitioner's Petition for Order of Protection and grant any other relief as the Court may deem just.

Respectfully Submitted,

**DOUGLAS LAW**
**A Professional Corporation**
Attorneys for Respondent

BY: _____
DWAYNE DOUGLAS
Attorney at Law

6

DWAYNE DOUGLAS
Attorney Number 6205491
**DOUGLAS LAW**
**A Professional Corporation**
2801 Lakeside Dr. Suite 211
Bannockburn, Illinois 60085
847.220.4050
service@douglaslawoffices.com

7

**EXHIBIT A**

This form is approved by the Illinois Supreme Court and is required to be accepted in all Illinois Circuit Courts.

| STATE OF ILLINOIS NINETEENTH JUDICIAL CIRCUIT LAKE COUNTY, ILLINOIS | PETITION FOR ORDER OF PROTECTION | |
|---|---|---|
| | Civil Proceeding ☒ <br> Criminal Proceeding ☐ | |

| Instructions ▼ | | For Court Use Only |
|---|---|---|
| Directly above, enter the county where you filed this case. | **Petitioner:** SEBASTIN FRANCIS (46) <br> (First, middle, last name) | 2023OP002596 |
| Enter your name as Petitioner. | v. | **Case Number** |
| Enter name of the person you are seeking protection from as Respondent. | **Respondent:** SOSSAMMMA GEORGE (47) A.K.A SOSSAMMA GEORGE-SEBASTIN <br> (First, middle, last name) | ☒ Independent <br> ☐ Juvenile <br> ☐ Other Civil Proceeding |
| Enter the Case Number given by the Circuit Clerk. | **People to be Protected by this Order** (check all that apply): Petitioner refers to any protected person in this Order. | ☐ Criminal |
| Check the boxes for ALL people you want to include in the Order. | ☒ Petitioner <br> ☒ Petitioner's minor children with Respondent: <br> ███ SEBASTIN (14) <br> █ R SEBASTIN (6) | **FILED** <br> NOV 17 2023 |
| On the lines provided, enter the name for each person you are trying to protect."Other household members" includes people living with you or working where you are staying. | ☐ Petitioner's minor children not related to Respondent: <br> _____ <br> ☐ Dependent adult: _____ <br> ☐ High-risk adult: _____ <br> ☐ Other household members: _____ | *Ena Cartwright Weinstein* <br> **CLERK OF THE NINETEENTH JUDICIAL CIRCUIT LAKE COUNTY, ILLINOIS** |

**NOTE:** If you are completing this form for a minor child, dependent adult, or high risk adult, insert information needed below as if you were that person. Do not use your information, except as directed at the bottom of page 10 where you will sign this form.

| | |
|---|---|
| Check either or both boxes for the type of order you want. If you need protection today, check the first one. | **TYPE OF ORDER OF PROTECTION REQUESTED AGAINST RESPONDENT** (check all that apply) <br><br> ☒ Emergency Order of Protection (civil case)/ Ex Parte Protective Order (criminal case) <br> (These short-term Orders of Protection can be granted on the same day you file your Petition without advance written notice to Respondent because advance notice would cause more abuse). <br><br> ☐ Plenary Order of Protection (civil case)/Final Protective Order (criminal case) <br> (These long-term Orders of Protection can only be granted at a court hearing after advance written notice to Respondent.) |
| In background information I, enter the address and email (if you have one) where you want to receive Court notices. If you do not want Respondent to know where you live, enter a different address where you can get mail. If you do not want Respondent to know your email, enter a different email where you can get Court | **BACKGROUND INFORMATION** <br><br> 1. ☐ If Respondent should not know household address because it may cause more abuse, use this address for Court notices: <br><br> _____ <br> *Street Address, Apt #, City, State, ZIP* <br><br> _____ <br> *Email* <br><br> OR <br><br> ☒ Respondent knows household address and it is: |

Case No. 2023OP002596

Ref. Case _____

| notices. If you do not have another email, leave this blank. | 113 MEADOWBROOK LANE, LAKE BLUFF, IL 60044. |
| --- | --- |
| | *Street Address, Apt #, City, State, ZIP* |
| | sfranci@cap.org |
| | *Email* |

**GETTING COURT DOCUMENTS BY EMAIL:** You should use an email account that you do not share with anyone else and that you check every day. If you do not check your email every day, you may miss important information, notice of court dates, or documents from other parties.

| In 2, if you do not know Respondent's date of birth or Respondent's home or work address, write "do not know." | 2. Respondent's Information |
| --- | --- |
| | Respondent's date of birth: 02/11/1976 |
| | Respondent's home address: 13268 WEST HEIDEN CIRCLE, LAKE BLUFF, IL 60044. |
| | *Street Address, Apt #, City, State, ZIP* |
| | Respondent's work information: |
| | BAXTER CREDIT UNION, 340 NORTH MILWAUKEE AVENUE, VERNON HILLS, IL 60061. |
| | *Employer          Street Address, City, State, ZIP* |

| In 3, check all the boxes that describe your relationship to Respondent. For example, if you are requesting an *Order of Protection* against your mother, you will check the box next to "Child" because you are the child of the Respondent. | 3. Petitioner's Relationship to Respondent *(check all that apply)* |
| --- | --- |

3. Petitioner's Relationship to Respondent *(check all that apply)*

- ☐ Boyfriend / Girlfriend / Dating Relationship (including ex) (BG)
- ☒ Spouse(SE)
- ☐ Ex Spouse(XS)
- ☐ Have Children with Respondent(never married to Respondent)(CC)
- ☐ Sharing or Shared Home(CS)
- ☐ Child(CH)
- ☐ Parent (PA)
- ☐ Brother / Sister / Sibling (SB)
- ☐ Other Family Member (OF)
- ☐ Other - Petitioner not Related to Respondent (OT)
- ☐ In-law (IL)
- ☐ Personal Caregiver to Disabled Petitioner (PC)
- ☐ Petitioner with Disability receives care from respondent (PD)
- ☐ Personal Assistant of Petitioner (PR)
- ☐ Grandchild (GC)
- ☐ Grandparent (GP)
- ☐ Step-Child (SC)
- ☐ Step-Brother / Step-Sister / Step-Sibling (SS)
- ☐ Prospective or Adoptive Child has Family or House hold Relationship with Respondent
- ☐ Foster Child has Family or Household Relationship with Respondent
- ☐ Legally Appointed Guardian or Custodian of a Child who has a Family or Household Relationship with Respondent
- ☐ Step-Parent (SP)

| Answer Sections 4 and 5 the best you can. If you check 'yes' but do not know some of the information asked for, then write "do not know." If you need more room, check the box, fill out the *Additional Case Information* form, and file it with this *Petition*. | 4. Is there now, or has there ever been, another *Order of Protection* entered against Respondent involving Petitioner? ☐ Yes   ☒ No   ☐ Do not know |
| --- | --- |

If yes, list information about the cases:

| Names of People Involved | State & County | Year |
| --- | --- | --- |
| | | |

☐ I have listed additional case information on the *Additional Case Information* form.

| In 5, list all other types of court cases that you | 5. Is there now, or has there ever been, another court case with Respondent involving Petitioner? |
| --- | --- |
| | ☒ Yes   ☐ No   ☐ Do not know   If yes, list information about the cases: |

OP-P 403.4                    Page 2 of 19 - Petition for Order of Protection                    (8/21)

Case No. 2023OP002596

Ref. Case _____

| Type of case | State & County | Year |
|---|---|---|
| DIVORCE - 20 D 905 | LAKE COUNTY, IL | 2020 |

☐ I have listed additional case information on the *Additional Case Information* form.

have been involved in with Respondent, such as divorce, custody, child support, parentage, parenting time, guardianship, adoption, and abuse and neglect cases.

In 6, check all boxes that are true.

6. This *Petition* may be filed in this county because (*check all that apply*):

☒ Petitioner resides here.

☒ Respondent resides here.

☒ The abuse happened here.

☐ Petitioner fled here to avoid abuse.

In 7, start with what happened most recently. Enter the date and time and describe what happened. Be as specific about dates and times as you can. You can include any past abuse and any criminal convictions that resulted. If you don't remember exact dates of things that happened long ago, just enter the month and year.

If you need more room, fill out the *Additional Incidents of Abuse* form or your own extra pages and file it with this *Petition*.

7. An *Order of Protection* is needed because Respondent did these things:
Date: 11/17/2023 Time: 9:00 a.m. What happened: TODAY THE CUSTODY EVALUATOR, DR. DAVID FINN, RELEASED HIS REPORT. THE REPORT IS DEEPLY DISTURBING, SHOCKING, DISGUSTING AND HEARTBREAKING FOR THE PARTIES? CHILDREN, R███ AND AS███. THE CHILDREN NEED THIS COURT?S IMMEDIATE PROTECTION. THE REPORT STATES THAT THERE IS A CLEAR AND IMMEDIATE DANGER TO R███E IF SHE IS ALLOWED TO STAY WITH SOSSAMMA. AS███ IS IN DANGER AS WELL. THE REPORT DETAILS THE ABUSE AND IS ATTACHED. THE REPORT DETAILS HOW SOSSAMMA HAS ABUSED AND HARASSED THEIR CHILDREN, BY BRAINWASHING THEM AND TRYING TO RUIN THEIR RELATIONSHIP WITH SEBASTIN. SPECIFICALLY, SOSSAMMA BRAINWASHED RE███ TO BELIEVE THAT SEBASTIN RAPED HER MANY TIMES AS A CHILD, THEREBY RESULTING IN R███ ATTEMPTING SUICIDE AND REQUIRING TWO YEARS OF MENTAL HEALTH TREATMENT (INCLUDING RESIDENTIAL TREATMENT ON AND OFF SINCE APRIL 2022). THE CUSTODY EVALUATOR?S REPORT STATES THAT SOSSAMMA?S CONDUCT SERIOUSLY ENDANGERS THE CHILDREN AND THAT SOSSAMMA SHOULD NOT HAVE TIME WITH THE CHILDREN, NOT EVEN SUPERVISED TIME UNTIL SHE HAS UNDERGONE THERAPY. THE REPORT STATES IN MANY PLACES THAT SOSSAMMA?S EXTREME NEED TO DISCREDIT SEBASTIN AND KEEP THE KIDS FROM SEBASTIN HAS LED HER TO DO THINGS THAT ARE EXTREMELY DETRIMENTAL TO THE CHILDREN?S EMOTIONAL, MENTAL AND PHYSICAL WELL-BEING. SOSSAMMA CANNOT HELP HERSELF AND IS UNABLE TO SEE HOW HER BEHAVIOR IS DESTROYING THE CHILDREN?S SENSE OF SELF AND WELLBEING AND THEREFORE SHE MUST BE KEPT AWAY FROM THE CHILDREN UNTIL SHE RECEIVES THERAPY AND TREATMENT THAT ALLOWS HER TO INTERACT WITH THE CHILDREN IN A DIFFERENT WAY. R███ AND A███ NEED THIS COURT?S IMMEDIATE PROTECTION FOR THEIR PHYSICAL, MENTAL, AND EMOTIONAL HEALTH. SOSSAMMA HAS COMMITTED THE FOLLOWING ACTS OF ABUSE: 1. PHYSICAL ABUSE IN THE FORM OF KNOWING OR RECKLESS CONDUCT WHICH HAS CREATED AN IMMEDIATE RISK OF PHYSICAL HARM, 2. SHE HAS ENGAGED IN WILLFUL DEPRIVATION BY WILLFULLY DENYING R███, WHO BECAUSE OF AGE AND HEALTH, REQUIRED MEDICATION AND MEDICAL CARE, AND THEREBY EXPOSING R███ TO RISK OF PHYSICAL, MENTAL AND EMOTIONAL HARM AND; 3. HARASSMENT BY ENGAGING IN KNOWING CONDUCT WHICH IS NOT NECESSARY TO ACCOMPLISH A PURPOSE THAT IS REASONABLE UNDER THE CIRCUMSTANCES, WOULD CAUSE A REASONABLE PERSON EMOTIONAL DISTRESS; AND DOES CAUSE EMOTIONAL DISTRESS. SOSSAMMA HAS MENTALLY TORTURED AND ABUSED R███ BY BRAINWASHING HER TO BELIEVE THAT SEBASTIN RAPED HER THOUSANDS OF TIME. SOSSAMMA CREATED THIS FALSE NARRATIVE BECAUSE SHE WAS UPSET THAT SEBASTIN WANTED A DIVORCE.

Case No. 2023OP002596

Ref. Case _____

SOSSAMMA HAS TAKEN YEARS FROM R███ WHERE SHE COULD HAVE BEEN A REGULAR PRE-TEEN ATTENDING SCHOOL AND SPENDING TIME WITH FAMILY AND FRIENDS. INSTEAD, SHE LIED TO HER AND HOISTED FALSE MEMORIES OF SEXUAL ABUSE ON HER. SOSSAMMA HAS PURPOSELY AND METHODICALLY ALIENATED R███ SEBASTIN BY CREATING AND ENCOURAGING FALSE MEMORIES. SEBASTIN HAS NOT SEEN HER SINCE SEPTEMBER 28, 2022. SOSSAMMA HAS ENGAGED IN REPEATED, METHODICAL AND CALCULATED ABUSE AND BRAINWASHING OF R███ TO FURTHER HER WISHES THAT R███ DOES NOT HAVE ANY CONTACT WITH SEBASTIN. SHE HAS CREATED A FALSE NARRATIVE TO ALLEVIATE ANY CHANCE THAT R███ WILL ALLOW A RELATIONSHIP WITH SEBASTIN. SOSSAMMA HAS BRAINWASHED RENNE TO BELIEVE THAT SEBASTIN SEXUALLY ABUSED HER HUNDREDS OF TIMES WHEN SHE WAS A CHILD. SOSSAMMA?S ABUSE AND BRAINWASHING HAS RESULTED IN R███ ATTEMPTING SUICIDE AND SELF-HARMING THROUGH CUTTING, HEAD BANGING, AND PULLING OUT HER OWN HAIR. R███?S EFFORTS TO SELF HARM HAVE RESULTED IN HER BEING MEDICATED, HOSPITALIZED, SEDATED AND STRAPPED DOWN ON MULTIPLE OCCASIONS. SOSSAMMA?S BRAINWASHING AND FALSE NARRATIVE HAS SHATTERED R███?S WELLBEING AND SERIOUSLY ENDANGERS HER MENTAL, EMOTIONAL AND PHYSICAL HEALTH DAILY. SOSSAMMA HAS STARTED TO ALIENATE A███. SEBASTIN IS AFRAID THAT SHE HAS ALSO TOLD A███, FALSELY, THAT HER SEXUALLY ABUSED R███. SOSSAMMA USES ?ANGEL GIFTS? TO BRAINWASH AND MANIPULATE A███. SHE GIVES HIM ANGEL GIFTS TO CUT HIS TELEPHONE CALLS WITH HIS FATHER SHORT, SHE GIVES HIM ANGEL GIFTS TO TALK ON THE PHONE WITH HER LONGER, AND SHE GIVES HIM ANGEL GIFTS TO HUG HER FOR A LONG TIME DURING PICK UP AND DROP OFF. SHE VIDEOTAPES THE LONG HUGS WITH A CAMERA PLACED ON A COUCH IN HER GARAGE POINTED AT THE PICK UP AND DROP OFF SPOT. SOSSAMMA TOLD AS███ THAT HE WOULD GO TO HELL IF HE WENT WITH HIS FATHER TO INDIA. IN ADDITION TO THE ATTEMPTS TO ALIENATE A███?S AFFECTION FOR SEBASTIN, SOSSAMMA CREATED A SITUATION WHERE R███ DISAPPEARED AND WAS GONE FROM AS███ FOR WEEKS AT A TIME. SOSSAMMA HAS CREATED A HOSTILE AND UNHEALTHY ENVIRONMENT FOR THE CHILDREN AND SEBASTIN AS A WAY TO PUNISH SEBASTIN FOR WANTING A DIVORCE. SOSSAMMA FILED FALSE POLICE REPORTS, SHE MADE FALSE REPORTS TO DCFS, AND FILED FOR AN OP ON FALSE ALLEGATIONS; ALL TO KEEP OUR CHILDREN AWAY FROM SEBASTIN. WITHOUT THE IMMEDIATE PROTECTION FROM THIS COURT, SEBASTIN IS FEARFUL THAT IF SOSSAMMA IS ALLOWED TO HAVE ANY CONTACT WITH A███ OR R███, SHE WILL PROVIDE THEM WITH INFORMATION FROM DR. FINN?S REPORT. SOSSAMMA WILL USE THE REPORT TO FURTHER ABUSE OR ENDANGER THE CHILDREN BY PROVIDING THEM WITH SENSITIVE INFORMATION REGARDING MENTAL HEALTH, RECOMMENDATIONS REGARDING PARENTING TIME, RECOMMENDATIONS REGARDING DECISION MAKING AND A PLAN FOR REUNIFICATION OF SEBASTIN WITH R███ THAT IS INAPPROPRIATE FOR THE CHILDREN AND WILL SERIOUSLY ENDANGER THEIR PHYSICAL, MENTAL AND EMOTIONAL WELL BEING. SEBASTIN IS FEARFUL THAT ONCE SOSSAMMA VIEWS THIS REPORT, SHE WILL SHARE OR CREATE INFORMATION OR STORIES OR OTHERWISE ENGAGE IN KNOWING OR RECKLESS CONDUCT WHICH WILL CREATE AN IMMEDIATE RISK OF SERIOUS PHYSICAL HARM TO R███ BECAUSE R███ COULD ATTEMPT OR COMMIT SUICIDE. BECAUSE OF SOSSAMMA?S ABUSE, RENNE IS FRAGILE AND NEEDS IMMEDIATE PROTECTION FROM THE FINDINGS IN THIS REPORT UNTIL SHE IS IN A THERAPEUTIC ENVIRONMENT AND CAN PROCESS THIS WITH THE GUIDANCE OF MENTAL HEALTH AND MEDICAL PROFESSIONALS. SEBASTIN HAS MAINTAINED FOR YEARS THAT SOSSAMMA WAS ABUSING R███ WITH HER FALSE

Case No. 2023OP002596

Ref. Case _____

NARRATIVE AND HAS ASKED FOR THIS COURT?S HELP IN THE FORM OF MANY EMERGENCY MOTIONS. THIS COURT HAS PREVIOUSLY FOUND AND ENTERED ORDERS FINDING THAT SOSSAMMA HAS SERIOUSLY ENDANGERED OUR DAUGHTER AND GIVEN SEBASTIN SOLE MEDICAL DECISION-MAKING FOR R███████ SEBASTIN NEEDS THIS COURT?S HELP IMMEDIATELY FOR THE SAFETY AND PHYSICAL, MENTAL, AND EMOTIONAL HEALTH OF R██████ AND A███████ A TIMELINE IS INCLUDED BELOW OF THE ABUSE THAT SOSSAMMA HAS INFLICTED ON R██████, AS███████, AND SEBASTIN STARTING WITH MOST RECENT EVENTS TO SHOW THE PATTERN AND HISTORY OF ABUSE.

**Date: 7/7/23 - present Time: What happened:** R██████ HAS WEEKLY SESSIONS WITH CURRENT OUTPATIENT THERAPIST, ANGEL ARNOLD. ALSO HAS THE SUPPORT TEAM AT LIBERTYVILLE HIGH SCHOOL (LHS), SAM AVILA (SOCIAL WORKER), AND JOHN MORTILLARO (SCHOOL COUNSELOR).

**Date: 7/17/23-8/31/23 Time: What happened:** R████E ATTENDED COMPASS? PHP, THEN IOP PROGRAM.

**Date: 5/2/23-7/14/23 Time: What happened:** R██████ WAS AN INPATIENT AND RECEIVED RESIDENTIAL MENTAL HEALTH TREATMENT AT MIDWEST CENTER, VALPARAISO, IN

**Date: 4/6/23-5/2/23 Time: What happened:** RE████ WAS AN INPATIENT AND RECEIVED RESIDENTIAL MENTAL HEALTH TREATMENT AT LINDEN OAKS BEHAVIORAL HEALTH, NAPERVILLE, IL. SHE HAD SUICIDAL IDEATIONS DUE TO ANXIETY AROUND DISCHARGE FROM COMPASS.

**Date: 12/14/22-4/5/23 Time: What happened:** COMPASS PHP, THEN STEPPED DOWN TO IOP, THEN AFTER SCHOOL. R██████ MADE A LOT OF GOOD PROGRESS DURING THIS TIME. HOWEVER, WHEN THE SUPPORT OF COMPASS WAS GOING TO BE STOPPED, SHE THREATENED TO COMMIT SUICIDE AND WAS ADMITTED TO AN INPATIENT FACILITY.

**Date: 12/20/22 Time: What happened:** A COURT ORDER WAS ENTERED RULING THAT SOSSAMMA?S BEHAVIOR, INTERACTION AND MEDICAL DECISION MAKING SERIOUSLY ENDANGERED R████E. AND THAT IT WAS FOUND TO BE A SERIOUS ENDANGERMENT TO R██████?S MENTAL HEALTH AND EMOTIONAL DEVELOPMENT. THE ORDER WENT ON TO SAY THAT SOSSAMMA?S TESTIMONY WAS NOT CREDIBLE. SEBASTIN WAS GRANTED SOLE MEDICAL DECISION-MAKING FOR R██████

**Date: 11/29/22-12/9/22 Time: What happened:** ROGERS PHP/OUTPATIENT PROGRAM IN SKOKIE. SOSSAMMA WAS RESPONSIBLE FOR TAKING R██████ TO THE OUTPATIENT PROGRAM. SHE CHOSE NOT TO. SOSSAMMA CLAIMED THAT R████E REFUSED TO GO FOR A COUPLE OF DAYS (SHE KNEW THEIR POLICY WAS THAT AFTER 3 ABSENCES, THEY WOULD DISCHARGE R██████ FROM THE PROGRAM).

**Date: 11/19/22-11/28/22 Time: What happened:** INPATIENT PROGRAM AT ROGERS BEHAVIORAL HEALTH (BROWN DEER, WI) FOLLOWING SELF-HARM

**Date: 11/17/22 Time: What happened:** SOSSAMMA CONTACT WITH DCFS ? ? JAMES JONES SEVERAL CONVERSATIONS WITH MS. SEBASTIN REGARDING THE REPORT AND ONGOING INVESTIGATION. MS. SEBASTIN EXPRESSES SUBSTANTIAL AMOUNTS OF ANIMOSITY TOWARD HER EX-HUSBAND AND STATES THAT SHE IS

Case No. 2023OP002596

Ref. Case _____

ONLY DOING THE THINGS SHE IS DOING TO PROTECT HER DAUGHTER. MS. SEBASTIN HAS ASKED ME TO MAKE DECISIONS OR TAKE ACTIONS BECAUSE SHE DOESN?T FEEL LIKE THE FAMILY COURT IS DOING WHAT THEY SHOULD BE DOING OR WHAT SHE WANTS. MS. SEBASTIN HAS CLEARLY STATED ON MORE THAN ONE OCCASION THAT SHE DOES NOT WANT HER CHILDREN TO HAVE ANY CONTACT WITH THEIR FATHER AND SHE IS FRUSTRATED THAT THE COURT IS NOT PROHIBITING THIS CONTACT. AFTER THE CV WAS VSI MS. SEBASTIN CONTACTED ME TO TRY TO HAVE ME PUT AN AGREEMENT INTO PLACE TO BAR THE FATHER FROM CONTACT WITH THE YOUNGER SIBLING DESPITE THERE BEING NO ALLEGATION OF ABUSE OR RISK OF HARM.?

Date: 11/6/22-11/18/22 Time: What happened: COMPASS PHP PROGRAM

Date: 10/11/22 Time: What happened: COURT ORDER - SOSSAMMA MUST MOVE OUT OF THE MARITAL RESIDENCE. 50/50 PARENTING TIME WITH A███.

Date: 10/1/22 Time: What happened: SOSSAMMA CALLED THE POLICE ON SEBASTIN (2ND INSTANCE) SINCE HE FOLLOWED THE COURT ORDER AND SET UP A TODDLER BED IN HIS ROOM FOR A███

Date: 9/28/22-11/3/22 Time: What happened: INPATIENT AT TIMBERLINE KNOLLS. ON NOV 1 OR 2ND SEBASTIN GOT THE CALL FROM JAMES JONES/DCFS WITH THE NO CONTACT ORDER, SINCE SOSSAMMA REACHED OUT TO WITH HER ?GRAVE CONCERN? THAT R███ SEEING ME DURING/AFTER DISCHARGE WOULD TRIGGER FURTHER TRAUMA FOR HER, AND THAT SEBASTIN WOULD CREATE A SCENE DURING DISCHARGE.

Date: 9/27/22 Time: What happened: SOSSAMMA FILED EMERGENCY OP AGAINST SEBASTIN AND INCLUDED BOTH KIDS TO BE PROTECTED PARTIES ? IT WAS DENIED. SHE CLAIMED ?RECENT INCREASE IN AGGRESSIVE BEHAVIOR. WALKS INTO ROOM WITHOUT KNOCKING. . . UNPLUGS WEB CAM WHEN SEBASTIN IS NOT HOME . . CALLS MY ROOM A MESS EVEN WHEN CLEAN . . .PUSHED ME. . .R███ AT HOSPITAL. LAST WEEK, PSYCHIATRIST INFORMED ME THAT R███ STARTED REMEMBERING HOW SHE WAS RAPED BY THE FATHER WHEN SHE WAS SMALL. HOSPITAL CALLED AND DCFS AND INVESTIGATION IS ONGOING.?

Date: 9/15/22 Time: What happened: CUSTODY EVALUATOR, DR. DAVID FINN APPOINTED PURSUANT TO 604.10(B).

Date: 9/15/22 Time: What happened: SOSSAMMA WAS INVOLVING AN UNLICENSED THERAPIST THAT WAS NOT QUALIFIED TO SEE R███E AND HANDLED THE MATTER WITH A LACK OF PROFESSIONALISM AND RECKLESSNESS THAT SERIOUSLY ENDANGERED R███ THE COURT ORDERED NEITHER CHILD TO SEE SAFIA KHAN.

Date: 9/28/22 Time: What happened: WHEN SEBASTIN LAST SAW R███ IN PERSON, DURING THE TRANSFER FROM HIGHLAND PARK HOSPITAL TO TIMBERLINE KNOLLS WHERE THE INCIDENT IN THE PARKING LOT HAPPENED WHERE SOSSAMMA HANDED THE PHONE TO R███ AND HAD R███ CALL THE POLICE ON SEBASTIN SINCE SHE DIDN?T WANT ME TO RIDE TOGETHER WITH THEM TO TK.

Date: 9/6/22-9/28/22 Time: What happened: HIGHLAND PARK HOSPITAL FOR TREATMENT FOR ATTEMPTED SUICIDE/OD. THIS IS WHERE THE 2ND DCFS

Case No. 2023OP002596

Ref. Case _____

ALLEGATION AGAINST SEBASTIN (SEXUAL ASSAULT) TOOK PLACE. THE FIRST TWO WEEKS SHE WAS ADMITTED, SHE SPOKE TO SEBASTIN AND VISITED WITH HIM EVERYDAY DURING VISITATION. THEN VERY ABRUPTLY, SHE STOPPED SEEING HIM DURING VISITATION, AND A COUPLE OF DAYS LATER CALLED HIM AROUND 10:30 PM ASKING HIM TO DROP OFF SOMETHING TO HER THAT INSTANT AND WHEN HE TOLD HER THE HOSPITAL VISITING HOURS WERE OVER FOR THAT DAY AND THAT HE WOULD BRING IT THE NEXT DAY, SHE GOT MAD AND TOLD SEBASTIN FOR THE FIRST TIME, ?YOU RAPED ME!? AND JUST HUNG UP. SHE STOPPED TAKING HIS CALLS AND DENIED SEEING HIM DURING VISITING HOURS AFTER THAT.

**Date: 9/25/22 Time: What happened:** MEDICAL RECORDS STATE ON 9/25/22 ? PATIENT VISITED WITH BOTH PARENTS YESTERDAY AND SAID IT WAS ?FINE? BUT REFUSED TO SEE DAD TODAY. SHE BRIEFLY MENTIONED HER FIRM BELIEF THAT HER FATHER HAD ABUSED HER WHEN SHE WAS FOUR, BUT SAID SO WITHOUT ANY EMOTION OR LOOKING UP FROM THE PAPER SHE WAS DRAWING ON. SAID SHE DOES NOT FEEL SAFE W/ HIM.?

**Date: 9/20/22 Time: What happened:** MEDICAL RECORDS STATE ON 9/20/22 ? DISCUSSING ALLEGATION OF SEXUAL ABUSE DCP WORKER JAMES JOYCE SAID THAT DUE TO ?LACK OF SPECIFIC INFORMATION WITHIN THE ALLEGATIONS (E.G., I JUST HAVE A THOUGHT THAT HE DID) THEY ARE UNSURE IF THEY WILL MAKE A RECOMMENDATION OR IF LAW ENFORCEMENT WOULD MOVE FORWARD WITH AN INVESTIGATION.

**Date: 9/19/22 Time: What happened:** DCFS REPORT ? ?COMPLAINING VICTIM REPORTS A ?WEIRD THOUGHT? THAT HER FATHER MAY HAVE RAPED HER AND THEN, PERHAPS, ERASED HER MEMORY OF THE ASSAULT. THEN UNABLE TO PROVIDE ANY OTHER DETAILS OF THE ALLEGATION THAT SHE WAS RAPED OR HOW HER MEMORY MIGHT HAVE BEEN ERASED.? INTERVIEW AT HIGHLAND PARK HOSP. WITH JAMES JONES ?R███ STATED THAT OVER SEVERAL MONTHS SHE HAD WHAT SHE CALLS A WEIRD IDEA THAT HER FATHER MAY HAVE RAPED HER AND THEN WIPED HER MEMORY. R███ WAS UNABLE TO GIVE A TIME FRAME OR EXACT CIRCUMSTANCES THAT LED HER TO BELIEVE THAT SHE HAD BEEN RAPED. R███ STATES THERE IS NOTHING THAT HAS INDICATED TO HER THAT SHE?S BEEN RAPED ASIDE FROM THIS IDEA THAT SHE HAS IN HER HEAD THAT IS MAY HAVE HAPPENED. WHEN I ASKED R███ HOW SHE BELIEVES HER FATHER WIPED HER MEMORY SHE STATED SHE DIDN?T KNOW THAT MAYBE HE HAS USED DRUGS TO DO SO. R███ STATES THAT BECAUSE DRUGS WERE ALLEGEDLY GIVEN TO HER TO WIPE HER MEMORY HER MEMORY WAS ALSO WIPED OF HAVING BEEN GIVEN THE DRUGS.?

**Date: 9/19/22 Time: What happened:** MEDICAL RECORDS STATE ON 9/19/22 ? ?RE███ SAID SHE IS SCARED THAT HER DAD RAPED HER AND SHE CANNOT REMEMBER BECAUSE HER DAD ?ERASED HER MEMORY.? SHE WAS ASKED HOW SHE COULD RECOVER THAT MEMORY. SHE WAS UNABLE TO STATE SPECIFICS ABOUT THE EVENT-SUCH AS WHEN OR WHERE IT HAPPENED, WHAT HE DID, ETC. DCFS REPORT FILED.? MEDICAL RECORDS STATE ON 9/19/22 ? ?PATIENT SIGNED ROI FOR GAL, ALTHOUGH DID NOT WANT RECORDS TRANSMITTED TO THIS INDIVIDUAL.? ?SW ATTEMPTED TO MEET WITH PATIENT TO PROVIDE UPDATED ROI FOR GAL, AS INITIAL NAME OF GAL RECORDS IN THE CHART WAS MISSPELLED. PATIENT CRYING, AFTER PULLING OUT HER HAIR.?

**Date: 9/13/22 Time: What happened:** LISA GLEICH EMAILED MICHAEL ALVARADO

Case No. 2023OP002596

Ref. Case _____

(SOSSAMMA'S FORMER COUNSEL) EXPLAINING SAFIA KHAN NOT CLINICALLY LICENSED AND NEEDS TO BE SUPERVISED BY HER. LISA/MOBILE THERAPY CENTER WILL NOT SUPERVISE SAFIA WITH R████ BECAUSE MENTAL HEALTH ISSUES OF R████ HAVE INCREASED AND OUTSIDE OF SCOPE OF THEIR TREATMENT. MICHAEL HAD WRITTEN TO LISA 9/12/22 REQUESTING SAFIA KEEP WORKING WITH R████ ("SOSSAMMA REPORTS R████ NEEDS SAFIA MORE THAN EVER").

**Date: 9/9/22 Time: What happened:** MEDICAL RECORDS STATE ON 9/9/22 ? ?SPOKE WITH LENGTH ABOUT MOTHER?S CONCERNS. SHE STATED PT?S THERAPIST, SAFIA KHAN, WORKS FOR A PRACTICE THAT WILL NOT ALLOW HER TO SEE PT DUE TO RISK. THERE IS NO OTHER THERAPIST INVOLVED IN CASE. MOTHER ALSO REQUESTED WE CONTACT PT?S GAL, KAREN BARONE (SIC). MOTHER STATED GAL IS INSISTING ON INITIATING FAMILY REUNIFICATION NOW. MOTHER GAVE VERBAL CONSENT TO RELEASE INFORMATION TO GAL.?

**Date: 9/8/22 Time: What happened:** MEDICAL RECORDS STATE ON 9/8/22 ? ?PATIENT STATES THAT SHE IS CLOSE WITH HER MOM BUT SHE FEELS DOWN ABOUT HER RELATIONSHIP WITH HER DAD AND THE DIVORCE HER PARENTS ARE GOING THROUGH.?

**Date: 9/7/22 Time: What happened:** MEDICAL RECORDS STATE ON 9/7/22 ? ?PATIENT DISCUSSED THE STRAINED RELATIONSHIP WITH HER FATHER. REPORTS SHE DOESN?T TRUST HIM AND FEELS ANGRY SHE HAS BEEN PUT IN THE MIDDLE OF HER PARENTS CONFLICT. SHE IS NOT INTERESTED IN REPAIRING THE RELATIONSHIP WITH HER FATHER ? SHE SAYS SHE WILL ONLY MAKE SMALL TALK WITH HER FATHER.? MEDICAL RECORDS STATES ON 9/7/22 ? ?OTHER STRESSORS ARE HER PARENTS ONGOING DIVORCE, THE CUSTODY BATTLES. . . FAMILY HISTORY ? MOM HAS DEPRESSION, ANXIETY ANGER ISSUES AND DAD IS AN ALCOHOLIC, ANGER PROBLEM . . PATIENT CLOSE TO MOM, BUT NOT CLOSE TO DAD. SHE SAID HER DAD LOST THE TRUST, HE IS HIDING STUFF FROM THEM, NOT REALLY HAVING TO CHOOSE, SHE LOST THE FATHER FIGURE IN HER LIFE. PATIENT REPORTS SOME TRAUMA FROM PARENTS FIGHTING WHEN SHE WAS LITTLE. BOTH OF THEM LET HER CALL THE POLICE, SHE DID NOT KNOW WHAT TO DO. SHE CURLED HERSELF IN THE CORNER. SHE STILL HAS THOSE FEELINGS. NO FLASHBACKS OR NIGHTMARES.? MEDICAL RECORD SUMMARY STATES ON 9/7/22 ? ?PATIENT CURRENTLY RESIDES WITH BIOLOGICAL PARENTS WHO ARE CURRENTLY IN THE MIDST OF A DIVORCE. THERE IS CURRENTLY A GAL ASSIGNED TO THE CHILDREN. PATIENT IS STRUGGLING WITH PARENTAL CONFLICT WITH ONE ANOTHER, FEELING OVERWHELMED WITH THEIR TUMULTUOUS RELATIONSHIP.? MEDICAL RECORD FAMILY MEETING NOTES STATES ON 9/7/22 ? ?PATIENT ASKED TO TAKE A BREAK FROM FAMILY MEETING. SW ESCORTED PATIENT OUT, AND PATIENT IMMEDIATELY STATED SHE DID NOT WANT TO RETURN TO SESSION DUE TO PERCEIVED TENSION BETWEEN PARENTS.? MEDICAL RECORDS STATE ? 9/7/22 ? ?STATES SHE DOESN?T FEEL SAFE AT HOME DUE TO FATHER. DENIES PHYSICAL ABUSE BUT IS SOMETIMES FEARFUL OF THIS.?

**Date: 9/3/22-9/6/22 Time: What happened:** R████ WAS AN INPATIENT AT ADVOCATE CHRIST CHILDREN?S HOSPITAL INPATIENT TREATMENT FOR OVERDOSING ON TYLENOL (SUICIDE ATTEMPT). WENT TO HIGHLAND PARK HOSPITAL NEXT FOR A LONGER TIME PERIOD.

**Date: 9/3/22 Time: What happened:** 9/3/22 LISA GLEICH EMAIL THAT MOBILE

OP-P 403.4                    Page 8 of 19 - Petition for Order of Protection                    (8/21)

Case No. 2023OP002598
Ref. Case _____

THERAPY CENTERS CAN NO LONGER PROVIDE THERAPY TO R█████ VIA SAFIA KHAN; SAFIA KHAN TO TERMINATE PROVIDING THE CLIENT SERVICES . AT SOSSOMMA?S ENCOURAGEMENT, SAFIA KHAN EMAILED MEDICAL AND MENTAL HEALTH INFORMATION IN VIOLATION OF THE MENTAL HEALTH ACT AND IN VIOLATION OF HIPPA TO THE COURT, GAL, COUNSEL, PARALEGALS, CLERKS, AND PARTIES. THE EMAIL WAS INCREDIBLY UNPROFESSIONAL AND A VIOLATION OF R█████ RIGHTS.

Date: 6/16/22-8/29/22 Time: What happened: INDIA ? AGAINST ADVICE OF R█████ TREATMENT TEAM, SOSSAMMA TRAVELED TO MUMBAI, INDIA WITH R█████ AND A█████. SEBASTIN HAD VERY LIMITED INTERACTIONS/CALLS WITH THE CHILDREN. SOSSAMMA SAID SHE WAS GOING FOR A COUPLE WEEKS AND THEN DIDN?T RETURN ALL SUMMER. WHEN SHE FINALLY RETURNED AS ORDERED BY THE COURT, THE KIDS HAD MISSED NINE DAYS OF SCHOOL. WHILE IN INDIA, SOSSAMMA UNILATERALLY DISCONTINUED SOME OF R█████S MENTAL HEALTH MEDICATIONS AND CHOSE TO PUT R█████ ON DIFFERENT MEDICATION. IN ADDITION, SHE FORCED R█████ TO WATCH HER GRANDFATHER DIE AND MISLED SEBASTIN ABOUT R█████?S CONDITION.

Date: 6/2/22-6/16/22 Time: What happened: PHP AT COMPASS

Date: 5/20/22-6/1/22 Time: What happened: R█████ WAS ADMITTED TO HIGHLAND PARK AFTER SHE DISCLOSED SUICIDE PLANS TO SAFIA KHAN. SOSSAMMA LISTED ONLY HERSELF ON THE HOSPITAL INTAKE FORMS AND SHE FALSELY LISTED SEBASTIN AS BEING AN ALCOHOLIC WITH AN ANGER PROBLEM ON THE HOSPITAL FORMS. SOSSAMMA LISTED HERSELF AS HAVING AN ANXIETY DISORDER.

Date: 5/23/22 Time: What happened: MEDICAL RECORDS STATE ? 5/23/22 ? ?PATIENT DESCRIBES THAT YEARS AGO SHE WAS EMOTIONALLY ABUSED BY DAD." ?RELATIONSHIP WITH PARENTS: MOM ? GOOD, DAD- I TRY NOT TO BE WITH HIM (PAST TRAUMA)

Date: 5/11/22-5/20/22 Time: What happened: R█████ ATTENDED COMPASS HEALTH (PHP, STEPPED DOWN TO IOP, THEN AFTER SCHOOL)

Date: 4/22/22-4/24/22 Time: What happened: R█████ WAS TAKEN THE ER FOR COVID WHERE THEY FIRST FOUND THE SELF-INFLICTED WOUNDS/MARKS.

Date: April 2022 Time: What happened: FIRST DCFS ALLEGATION AGAINST SEBASTIN (FOR HIM ALLEGEDLY SLAPPING RE█████ THROWING GARBAGE). IT DID NOT HAPPEN.

Date: 3/15/22 Time: What happened: SOSSAMMA MET WITH THE GAL, CARYN, FOR THE FIRST TIME. R█████ MET WITH CARYN FOR THE FIRST TIME. SOSSAMMA UNILATERALLY OBTAINED A THERAPIST THE DAY AFTER CLAIMING R█████ WAS SO DISTRESSED BY THE GAL MEETING THAT SHE REQUIRED IMMEDIATE MENTAL HEALTH INTERVENTIONS. GAL DIDN?T OBSERVE ANY DISTRESS FROM CHILD. THIS IS WHEN SAFIA KHAN BECOMES INVOLVED.

Date: 2/16/22 Time: What happened: SEBASTIN MET WITH CARYN THE FIRST TIME.

Date: 1/31/22 Time: What happened: GAL CARYN BARONE APPOINTED.

Case No. 2023OP002596

Ref. Case _____

Date: 1/15/22 Time: What happened: SOSSAMMA CALLED POLICE (1ST INSTANCE) TO THE HOUSE ALLEGING SHE ?SMELLED? SOMETHING ON SEBASTIN (DRUGS); SEBASTIN HAD THE DRUG TEST DONE ON 1/17/2022 AND SENT THE RESULTS TO SOSSAMMA THE WEEK AFTER. SEBASTIN HAS A COPY OF THE POLICE REPORT FROM THEIR VISIT.

Date: 7/13/20 Time: What happened: SEBASTIN FILED HIS PETITION FOR DISSOLUTION OF MARRIAGE.

☐ I have attached the *Additional Incidents of Abuse* form or my own extra pages.

**PROTECTIONS REQUESTED BY PETITIONER**

In 1, check box 1 and each box below for the type of abuse you want to prevent. If you are unsure what the words after the boxes mean, you can look at definitions on the last page of this form.

☒ **1. No Abuse**

Respondent be ordered not to threaten or commit the following acts of abuse towards Petitioner (*check all that apply*):

☒ Harassment     ☐ Intimidation of a Dependent

☒ Physical Abuse     ☐ Exploitation of a High-Risk Adult with Disabilities

☒ Stalking     ☐ Neglect of a High-Risk Adult with Disabilities

☐ Willful Deprivation     ☐ Interference with Personal Liberty

Check 2 if you want Respondent to stay away, at all times, from your home or provide you alternative housing.

☐ **2. Possession of Residence** *(check a or b)*

These remedies do not affect who owns the property, only who gets to use or occupy it.

☐ a. Petitioner be granted exclusive possession of the residence and Respondent be ordered not to stay or be at the residence.

☐ Petitioner's residence is located at:

Check 2a if you want Respondent to stay away from your home. If you listed your address on page 1, check the first box under 2a and enter your address. If you did not list your address on page 1, check the second box under 2a. Under BECAUSE, check the reason why Respondent should not be allowed to stay at the place you are living. Check 2b if you want Respondent to provide you different housing.

_____

*Street Address, Apt #, City, State, ZIP*

OR

☐ Petitioner's address is undisclosed.

BECAUSE *(check one)*:

☐ Petitioner has a right to occupy the residence and Respondent has no right; OR

☐ Petitioner and Respondent both have a right to occupy the residence but it would be harder on Petitioner to leave.

OR

☐ b. Respondent be ordered to provide, and stay away from, alternate housing for Petitioner to live in because the parties share a residence. *(available ONLY after actual notice to Respondent and/or a hearing with the judge).*

In 3, read the information in the box below and make sure that is what you want. If so, check box 3 and each box below that applies.

☒ **3. Stay Away from Petitioner and Certain Places** *(see box below)*

Respondent be ordered to (*check all that apply*):

☒ Not have any communication with Petitioner.

☒ Stay away from Petitioner at all times.

**IMPORTANT:** If ordered to stay away from Petitioner, Respondent must not have ANY physical, non-physical, direct or indirect contact with Petitioner. If ordered to not communicate with Petitioner, communication includes oral communication, written communication, sign language, telephone and cell phone calls, faxes, texts, tweets, emails, posts, or communication by any other social media, and all other communication with Petitioner. This also includes contact or communication through others who may not know about the *Order of Protection*.

Case No. 2023OP002586

Ref. Case _____

<table>
<tr><td>In 3a, check if you want Respondent to stay away from places you need to go.<br><br>NOTE: Respondent will see these addresses. If you do not want Respondent to know where the children go to school, do not list it. Instead, check the box and fill out the *Confidential Name & Location of the School or Childcare Provider* form, and file it with the Circuit Clerk as *"confidential."*</td><td>

☒ a. Respondent be ordered not to be or stay at any of the following places while Petitioner is there:

☒ Places of employment of Petitioner, located at:<br>COLLEGE OF AMERICAN PATHOLOGISTS 325 WAUKEGAN ROAD<br>NORTHFIELD ILLINOIS 60093<br>*Name, Street Address, Apt #, City, State, ZIP*

<hr>
*Name, Street Address, Apt #, City, State, ZIP*

☒ Schools, kindergartens, or daycare centers of Petitioner, located at:<br>LIBERTYVILLE HIGH SCHOOL, 708 W. PARK AVE., LIBERTYVILLE, ILLINOIS 60048<br>*Name, Street Address, Apt #, City, State, ZIP*<br>OAK GROVE SCHOOL 1700 OPLAINE RD GREEN OAKS ILLINOIS 60048<br>*Name, Street Address, Apt #, City, State, ZIP*

☐ I have given the name and location of the school or childcare provider on the *Confidential Name & Location of the School or Childcare Provider* form.

☐ Other locations:

<hr>
*Name, Street Address, Apt #, City, State, ZIP*

<hr>
*Name, Street Address, Apt #, City, State, ZIP*
</td></tr>
<tr><td>Fill in 3b only if Respondent attends the same school as Petitioner.</td><td>

☐ b. School Restrictions

_____ is an elementary, middle, or<br>*School Name*<br>high school attended by both Respondent and Petitioner for whom protection is sought. Respondent be ordered *(check one)*:

☐ Not to attend Petitioner's school for as long as Petitioner is enrolled there;

☐ To accept a change of placement or program at Petitioner's school, as determined by the public school district or by a private or non-public school; OR

☐ Not to be present in these parts of Petitioner's school:

<hr>
</td></tr>
<tr><td>In 3c, if Respondent is a minor, include the name of Respondent's Parent or Guardian, if you know it.</td><td>

☐ c. Requirements for Parents and Guardians<br>Respondent is a minor. To ensure that Respondent follows this Order, Respondent's Parent or Guardian _____<br>*Name of Parent or Guardian*<br>be ordered to: _____
</td></tr>
<tr><td>Check 4 if you want Respondent to get evaluation and treatment and all the boxes under it that apply to your case. NOTE: A judge can only order counseling at a hearing where Respondent is present or has been given formal written notice.</td><td>

☒ 4. **Counseling** *(available ONLY after actual notice to Respondent and/or a hearing with the judge)*

☒ Respondent be ordered to participate in the following *(check all that apply)*:

☐ A Domestic Violence Partner Abuse program.

☐ An alcohol and substance abuse evaluation and to successfully complete all recommendations.

☒ A mental health evaluation and to successfully complete all recommendations.

☐ Other *(please specify)*:

<hr>
</td></tr>
</table>

**Petitioner:** Fill out Section 5 only if you have children younger than 18 with Respondent.

Case No. 2023OP002586

Ref. Case _____

| | | In 5a, enter the names of all children under age 18 that you and Respondent have together. |
|---|---|---|

☒ **5. Care and Possession of Children**

☒ a. Respondent and Petitioner are both the parents of these minor children:

| Child's Name (first, middle, last) | Age | State of Residence | Included as a Protected Person? |
|---|---|---|---|
| R███ SEBASTIN | 14 | ILLINOIS | Y |
| A███ SEBASTIN | 6 | ILLINOIS | Y |

**In 5a, enter the names of all children under age 18 that you and Respondent have together.**

**Check the box after each child if you want to protect them from Respondent.**

**In 5b, check the boxes that apply to your children with Respondent.**

☐ b. Parentage of the Children

   ☐ The parties are NOT married and parentage HAS NOT been established.
   OR

   ☐ Parentage HAS been established because (check one):

      ☐ The children of the parties were born before or during the marriage of the parties, or within 300 days of termination of the marriage.

      ☐ The parties are NOT married but parentage HAS been established by one or more of the following:
       1. Both parties have signed a Voluntary Acknowledgment of Paternity (VAP)
         (if both parties' names are on the birth certificate, both parties signed the VAP)
       2. A court or administrative order
       3. Other: _____

**Check 5c and check the box for the person who takes care of the children most of the time. If the primary caretaker of the children is someone other than you or Respondent, check the box for "Other person" and enter that person's name and address.**

☐ c. The primary caretaker of the minor children is (check one):

   ☐ Petitioner

   ☐ Respondent

   ☐ Other person: _____
           Name

   _____
   Street Address, Apt #, City, State, ZIP

**Check 5d if you are protecting children you have with Respondent. Check the boxes that apply to your case and fill in the information.**

☒ d. Care and Possession of Children
   Petitioner requests the following (check all that apply):

   ☒ Petitioner be granted physical care and possession of the minor children.

   ☐ Respondent be ordered to return the minor children to the physical care of Petitioner or another person, _____

   ☒ Respondent be ordered to not remove the minor children from the physical care of Petitioner or from a school or childcare provider.

   1. Child's Name: R███ SEBASTIN

**If you do not want Respondent to know where the children go to school, do not list it. Instead, check the last box and fill out the Confidential Name & Location of the School or Childcare Provider form, and file it with the Circuit Clerk as "confidential."**

   School/Childcare Provider Name LIBERTYVILLE HIGH SCHOOL   ☒ School ☐ Daycare

   Address: 708 W PARK AVE LIBERTYVILLE ILLINOIS 600
       Street Address, City, State, ZIP

   2. Child's Name: A███ SEBASTIN

   School/Childcare Provider Name OAK GROVE SCHOOL   ☒ School ☐ Daycare

   Address: 1700 OPLAINE ROAD, GREEN OAKS, ILLINOIS
       Street Address, City, State, ZIP

   ☐ I have given the name and location of the school or childcare provider on the Confidential Name & Location of the School or Childcare Provider form.

Case No. 2023OP002596

Ref. Case _____

| Petitioner: | Fill out Sections 6-7 only if you have children younger than 18 with Respondent. |
|---|---|

Check 6, if you want significant decision-making responsibility (formerly custody).

☒ **6. Temporary Significant Decision-Making Responsibility** *(formerly custody)*
*(available ONLY after actual notice to Respondent and/or a hearing with the judge)*

☒ Petitioner requests temporary significant decision-making responsibility for the minor children.

In 7, check box a, b, c, or d to let the court know if, how, and when Respondent should have parenting time.

☒ **7. Respondent's Parenting Time** *(formerly visitation)* **with the Minor Children**
Petitioner requests that the court order parenting time as follows *(check a, b, c, or d)*:

☐ a. GRANT parenting time for Respondent without restrictions *(If granting, fill out schedule below in part 7e).*

☐ b. RESERVE parenting time until a later hearing *(this means the Court will not make any decisions on parenting time right now). (If you checked RESERVE, skip to Section 8.)*

Check 7b if you do not want parenting time decided now, then skip to 8.

☒ c. DENY parenting time for Respondent *(no visits at all). If you checked DENY, check your reasons below, then skip to Section 8).*

If you checked 7c or 7d, check all reasons that apply.

☐ d. RESTRICT parenting time for Respondent *(Visits with limits. Check your reasons below, then fill out the schedule below in 7e.)*
If you chose DENY or RESTRICT, check your reasons below.
Respondent is likely to *(check all that apply)*:

☒ Abuse or endanger the children during parenting time.

☒ Use parenting time to abuse or harass Petitioner, Petitioner's family, or household members.

☒ Improperly hide or detain the children.

☒ Act in a way that is not in the best interest of the children.
If you chose GRANT or RESTRICT, request your parenting time schedule below:

In 7, If you checked GRANT or RESTRICT and you want Respondent to have parenting time, complete 7e. If you know what the schedule should be, either attach it and check 7e1 or pick your parenting time schedule in 7e2. Enter when, where, and how you want parenting time to happen and fill in the blanks with specific times, days, and other information. Include a.m. or p.m.

☐ e. Respondent's parenting time should be *(check 1 or 2)*:

☐ 1. See attached parenting time schedule; OR

☐ 2. The following parenting time schedule *(check all that apply)*:

☐ Every _____ from _____ to _____
       Week days        Time        Time

☐ Each weekend OR ☐ Every other weekend as follows: *(include a.m. or p.m.)*

☐ from Friday at _____ to Saturday at _____
☐ from Friday at _____ to Sunday at _____
☐ from Saturday at _____ to Saturday at _____
☐ from Saturday at _____ to Sunday at _____
☐ from Sunday at _____ to Sunday at _____

☐ Parenting time is to begin on: _____
       Date

☐ Holidays: _____
from: _____ to: _____
    Time       Time

Enter the name of the person who will be responsible for transportation during parenting time.

☐ The person responsible for transportation of the children for parenting time is:
_____
Name

Enter the name or address of the place where pickup and return will take place.

☐ Pickup for parenting time to take place at:
_____
Name of place (if any), Street Address, Apt #, City, State, ZIP

Enter the address of

Case No. 2023OP002696

Ref. Case _____

☐ Return from parenting time to take place at:

_____
*Name of place (if any), Street Address, Apt #, City, State, ZIP*

☐ Parenting time will take place at:

_____
*Name of place (if any), Street Address, Apt #, City, State, ZIP*

☐ Parenting time will be supervised by: ,_____

*Name of Supervisor*

who has filed or will file an *Affidavit of Parenting Time Supervisor* form with the court accepting responsibility and acknowledging accountability.

☐ Parenting time will be supervised at an official supervised visitation center *(if available)*

☐ Respondent to return the children to Petitioner or the person designated by Petitioner immediately at the end of parenting time.

| | |
|---|---|
| the place where the parenting time will take place. | |

If you want an individual to supervise parenting time, enter that person's name on the line. The *Affidavit of Parenting Time Supervisor* form must be completed and signed by the supervisor. This *Affidavit* is not required if an agency or center is supervising.

In 8, check if you are afraid Respondent will hide your children or take them out of state.

☒ **8. No Concealment or Removal of Children**
   Respondent be ordered not to hide the children or remove them from Illinois.

In 9, check if Respondent has your children and you want them to be with you.

☐ **9. Appear with Children** *(check all that apply)*
   Respondent be ordered to appear in court with the children

   ☐ To prevent abuse, neglect, removal or concealment of the children.

   ☐ To return the children to Petitioner.

   ☐ To permit a court-ordered interview or examination of the children or Respondent.

Check 10a if you want your things protected from Respondent. List things you want to keep with you.

☐ **10. Possession of Personal Property** *(check all that apply)*

   ☐ a. Petitioner be awarded possession of this property:

   _____

Check 10b if Respondent has some or all of the property you listed in 10a. List the things you want back. Check all boxes below that apply to your case.

   ☐ b. Respondent be ordered to give Petitioner this property:

   _____

   **BECAUSE** *(check one)*:

   ☐ Petitioner, but not Respondent, owns the property.

   ☐ Petitioner and Respondent both own the property. Sharing it would put Petitioner at risk for abuse or is not practical. Not having the property would be harder on Petitioner.

   ☐ The parties are married and a divorce case   ☐ has   ☐ has not been filed.

In 10c, check if you have things that Respondent may need immediately. Then check the boxes that fit your case and list any other items.

   ☐ c. Respondent be awarded possession of:   ☐ clothing,   ☐ medicine, AND/OR

   ☐ other personal property *(list)*:

   _____

In 10d, check if

   ☐ d. Respondent be given the right to enter the residence <u>only one time</u> to retrieve their property, but only in the presence of law enforcement or another person

Case No. 2023OP002596

Ref. Case _____

| | |
|---|---|
| Respondent can enter the residence one time to get their things. | named below. |

☐ e. Transfer of Personal Property
Property to be transferred at:

_____

*Street Address, Apt #, City, State, ZIP*

☐ f. Property to be transferred in the presence of *(check one)*:

☐ Law enforcement: _____

*Name of law enforcement agency*
to be arranged with law enforcement.

☐ Another person: _____

*Name*

Transfer Date: _____  Time: _____

The margin instruction boxes read:

- Check 10e if you checked 10b or 10c. Enter the address where you want the transfer to happen.
- In 10f, check who you want to be there when it happens and enter that person's name. It may be safer if the transfer is in the presence of a law enforcement officer.
- Enter the date and time you want to transfer these things.
- Check 11 if you want your things protected from Respondent and list what you want protected.
- Then, check all the boxes below the lines that apply to your case.
- Check Restrictions on Resources to stop Respondent from using an elderly person's money or property for themselves.
- In 11.5, check to protect your pets from Respondent.
- In 12, check if you want Respondent to give you money to help you or children you have together. If you have it, bring proof of income to the next court date.
- In 13, check all boxes that apply to your case. If you know, enter the amount of

☐ **11. Restrictions on Property**

☐ Respondent be ordered not to take, damage, or otherwise dispose of this property:

_____

BECAUSE *(check one)*:

☐ Petitioner, but not Respondent, owns the property.

☐ Petitioner and Respondent both own the property. Not having the property would be harder on Petitioner.

☐ The parties are married and a divorce case ☐ has ☐ has not been filed.

☐ Restriction on Resources of an Elderly Petitioner
Respondent be ordered not to use financial or other resources of an elderly Petitioner for the benefit of Respondent or any other person.

☐ **11.5 Possession of Animals**
Petitioner be awarded possession of these animals:

_____

*Name and description of each animal*

☒ **12. Temporary Support** *(available ONLY after actual notice to Respondent, and/or a hearing with the judge, check all that apply)*
Respondent be ordered to pay support as follows:

☒ Respondent pay temporary child support

☐ Respondent pay temporary maintenance (formerly called spousal support or alimony)

☒ **13. Payment for Losses because of Abuse** *(available ONLY after actual notice to Respondent)* *and/or a hearing with the judge, check all that apply)*

☒ Respondent be ordered to pay Petitioner for losses caused by abuse, neglect, or exploitation, including:

Case No. 2023OP002596

Ref. Case _____

<table>
<tr><td>☒ Medical expenses.........................................................................................$</td><td>_____</td></tr>
<tr><td>☐ Lost earnings............................................................................................$</td><td>_____</td></tr>
<tr><td>☐ Repair or replace property damaged or taken........................................$</td><td>_____</td></tr>
<tr><td>☐ Moving and other travel expenses..........................................................$</td><td>_____</td></tr>
<tr><td>☐ Reasonable expenses for housing other than a domestic violence shelter...$</td><td>_____</td></tr>
<tr><td>☐ Expenses for search and recovery of children........................................$</td><td>_____</td></tr>
<tr><td>☒ Reasonable attorney's fees.....................................................................$</td><td>_____</td></tr>
<tr><td>☒ Other: INVESTIGATION PENDING AS TO AMOUNTS      $</td><td>_____</td></tr>
</table>

<table>
<tr>
<td valign="top">

the cost in the blank.
If you are not sure,
you can estimate.
Bring receipts,
including proof of
payment, and
estimates of repairs to
court if you have
them.

**NOTE:** A judge can
only order economic
remedies be awarded
at a hearing where
Respondent is present
or has been given
formal written notice.

If you checked any
box in Section 2 or
one of the first two
boxes in Section 3,
you cannot check box
14.

In 14.5, check if you
want to ask for guns to be
taken away and
Respondent is a current
intimate partner of
Petitioner and represents a
threat to the physical
safety of Petitioner or
Petitioner's child. Then
check all boxes
that fit your case.

**NOTE:** A judge can
only order guns to be
taken away at a
hearing where
Respondent is present
or has been given
formal written notice.

In 15, check if you
do not want
Respondent to get
your children's
school records or
other records. These
records could
provide Respondent
with your protected
address. Check all
boxes that apply to
your case.

In 16, check if you

</td>
<td valign="top">

☐ **14. No Entry or Presence Under Influence**
Respondent is allowed at the Petitioner's residence, but cannot be or stay there while under the influence of drugs or alcohol. This would be a threat to the safety or well-being of Petitioner or Petitioner's children.

☒ **14.5 FIREARMS** *(available ONLY after actual notice to Respondent and/or a hearing with the judge)*

☒ Respondent is a current or former intimate partner of the Petitioner and represents a threat to the physical safety of Petitioner or Petitioner's child. Respondent should be ordered to turn over all firearms in their possession.
In addition, Respondent *(check all that apply)*:

☐ Has a history of violence.

☐ Has a history of possession or use of firearms.

☐ Carries a firearm on their person or in a vehicle.
Make and model of vehicle: _____

☐ May be a threat to the safety of the public or police officer.

☐ Is now, or has been, suicidal.

☒ **15. Children's Records**
Respondent should not be allowed to access, inspect, or obtain school records, healthcare records, or any other records of the children BECAUSE *(check all that apply)*:

☒ Petitioner is requesting that Respondent not be allowed to have contact with the minor children.

☐ The actual address of Petitioner is not included in this Petition due to the risk of further abuse.

☒ It is necessary to prevent abuse or wrongful removal or concealment of the children.

☐ **16. Shelter Reimbursement** *(available ONLY after actual notice to Respondent and/or a hearing*

</td>
</tr>
</table>

Case No. 2023OP002596

Ref. Case _____

| | |
|---|---|
| want Respondent to pay the shelter. If you know, enter the amount of the cost in the blank. If you are not sure, you can estimate. Bring receipts to court if you have them. | *with the judge)* Respondent be ordered to reimburse a shelter providing temporary housing or counseling to Petitioner....................................................................................................$ _____ |

☒ **17. MISCELLANEOUS REMEDIES**
Respondent be ordered to:
NO CONTACT WITH CHILDREN'S DOCTORS, THERAPISTS, DCFS, R████S CHURCH, MELEKUNNIL CHACKO THOMAS AND ANNAMMA THOMAS (NANNIES) _____
BECAUSE:

_____

Check 17 if there are other things you want Respondent to do or to stop doing. List those things on the lines.

Explain the reasons on the lines after "Because."

☒ **18. Telephone Services**
A wireless telephone provider should transfer from Respondent to Petitioner the right to continue to use their own telephone numbers and be responsible for the cost of them. Petitioner, or a minor child in Petitioner's custody, uses the telephone numbers.
      R████ PHONE NUMBER TRANSFERRED
    Provider: TO SEBASTIN _____
    Name of Account Holder: _____
Billing Phone #: _____
Petitioner's Phone #s: _____
Petitioner's Phone #s: _____

In 18, check if you are on Respondent's cell phone plan and you want to separate your account. Enter the provider name and telephone numbers.

**I certify that everything in the *Petition for Order of Protection* is true and correct. I understand that making a false statement on this form is perjury and has penalties provided by law under 735 ILCS 5/1-109.**

Under the Code of Civil Procedure, 735 ILCS 5/1-109, making a statement on this form that you know to be false is perjury, a Class 3 Felony.

If you are completing this form on a computer, sign your name by typing it. If you are completing it by hand, sign and print your name.

*[signature]*

*Petitioner Signature*

If prepared by someone other than Petitioner, that person should enter their name, address, phone number, and email address.

SEBASTIN FRANCIS (46) _____
*Petitioner Name*

Prepared by: MICHONE RIEWER

OP-P 403.4

Page 17 of 18 - Petition for Order of Protection

(8/21)

Case No. 2023OP002596

Ref. Case _____

Street Address: 900 N. SHORE DRIVE

City, State, ZIP: LAKE BLUFF IL

Phone Number: _____

Email: _____

Attorney # (if any): _____

## DEFINITION OF TERMS USED IN THIS *PETITION*

These definitions are incorporated in and made a part of the *Petition* to which they are attached.

1. **Abuse:** "Abuse" means physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person in *loco parentis*.

2. **Adult with Disabilities:** "Adult with Disabilities" means an elder adult with disabilities or a high-risk adult with disabilities. A person may be an adult with disabilities for purposes of this Act even though he or she has never been adjudicated an incompetent adult. However, no court proceeding may be initiated or continued on behalf of an adult with disabilities over that adult's objection, unless such proceeding is approved by his or her legal guardian, if any.

3. **Elder Adult with Disabilities:** "Elder adult with disabilities" means an adult prevented by advanced age from taking appropriate action to protect himself or herself from abuse by a family or household member.

4. **Exploitation:** "Exploitation" means the illegal, including tortious, use of a high-risk adult with disabilities or of the assets or resources of a high-risk adult with disabilities. Exploitation includes, but is not limited to, the misappropriation of assets or resources of a high-risk adult with disabilities by undue influence, by breach of a fiduciary relationship, by fraud, deception, or extortion, or the use of such assets or resources in a manner contrary to law.

5. **Family or Household Members:** Include spouses, former spouses, parents, children, stepchildren and other persons related by blood or by present or prior marriage, persons who share or formerly shared a common dwelling, persons who have or allegedly have a child in common, persons who share or allegedly share a blood relationship through a child, persons who have or have had a dating or engagement relationship, persons with disabilities and their personal assistants, and caregivers as defined in Section 12-4.4a of the Criminal Code of 2012. For purposes of this paragraph, neither a casual acquaintanceship nor ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute a dating relationship. In the case of a high-risk adult with disabilities, "family or household members" includes any person who has the responsibility for a high-risk adult as a result of a family relationship or who has assumed responsibility for all or a portion of the care of a high-risk adult with disabilities voluntarily, or by express or implied contract, or by court order.

6. **Harassment:** "Harassment" means knowing conduct which is not necessary to accomplish a purpose that is reasonable under the circumstances, would cause a reasonable person emotional distress, and does cause emotional distress to Petitioner. Unless the presumption is rebutted by a preponderance of the evidence, the following types of conduct shall be presumed to cause emotional distress:
   a. creating a disturbance at Petitioner's place of employment or school; or
   b. repeatedly telephoning Petitioner's place of employment, home or residence; or
   c. repeatedly following Petitioner about in a public place or places; or
   d. repeatedly keeping Petitioner under surveillance by remaining present outside his or her home, school, place of employment, vehicle or other place occupied by Petitioner or by peering in Petitioner's windows; or
   e. improperly concealing a minor child from Petitioner, repeatedly threatening to improperly remove a minor child of Petitioner's from the jurisdiction or from the physical care of Petitioner, repeatedly threatening to conceal a minor child from Petitioner, or making a single such threat following an actual or attempted improper removal or concealment, unless Respondent was fleeing an incident or pattern of domestic violence; or
   f. threatening physical force, confinement or restraint on one or more occasions.

7. **High-risk Adult with Disabilities:** "High-risk adult with disabilities" means a person aged 18 or over whose physical or mental disability impairs his or her ability to seek or obtain protection from abuse, neglect, or exploitation.

8. **Interference with Personal Liberty:** "Interference with personal liberty" means committing or threatening physical abuse, harassment, intimidation or willful deprivation so as to compel another to engage in conduct from which she or he has a right to abstain or to refrain from conduct in which she or he has a right to engage.

9. **Intimidation of a Dependent:** "Intimidation of a dependent" means subjecting a person who is dependent because of age, health or disability to participation in or the witnessing of: physical force against another or physical confinement or restraint of another which constitutes physical abuse as defined in this Act, regardless of whether the abused person is a family or household member.

10. **Neglect:** "Neglect" means the failure to exercise that degree of care toward a high-risk adult with disabilities which a reasonable person would exercise under the circumstances and includes but is not limited to:
    a. the failure to take reasonable steps to protect a high-risk adult with disabilities from acts of abuse; or
    b. the repeated, careless imposition of unreasonable confinement; or
    c. the failure to provide food, shelter, clothing, and personal hygiene to a high-risk adult with disabilities who requires such assistance; or
    d. the failure to provide medical and rehabilitative care for the physical and mental health needs of a high-risk adult with disabilities; or
    e. the failure to protect a high-risk adult with disabilities from health and safety hazards.
    Nothing in this definition shall be construed to impose a requirement that assistance be provided to a high-risk adult with disabilities over his or her objection in the absence of a court order, nor to create any new affirmative duty to provide support to a high-risk adult with disabilities.

11. **Petitioner:** "Petitioner" may mean not only any named petitioner for the order of protection and any named victim of abuse on whose behalf the petition

Case No. 2023OP002596

Ref. Case _____

is brought, but also any other person protected by this Act.

12. **Physical Abuse:** "Physical abuse" includes sexual abuse and means any of the following:

    a. knowing or reckless use of physical force, confinement or restraint, or

    b. knowing, repeated and unnecessary sleep deprivation; or

    c. knowing or reckless conduct which creates an immediate risk of physical harm.

13. **Stalking:** "Stalking" means knowingly and without lawful justification, on at least two (2) separate occasions, following another person or placing the person under surveillance or any combination thereof and:

    a. at any time transmitting a threat of immediate or future bodily harm, sexual assault, confinement or restraint and the threat is directed towards that person or a family member of that person; or

    b. placing that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint; or

    c. placing that person in reasonable apprehension that a family member will receive immediate or future bodily harm, sexual assault, confinement, or restraint.

14. **Willful Deprivation:** "Willful deprivation" means willfully denying a person who because of age, health or disability requires medication, medical care, shelter, food, therapeutic device, or other physical assistance, and thereby exposing that person to the risk of physical, mental or emotional harm, except with regard to medical care or treatment when the dependent person has expressed an intent to forego such medical care or treatment. This paragraph does not create any new affirmative duty to provide support to dependent persons.

# FEDCOMPLAINT - APPENDIX G

Plaintiff's Motion to bar Defendant Finn showing forensic fraud

**FILED**
**5/10/2024 5:13 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

**IN THE CIRCUIT COURT OF THE NINETENETH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

| | | |
|---|---|---|
| IN RE: THE FORMER MARRIAGE OF | ) | |
| | ) | |
| SEBASTIN FRANCIS | ) | |
|      Petitioner | ) | Case No. 20 D 905 |
| | ) | |
| and | ) | |
| | ) | |
| SOSSAMMA GEORGE SEBASTIN | ) | |
|      Respondent. | ) | |

## MOTION IN LIMINE, TO COMPEL PRODUCTION AND OTHER RELIEF

NOW COMES, the Respondent, Sossamma George (hereinafter "Sossamma" or "Respondent"), by and through her attorneys, Farooqi & Husain, LLC, pursuant to Illinois Supreme Court Rule 219, brings the following Motion In Limine, to Compel Production and Other Relief to bar and prevent the introduction of certain evidence by Dr. Finn and Petitioner, Sebastin George (hereinafter "Sebastin" or "Petitioner") from entering certain exhibits and witnesses, and in support thereof states as follows:

1. This court has jurisdiction over the subject-matter, Petitioner, Sebastin Francis (hereinafter "Sebastin"), and Sossamma.

2. On April 28, 2007, the parties were lawfully married in Ulhasnagar, Maharastra, India.

3. During the course of the marriage, two (2) children were born to the parties, namely, R█ S█████, born █████████ 2008, and A███ S█████, ████████, 2017. No other children were born to or adopted by the parties.

4. On July 13, 2020, Sebastin filed a Petition for Dissolution of Marriage in the Circuit Court of Lake County under Case No. 2020 D 905.

5. On or about September 2022, Dr. David Finn, Psy.D was appointed as the 604.10(b) evaluator.

6. On or about November 17, 2023. Dr. Finn issued his 604.10(b) report, which recommended immediate transition of the children to Sebastin and no contact of any kind with Sossamma until certain other conditions are met. The report was disseminated to the parties' respective counsels and the GAL, but not to the parties directly.

7. On November 17, 2023, Sebastin filed an Emergency Petition for Order of Protection and Emergency Motion to Terminate Parenting Time. The Emergency Order of Protection was granted and a separate order was entered related to temporary order of allocation of parental responsibilities which effectively restricted Sossamma's parenting time and decision-making until further order of this court.

8. Sossamma subsequently found her own expert, Dr. Jack Joseph, Ph.D, in order for him to provide his own expert opinion and analysis of Dr. Finn's report.

9. On January 11, 2024, Sossamma' s former counsel sent a subpoena to Dr. Finn. The subpoena was received on January 18, 2024, and a subpoena response was due by January 31, 2024.

10. The documents were not received by the deadline. On February 12, 2024, Sossamma's former counsel was forced to file a Motion to Compel David Finn, Psy.D to Comply with Subpoena.

11. Dr. Finn eventually produced a response to the subpoena and sent the response to Dr. Jack Jospeh, however severe discrepancies remained.

12. On April 16, 2024, Sossamma filed a Motion to Compel Dr. David Finn to Comply with Subpoena citing specific deficiencies that should have been included in the subpoena

response, including, but not limited to the original psych testing material for the MMPI (Minnesota Multiphasic Personality Inventiry-2).

13.    On April 30, 2024, Dr. Finn was ordered to produce the missing documents from the subpoena response, as well as send the original psychological testing material for the MMPI, including the publisher's computer report and computer-generated narrative to Dr. Jack Joseph by May 6, 2024.

14.    On May 1, 2024, Dr. Jack Jospeh received the psychological testing material for the MMPI. According to Dr. Joseph's review, Sebastian had a T-Score of 81 on the L-r validity scale and 66 on the K-r validity scale.  These scales relate to the truthfulness of the party.  The higher the score, the more untruthful the litigant.  Comparatively, Sossamma had a T-Score on the L-r validity scale of 71 and on the K-r validity scale of 55.

15.    The MMPI results will also generate a section entitled Comparison Group Data: Forensic, Child Custody Litigant (Men), N=243.  This section is designed to compare the T-Scores on validity to individuals in similar circumstances as to determine the truthfulness of the individual relative to others in the same situation.  Since it is not uncommon for individuals going through a custody litigation to dishonest in the manner in which they attempt to present themselves, the comparative results are an important lens by which to interpret the T-Scores.  On Sebastian's report, he scored in the 98th percentile, which means that 98% of similar litigants had a lower T-Score and were more truthful than Sebastian.

16.    Given Sebastian's inflate T-Scores, indicating significant deception on his part during the testing and evaluation process, it is important to have Sossamma's same comparative data to determine if her responses were significantly more honest.  However, on her MMPI results, the comparative data has been omitted.  As the comparative data is typically standard on MMPI

results, their omission is suspect and makes it more difficult to present evidence that Sossamma's answers during the evaluations were more truthful. According to Dr. Jospeh, these comparative results are automatically generated for each participant, and thus a corresponding section should exist for Sossamma. True and accurate copies of the score reports are incorporated herein by reference and can be made available to the Court at hearing.

17.   Upon information and belief, Sossamma's score report was most likely altered, and removed from her score report.

18.   Sebastin's results indicate that he has a tendency to display deceptive behaviors. Throughout this litigation, Sossamma has been accused of lying. She should have the opportunity to refute any results that indicate this pattern of behavior, if such a score result exists.

19.   There are severe allegations against Sossamma, and extreme ramifications have resulted from Dr. Finn's evaluation. Sossamma will be unduly prejudiced at the upcoming trial without the missing results.

20.   Dr. Finn's testimony and report are key pieces of evidence in this cause.

21.   Pursuant to Illinois Supreme Court Rule 219, this Court is empowered to sanction in a number of ways, including but not limited to barring testimony and exhibits.

22.   The missing results from the MMPI is a significant error. Pursuant to Illinois Supreme Corut Rule 219, Dr. Finn should be barred from testifying in this case and his report should be barred, and Sebastin's testimony and exhibits related to the 604.10(b) evaluation and report should be barred. In the alternative, Dr. Finn should be compelled to produce the missing comparative results for Sossamma before he is allowed to testify and before his report is entered into evidence at trial, and Sossamma should be granted time to review said results.

23. Sossamma has previously filed a Motion for a 604.10(c) evaluator, raising a number of issues and concerns with Dr. Finn's 604.10 evaluation. Sossamma restates those issues and concerns and incorporates them by reference. Given the significant concerns with the reports, missing data, and potential for altered test result information, Sossamma should be entitled to, at the least, have an expert witness fully review Dr. Finn's 604.10 evaluation and offer his expert opinion at trial, if not be permitted to conduct a full 604.10(c) evaluation.

24. A letter regarding the test results reviewed by Dr. Joseph is attached hereto as *Exhibit A*.

**WHEREFORE,** the Respondent, Sossamma George, moves this Court to enter an Order as follows:

A. Granting Respondent's Motion in Limine and Other Relief;

B. Barring Dr. Finn's 604.10(b) evaluation and barring Dr. Finn from testifying in this matter;

C. In the alternative, compelling Dr. Finn to produce the missing comparative results from the MMPI for Respondent prior to being permitted to testify or allowing his report to be entered into evidence;

D. Granting Respondent additional time for Respondent to (1) conduct a 604.10(c) evaluation; or (2) allow an expert to examine Dr. Finn's 604.10(b) evaluation, render an opinion, and be permitted to testify at trial;

E. Enter any such Order this Honorable Court deems equitable and just.

Respectfully Submitted

Ausaf Farooqi
**Farooqi & Husain, LLC**

Farooqi & Husain, LLC
Attorney for Petitioner
2 Trans Am Plaza Dr. Suite 160
Oakbrook Terrace, IL 60181
(P) 630-909-9114
(F) 630-559-3914
Email: ausaf@farooqihusain.com
Attorney Number: 301523

**SHELDON COTLER, PH.D.   ROBERT L. DAVENPORT, PH.D.   JACK JOSEPH, PH.D.**

LICENSED CLINICAL PSYCHOLOGISTS

## NORTH SHORE CONSULTATION CENTER

NORTHBROOK COURT PROFESSIONAL PLAZA
1535 LAKE COOK ROAD, SUITE 111
NORTHBROOK, ILLINOIS 60062
(847) 498-4744
FAX: (847) 498-4811



**EXHIBIT**

**A**

May 5, 2024

To:        Mr. Ausaf Farooqi, Attorney

From:      Dr. Jack Joseph

Re:        MMPI-2-RF Score Reports

As per our discussion, I am enclosing copies of Pages 2-6 of Sabastin Francis and Sossamma George's score reports that were presumably generated by the test publisher (Pearson) and submitted to me by Dr. David Finn on May 1, 2024. On all five of these pages, there is a section entitled Comparison Group Data: Forensic, Child Custody Litigant (Men), N=243 on Mr. Francis' report but no corresponding section on Ms. George' report. I would suggest that you contact Dr. Finn in the hope that he can explain why this section was omitted from Ms. Georgs's report and if the corresponding sections do indeed exist for Ms. George, to produce the missing data. I would also recommend that you subpoena the publisher (Pearson) to get a copy of the report that they sent to Dr. Finn to make sure that what he sent me had not been tampered with. Also, you had requested that I suggest the names of competent therapists, as well as a competent GAL and a competent 604.10C evaluator. Two quality clinical psychologists come to mind. Dr. Margot Touris and Dr. Karen Williamson. Both have offices in Northbrook. A competent GAL that I could recommend would be Mr. Dennis Sopata and a competent 604.10c evaluator would be Dr. Robert Shapiro.

Please call me if you have any questions.

# FEDCOMPLAINT - APPENDIX H

Plaintiff's Motion In Limine shows that Dec 2022 ruling was unjust

**FILED**
**5/15/2023 2:23 PM**
**ERIN CARTWRIGHT WEINSTEIN**
**Clerk of the Circuit Court**
**Lake County, Illinois**

STATE OF ILLINOIS    )
                      ) SS
COUNTY OF LAKE      )

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

IN RE: THE MARRIAGE OF      )
                                  )
SEBASTIN FRANCIS,         )
   Petitioner,              )
                                  )     GEN. NO.    20 D 905
   and                   )
                                  )
SOSSAMMA GEORGE-SEBASTIN,  )
   Respondent.          )

## MOTION IN LIMINE

NOW COMES the Respondent, SOSSAMMA GEORGE-SEBASTIN, by and through her attorney, DWAYNE DOUGLAS of DOUGLAS LAW, A PROFESSIONAL CORPORATION, and, hereby moves to exclude evidence at the hearing of this cause as is described more fully herein.

In support of this Motion, Respondent deposes and states as follows:

1. On October 6, 2022, the parties were awarded shared parenting time with their minor child, A.S., and for their minor child R.S., no parenting schedule was set and the parties were directed to listen to professionals and R.S., which has resulted on SEBASTIN having no parenting time with R.S. *See*, Exhibit A.

2. On December 13, 2022, Petitioner, SEBASTIN FRANCIS (hereinafter "SEBASTIN") filed his Emergency Petition to Compel Residential Treatment, for Restricted Parenting Time with Both Children, and for Other Relief. *See*, Exhibit B.

1

3.      From the facts adduced at the hearing on said Emergency Petition on December 13, 2022 and December 14, 2022, in its December 20, 2022 Order, the Court did not modify parenting time, and it only modified decision-making responsibilities for one child in one area for non-emergency decisions. *See*, Exhibit C.

4.      Now, on or about May 12, 2023, Petitioner, SEBASTIN FRANCIS (hereinafter "SEBASTIN") filed his Emergency Motion to Restrict Parental Responsibilities. *See*, Exhibit D. The allegations of this Emergency Motion, with exceptions, mirror the allegations of the Emergency Petition filed in December 2022.

5.      To the extent that the Emergency Motion realleges matters alleged in the December 2022 Emergency Petition, they are not properly before this Court.

6.      "The court may modify an order restricting parental responsibilities if, after a hearing, the court finds by a preponderance of the evidence that a modification is in the child's best interests based on (i) a change of circumstances that occurred *after the entry of an order restricting parental responsibilities*; or (ii) conduct of which the court was previously unaware that seriously endangers the child." 750 ILCS 5/603.10(b) (West 2023). The statute does not provide that a party may modify such an order for circumstances that occurred *before* the entry of an order restricting parental responsibilities, and to the extent that the same allegations are made again and again, those by definition cannot be matters "of which the court was previously unaware." SEBASTIN is attempting to get a second bite at the apple to the extent that he seeks, again, to restrict parenting time based upon many of the same facts he alleged in December 2022.

7.      Indeed, even with not seeking a restriction on parenting time, "[p]arenting time may

2

be modified at any time, without a showing of serious endangerment, upon a showing of *changed circumstances* that necessitates modification to serve the best interests of the child." 750 ILCS 5/610.5(a) (West 2023). Neither by the express provisions of the Illinois Marriage and Dissolution of Marriage Act or by logic can a party seek temporary relief, fail to get all the relief sought, and reallege the same facts, again and again, until the Court relents.

8. For the reasons stated above, facts preceding the entry of the December 20, 2022 are not admissible.

9. At the prior hearing, this Court permitted leading questions to be asked by opposing counsel. *See*, *e.g.*, Exhibit E. While the Court does have discretion in this area, if there is "a manifest abuse of it, to the detriment of the party complaining," leading questions should not be permitted, *Waukegan Park Dist. v. First Nat. Bank of Lake Forest*, 22 Ill. 2d 238, 244, 174 N.E.2d 824, 828 (1961), and should a hearing be conducted on the Emergency Motion, SOSSAMMA moves that leading questions be denied, and if permitted, only for foundational matters.

10. At the prior hearing, inadmissible speculation was permitted, for example, the Guardian *ad litem* was permitted to testify and speculate as to matters outside her knowledge, such as whether SOSSAMMA had groomed R.S. to say things, whether R.S.'s allegations regarding SEBASTIN came from SOSSAMMA, and whether SOSSAMMA had made false claims as part of a litigation strategy. *See*, Exhibit F. Regarding such testimony, in answer to an objection based upon speculation, the Court found that "that's what a GAL is supposed to do in this situation." *See*, Exhibit F.

11. The Court erred and testimony that is a witness's speculation should not recur in

3

the next hearing if a hearing is conducted regarding the newly filed Emergency Motion.

> The concept of relevancy is basic to the law of evidence as it circumscribes admissibility. *People ex rel. Noren v. Dempsey*, 10 Ill.2d 288, 293, 139 N.E.2d 780 (1957). In *People v. Monroe*, 66 Ill.2d 317, 321–22, 5 Ill.Dec. 824, 362 N.E.2d 295 (1977), the Illinois Supreme Court adopted Rule 401 of the Federal Rules of Evidence (Fed.R.Evid.401). Rule 401 provides that: "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed R. Evid. 401; *Monroe*, 66 Ill.2d at 322, 5 Ill.Dec. 824, 362 N.E.2d 295. It follows, therefore, that testimony grounded in guess, surmise, or conjecture, not being regarded as proof of a fact, is irrelevant as it has no tendency to make the existence of a fact more or less probable. From this conclusion follows the rule that expert opinions based upon the witness's guess, speculation, or conjecture as to what he believed might have happened are inadmissible. *See Dyback v. Weber*, 114 Ill.2d 232, 244–45, 102 Ill.Dec. 386, 500 N.E.2d 8 (1986).

*Modelski v. Navistar Int'l Transp. Corp.*, 302 Ill. App. 3d 879, 885–86, 707 N.E.2d 239, 244–45 (1st Dist. 1999). "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of Rule 703, relating to opinion testimony by expert witnesses." Ill. R. Evid. 602 (eff. Jan. 1, 2011).

12. Neither the Guardian *ad litem* nor other witnesses may testify to matters outside of their knowledge and SOSSAMMA moves to bar such testimony at the hearing on the Emergency Motion, if such a hearing is conducted, including but not limited so speculation regarding SOSSAMMA's conversations with a therapist unless the therapist herself is called testify.

13. At the prior hearing the Court permitted testimony that was both speculative and hearsay finding that the Court had the authority to do so because "I have a suicidal teenager that

4

I'm trying to protect." *See, e.g.,* Exhibit G.

14. There is no basis under the law to permit hearsay testimony based upon the Court's perception of whether or not the underlying circumstances at hand are a matter of urgency; no such exception to the hearsay rule exists. *See,* Ill. R. Evid 803 (eff. Jan. 25, 2023), Ill. R. Evid 804 (eff Jan. 1, 2011). Indeed, the opposite is true; the more urgent the situation, the more vital it is that decisions be made based upon reliable competent evidence. SOSSAMMA moves to enforce the Rules of Evidence pertaining to hearsay should a hearing be conducted on the Emergency Motion.

15. SEBASTIN in support of his Emergency Motion alleges in paragraph 10 that the parties' child, A.S. told him something that SOSSAMMA told him regarding a vacation. This unsubstantiated statement purportedly heard from an interested party that allegedly came from a five-year-old child is double hearsay from a child that has not been found competent to testify. "Previous statements made by the child relating to any allegations that the child is an abused or neglected child within the meaning of the Abused and Neglected Child Reporting Act, or an abused or neglected minor within the meaning of the Juvenile Court Act of 1987, shall be admissible in evidence in a hearing concerning allocation of parental responsibilities in accordance with Section 11.1 of the Abused and Neglected Child Reporting Act. No such statement, however, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 750 ILCS 5/606.5(c) (West 2023). To claim that the alleged double hearsay statement relates to abuse or neglect is frivolous within the meaning of Rule 137. The alleged statement is inadmissible.

WHEREFORE, the Respondent, SOSSAMMA GEORGE-SEBASTIN, respectfully

5

requests that this Honorable Court bar the Petitioner from admitting into evidence matters as described above, or grant any other such relief and the Court may deem just.

Respectfully Submitted,

**DOUGLAS LAW**
**A Professional Corporation**
Attorneys for Respondent

BY: _____
DWAYNE DOUGLAS
Attorney at Law

DWAYNE DOUGLAS
Attorney Number 6205491
**DOUGLAS LAW**
**A Professional Corporation**
2801 Lakeside Dr., Suite 211
Bannockburn, IL 60015
847.220.4050
service@douglaslawoffices.com

6

**EXHIBIT A**

FILED

OCT 0 6 2022

Erin Cartwright Weinstein
CIRCUIT CLERK

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

IN RE THE MARRIAGE OF:               )
                                     )
SEBASTIN FRANCIS,                    )
                Petitioner,          )        No. 2020 D 000905
and                                  )
                                     )
                                     )
SOSSAMMA GEORGE SEBASTIN,            )
                Respondent.          )

### 10/6/22 AGREED ORDER

This cause coming before the Court for hearing on each party's emergency motion for exclusive possession and other relief; all parties, their counsel and GAL being present via zoom; and the Court hearing argument and reviewing the emergency motions and being fully advised, and the Court making certain recommendations which each party agreed;

IT IS FOUND:

A. This matter is found to be an emergency.

IT IS HEREBY ORDERED:

1. On a temporary basis, without prejudice to either party, the parties shall each receive 50% of the time with their minor child A███r as follows:
   a. Mom shall have parenting time from after school on Monday (or 8:00 a.m. if no school) until delivery to school on Wednesday (or delivery to Dad at 8:00 a.m. if no school);
   b. Dad shall have parenting time from after school on Wednesday (or 8:00 a.m. if there is no school) until delivery to school on Friday (or delivery to mom at 8:00 a.m. if no school if it is Mom's weekend parenting time);
   c. The parties shall have every other weekend from Friday (after school or 8:00 a.m. if no school) to Monday (drop off at school or delivery to Mom at 8:00 a.m. if no school).
   d. Mom shall have the weekend of October 7, 2022 and Dad shall have the following weekend with the parties alternating weekends thereafter.
   e. Both parties may attend any school or extra curricular activities for A███r, regardless of whose parenting time it is, and have full contact with any teachers coaches, other school personnel and medical personnel.

2. Both parties to encourage the relationship with the other parent and encourage the parenting schedule, and only talk complimentary of the other parent in front of the children.

1

3. Each party may select their own nanny and have his or her nanny on their own time. Each to share their Nanny's name and address and phone number and email with the other party and GAL before the nanny starts.

4. For R███, per prior orders, the parties will listen to professionals and R███. No set parenting schedule yet. If R███ continues to refuse to execute a release for medical information for Dad and/or the GAL and agrees to sign said release for Mom, Mom shall immediately—within 24 hours—transmit any records or other information she receives to Dad and the GAL.

5. Mom shall move out on or before October 11, 2022 by 6:00 p.m. and Dad shall have exclusive possession of the residence as of October 11, 2022 at 6:00 p.m. Mom shall not move out in front of A███ unless the parties agree. If they do not agree, Dad shall take A███ out of the home while Mom is moving out.

6. This matter is set for status on GAL's investigation and the parenting schedules on November 16, 2022 at 8:30 a.m. via zoom with Judge Bruno, C-107.

7. Mom is allowed to remove her personal property, including all of the furniture and items in her bedroom, and only other furniture and items agreed upon by the parties in writing. Mom can take 50% of the children's clothes and toys, and the bed she bought for A███. This division is not to happen in front of A███. If the parties cannot agree in writing, then the Court to decide on further division.

8. The parties shall use their best efforts if possible to ensure that both parties are included on all communications from and to TK and/or relating to R███, but they do not have to be on every call. In the event that one of the parties is not included in the communication, the other party shall immediately (within 30 minutes unless physically unable to, and then within two hours) share the information with the other party via OFW. R███ shall not be consulted about whether information is being shared.

9. Mom is voluntarily withdrawing her petition for order of protection per separate disposition order.

10. The police are not to be called unless a life threatening emergency. Disputes over property and raised voices do not constitute a life threatening emergency.

Michael P. Alvarado (ARDC #6294198)
DAVIS FRIEDMAN LLP
Attorneys for Sossamma George Sebastin
135 South LaSalle Street, 36th Floor
Chicago, Illinois 60603
312 782-2220
service@davisfriedman.com
malvarado@davisfriedman.com

ENTERED

Dated : October 6, 2022

_Rhonda K. Brunt_
Judge

2

Strategic Divorce, Attorneys for SEBASTIN FRANCIS, service@strategicdivorce.com
Ms. Caryn Barone, GAL, cbarone@sjtpom.com

**EXHIBIT B**

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS **F I L E D**

IN RE THE MARRIAGE OF: )
)                                                    DEC 1 3 2022
SEBASTIN FRANCIS, )
          Petitioner, )                     No. 2020 D 000905 ~~Erin Cartwright Weinstein~~
and )                                                             CIRCUIT CLERK
)
SOSSAMMA GEORGE SEBASTIN, )
          Respondent. )

## 12/13/22 ORDER

This cause coming on Sebastin's emergency motion. Over Sossamma's counsel's objection, this matter was found to be an emergency and went to immediate hearing.

**IT IS ORDERED:**

1. Neither Party shall discuss any aspect of this case or the pending emergency motion with R████.

2. Neither Party shall make any decisions relating to R████, except in the event of a life threatening emergency where Sossamma may take the minor child to Highland Park Emergency Room/Hospital and follow recommendations. *+ advise Sebastin of all information & consider his input*

3. Hearing continued to 12/14 at 10:00 a.m.

4. The GAL is in the middle of testimony and still under oath, and therefore cannot discuss the case with either party.

Michael P. Alvarado (ARDC #6294198)          ENTERED
DAVIS FRIEDMAN LLP
Attorneys for Sossamma George Sebastin
135 South LaSalle Street, 36th Floor
Chicago, Illinois 60603               Dated
312 782-2220
service@davisfriedman.com
malvarado@davisfriedman.com          *Rhonda K. Bruso*
                                   Judge

Strategic Divorce, Attorneys for SEBASTIN FRANCIS, service@strategicdivorce.com
Ms. Caryn Barone, GAL, cbarone@sjtpom.com

1

EXHIBIT C



IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

DEC 2 0 2022

*Enn Centruguet Weinstein*
CIRCUIT-CLERK

IN RE THE MARRIAGE OF: )
)
SEBASTIN FRANCIS, )
        Petitioner, )     No. 2020 D 000905
)
and )
)
SOSSAMMA GEORGE SEBASTIN, )
        Respondent. )

## ORDER
### December 13 & 14 2022

This cause coming before the Court on Sebastin's Emergency Petition to Compel Residential Treatment, For-Restricted Parenting Time with Both Children and for Other Relief, the Court finding the Petition to be an emergency and proceeding to hearing over Respondent's attorneys' objection; all parties, their counsel and GAL being present for two days for an evidentiary hearing via zoom; and the Court being fully advised,

IT IS HEREBY ORDERED:

1. Sossamma's behavior, interaction and medical decision making regarding R▮▮ is found to be a serious endangerment to R▮▮'s mental health and emotional development.
2. Sossamma's testimony is found not to be credible.
3. Sebastin is immediately granted sole medical decision making as to R▮▮ S▮▮ with complete disclosure and prior consultation with Sossamma, except in the event of a life threatening emergency as described below.
4. Neither party shall communicate to R▮▮ any change regarding medical decision making or any other part of this litigation, or show her or discuss any order, Child Advocacy Center victim sensitive interview or what the GAL says.
5. Sebastin shall have Christmas visitation with A▮▮r from 12/24 at 10 a.m. until 12/25/22 at 10 a.m. Sossamma has from 12/25 at 10 a.m. until 12/26 at 10 a.m. In addition, Sossamma shall have New Year's visitation with A▮▮ from 12/31 at 10 a.m. until 1/1 at 10 a.m. and Sebastin shall have visitation from 1/1 at 10 a.m. until 1/2 at 10 a.m. The remaining visitation will stay as previously ordered.
6. The parties agree that Thanksgiving, Christmas and New Years parenting time shall be flipped in 2023.
7. Safia Kahn's release dated 11/7/22 is revoked ⌀
8. Sossamma shall not make any medical decisions except in the event of a life threatening emergency, where Sossamma may take the minor child to Highland Park Emergency Room/Hospital, immediately notify Sebastin, and thereafter, Sebastin shall make all medical decisions with complete disclosure and prior consultation with Sossamma.
9. The parties shall create a new thread for every issue/event and clearly label the topic in the subject line on OFW.
10. This matter is set for status on January 25, 2023, at 1:30 p.m. in C105 via Zoom.

ENTERED

1

Dated       _Rhonda E. Bru_

             Judge

Michone J. Riewer/6231058
Ann Leone/6319329
Strategic Divorce
900 North Shore Drive, Suite 220
Lake Bluff, IL 60044
Tel: 847-234-4445
Email: service@strategicdivorce.com / aleone@strategicdivorce.com


Strategic Divorce, Attorneys for SEBASTIN FRANCIS, service@strategicdivorce.com
Ms. Caryn Barone, GAL, cbarone@sjtpom.com
Michael P. Alvarado of Davis Friedman, LLP, Attorneys for SOSSAMMA GEORGE,
malvarado@davisfriedman.com
service@davisfriedman.com

2

**EXHIBIT D**

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

IN RE THE MARRIAGE OF:                        )
SEBASTIN FRANCIS,                             )
                                              )
            Petitioner,                       )
    and                                       )    Case No. 2020 D 905
                                              )
SOSSAMMA GEORGE SEBASTIN,                     )
                                              )
            Respondent.                       )

## EMERGENCY NOTICE OF MOTION

TO:   Mr. Dwayne Douglas, 2801 Lakeside Drive, Suite 211, Bannockburn, Illinois 60085
      Email: service@douglaslawoffices.com; ddouglas@douglaslawoffices.com

      Ms. Caryn Barone, Soffietti, Johnson, Teegen, Argueta, Bawcum & Barone, 209 N. West
      Street, Waukegan, IL 60085; Email: cbarone@sjtpom.com

**On May 17, 2023 at 9:00 a.m.** or as soon thereafter as counsel may be heard, we shall appear via Zoom video conference before the **Honorable Judge Rhonda K. Bruno,** or any judge sitting in her stead, in the courtroom usually occupied by her in the Circuit Court of Lake County, **Courtroom C-105** Lake County Courthouse, Waukegan, Illinois, and then and there present the attached, **Emergency Motion to Restrict Parental Responsibilities,** a copy of which is hereby served upon you, and request an emergency hearing instanter

**Parties wishing to attend the presentment of this motion may appear in-person in the courtroom or may attend remotely on Zoom video and telephone conferencing. A Zoom Meeting ID, Password and Link for this court call will be listed by courtroom, date and time at:**https://19theircuitcourt.state.il.us/2163/Remote-Court-Hearings

Michone J. Riewer/6231058
Lauren A. Wu/6304336
STRATEGIC DIVORCE
900 N. Shore Dr., Ste. 220
Lake Bluff, IL 60044
Phone: 847-234-4445
Email: service@strategicdivorce.com

## CERTIFICATE OF SERVICE

Under penalties of perjury as provided by law pursuant to 735 ILCS 5/1-109, the undersigned certifies that she served this Notice on **May 12, 2023,** by ___ personal delivery and/or ___ faxing and/or ___ mailing and/or _X_ emailing a copy to each person to whom it is directed by placing a true and correct copy thereof in an envelope(s) which was sealed; that, if mailed, sufficient U.S. postage for first class mail was placed thereon, and the same was deposited in the U.S. Mail at Lake Bluff, Illinois.

*Denise Globis*

_____
Denise Globis

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

IN RE THE MARRIAGE OF:     )
             )
SEBASTIN FRANCIS,      )
             )
    Petitioner,     )
  and          )  Case No. 2020 D 905
             )
SOSSAMMA GEORGE SEBASTIN,  )
             )
    Respondent.     )

**EMERGENCY MOTION TO RESTRICT PARENTAL RESPONSIBILITIES**

**NOW COMES** the Petitioner, SEBASTIN FRANCIS ("SEBASTIN"), by and through his attorneys, Strategic Divorce, pursuant to Sections 102, 501, and 603.10 of the Illinois Marriage and Dissolution of Marriage Act ("IMDMA") 750 ILCS 5/102, 501, and 603.10, and Lake County Local Rule 13.4(a)(ii), he hereby moves this Honorable Court *on an emergency basis* for the entry of an order suspending the Respondent, SOSSAMMA GEORGE SEBASTIN ("SOSSAMMA")'s parenting time with the minor children and further restricting her decision-making on medical issues. In support hereof, SEBASTIN states as follows:

Statement of Emergency

1. This matter comes before the Court *on an emergency basis* and should be heard as such as SOSSAMMA's behavior constitutes a serious endangerment to the physical, mental, moral, and emotional health of the parties' two minor children, R.S., born November 2008, and A.S., born May 2017. SEBASTIN fears that absent this Court's immediate intervention, SOSSAMMA will continue to endanger both children if her parenting time is not restricted and her decision-making on medical issues is not further restricted.

2. SEBASTIN and SOSSAMMA were married on April 28, 2007. Two children were

1

born to the parties during the marriage, namely R.S., born November 2008, presently age 14, and A.G., born May 2017, presently age 5.

3.     On July 13, 2020, SEBASTIN filed his Petition for Dissolution of Marriage which remains pending and undetermined before this Honorable Court.

4.     On or about January 31, 2022, this Honorable Court appointed Caryn Barone as Guardian *ad litem* ("GAL") for the minor children.

5.     On or about September 15, 2022, this Honorable Court appointed Dr. David Finn pursuant to 750 ILCS 5/604(b) to provide the court with professional advice on custody, visitation, and the best interest of the children. Dr. Finn's report remains pending.

6.     On December 20, 2022, this Honorable Court entered an Order finding that SOSSAMMA's behavior, interaction and medical decision making regarding R.S. to be a serious endangerment to R.S.' mental health and emotional development, finding SOSSAMMA's testimony to not be credible, and awarding SEBASTIN immediate sole medical decision making as to R.S. with complete disclosure and prior consultation with SOSSAMMA. See Exhibit A incorporated only by reference and will be provided to the Court via courtesy copies.

7.     The December 20, 2022 Order also provided that "SOSSAMMA shall not make any medical decisions except in the event of a life threatening emergency, where SOSSAMMA may take the minor child to Highland Park Emergency Room/Hospital, immediately notify SEBASTIN, and thereafter, SEBASTIN shall make all medical decisions with complete disclosure and prior consultation with SOSSAMMA. See Exhibit A.

8.     This matter is an emergency because despite this Court's December 20, 2022, Order, SOSSAMMA is once again engaging in her long and egregious pattern of unilaterally swooping in as R.S. enters a treatment facility to repeat her destructive, false narrative and allegations against

2

SEBASTIN to facility administrators and treatment providers thereby sabotaging R.S.' treatment.

9. This matter is an emergency because SOSSAMMA has interfered in the admission process for R.S. in at least five and now six facilities: Southshore Academy/Midwest Center for Youth and Families (hereinafter "SSA"), Northshore Hospital, Highland Park Adolescent Behavioral Health Program, Timberland Knolls, Compass, and Rogers PHP.

10. This matter is an emergency because SOSSAMMA unilaterally changed the initial appointment with Samantha Zaremba, R███'s therapist at SSA on purpose.

11. This matter is an emergency because SOSSAMMA did not communicate this change to SEBASTIN. SOSSAMMA then had the initial session with Samantha on Tuesday May 9, 2023, without SEBASTIN present.

12. This matter is an emergency because upon information and belief, SOSSAMMA is once again trying to get in front of the facility's treatment providers first to begin the re-telling of her false narrative and allegations against SEBASTIN and again sabotaging R.S.'s treatment. See Exhibit B, email thread between SEBASTIN, SOSSAMMA and Samantha from Tuesday May 2, 2023, to Wednesday May 10, 2023, incorporated only by reference and will be provided to the Court via courtesy copies.

13. This matter is an emergency because SOSSAMMA has once again engaged in conduct that seriously endangers R.S.' mental, moral, or physical health or that significantly impairs her emotional development despite a court order that gives SEBASTIN sole medical decision-making.

14. This matter is an emergency because SOSSAMMA is using her parenting time to plant thoughts and stories into A.S.' brain regarding his planned trip to India with Sebastin this summer.

3

15. This matter is an emergency because on May 10, 2022, A.S. returned to SEBASTIN after five days of parenting time with SOSSAMMA and appeared withdrawn and upset. When SEBASTIN asked the child what was wrong, the child said that "we can't go to India, and we have to stay here with family [meaning A.S. and SEBASTIN stay here at home with SOSSAMMA and R.S.] or mom said we'll go to hell."

16. This matter is an emergency because SOSSAMMA has begun grooming A.S. in the same fashion in which she has groomed R.S. and alienated her from SEBASTIN.

17. This matter is an emergency because SOSSAMMA has engaged in conduct that seriously endangers A.S.' mental, moral, or physical health or that significantly impairs his emotional development.

<u>History of SOSSAMMA's Interference with R.S.' Treatment Providers</u>

18. In April 2022, R.S. was diagnosed with severe depression and anxiety, and in May 2022 R.S. was hospitalized for suicide prevention at NorthShore Hospital in Highland Park. SOSSAMMA made every effort to preclude SEBASTIN from participating in R.S.'s treatment and to restrict his access to R.S.'s medical information. SOSSAMMA went as far as to falsely report to R.S.'s doctors that SEBASTIN suffers from an alcohol abuse problem and SOSSAMMA left "Father Information" blank on intake forms.

19. On September 2, 2022, the same day the Court entered an Agreed Order requiring reunification therapy between R.S. and SEBASTIN, R.S. attempted to overdose on Tylenol and was hospitalized at Highland Park Hospital in their Adolescent Behavioral Health Program. SEBASTIN was unable to receive information and/or updates regarding R.S.'s condition and treatment from the providers. SOSSAMMA alone relayed information to SEBASTIN. Upon information and belief, SOSSAMMA directed R.S. to restrict SEBASTIN's access to her medical records.

4

20.     On or about September 28, 2022, the day after SOSSAMMA attempted to get an Emergency Order of Protection, including the children, which was denied, R.S. was transferred to Timberland Knolls for a Residential Treatment Program ("TK"). SOSSAMMA again interfered in the admissions process to prevent SEBASTIN's involvement. TK received all historical information from SOSSAMMA and, at SOSSAMMA's request, SEBASTIN was not allowed to participate in any family therapy sessions.

21.     R.S. was released from TK on or about November 4, 2022. At the recommendation of TK, R.S. was enrolled in a Partial Hospitalization Program through Compass ("Compass PHP").

22.     Upon her enrollment at Compass, R.S., at the direction of SOSSAMMA, refused to sign the Release of Information to SEBASTIN. SEBASTIN was given "restricted access."

23.     On or about November 19, 2022, R.S. was again hospitalized for suicide prevention at Rogers in Brown Deer, WI. At the Rogers staff recommendation, R.S. was discharged into a Partial Hospitalization Program through Rogers in Skokie, IL "Rogers PHP." R.S. was admitted into Rogers PHP on November 29, 2022.

24.     Upon R.S.'s admission into Rogers PHP, SOSSAMMA advised the staff of incorrect information in an effort again to preclude SEBASTIN's access to information and participation in R.S.' treatment. SOSSAMMA told the staff there was a "no contact order" between R.S. and SEBASTIN and that he must not be allowed to participate in family therapy.

25.     Shortly after SOSSAMMA became aware that Rogers PHP staff was communicating directly with SEBASTIN and the GAL, SOSSAMMA stopped taking R.S. to Rogers PHP. Upon R.S. discharge from Rogers PHP, counsel for SOSSAMMA again insisted that R.S. be enrolled in Compass PHP.

26.     In the past, A.S. has begun exhibited resistance to going to SOSSAMMA's home for

5

parenting time. He has expressed to SEBASTIN on various occasions that he wants to stay at SEBASTIN's and asks why he has to go to SOSSAMMA's.

27. R.S.'s physical, emotional, and mental health are endangered by SOSSAMMA's continued disregard for R.S.'s best interests, her unilateral decision-making despite this Court's order, and self-serving litigation tactics.

28. Section 603.10 of the Illinois Marriage and Dissolution of Marriage Act governs the restriction of parental responsibilities and parenting time and states in relevant part as follows:

> Sec. 603.10. Restriction of parental responsibilities.
>
> (a) After a hearing, if the court finds by a preponderance of the evidence that a parent engaged in any conduct that seriously endangered the child's mental, moral, or physical health or that significantly impaired the child's emotional development, the court shall enter orders as necessary to protect the child. Such orders may include, but are not limited to, orders for one or more of the following:
>
> > (1) a reduction, elimination, or other adjustment of the parent's decision-making responsibilities or parenting time, or both decision-making responsibilities and parenting time;
> >
> > (2) supervision, including ordering the Department of Children and Family Services to exercise continuing supervision under Section 5 of the Children and Family Services Act;
> >
> > (3) requiring the exchange of the child between the parents through an intermediary or in a protected setting;
> >
> > (4) restraining a parent's communication with or proximity to the other parent or the child;
> >
> > (5) requiring a parent to abstain from possessing or consuming alcohol or non-prescribed drugs while exercising parenting time with the child and within a specified period immediately preceding the exercise of parenting time;
> >
> > (6) restricting the presence of specific persons while a parent is exercising parenting time with the child;
> >
> > (7) requiring a parent to post a bond to secure the return of the child following the parent's exercise of parenting time or to secure other performance required by the court;

6

(8) requiring a parent to complete a treatment program for perpetrators of abuse, for drug or alcohol abuse, or for other behavior that is the basis for restricting parental responsibilities under this Section; and

**(9) any other constraints or conditions that the court deems necessary to provide for the child's safety or welfare.**

(Emphasis added). 750 ILCS 5/603.10.

29.     SOSSAMMA's conduct has seriously endangered the children's mental, moral, and physical health, and SOSSAMMA's conduct has significantly impaired the children's emotional development, in direct opposition and contravention of the best interests of the children.

30.     For the reasons further set forth hereinabove, SOSSAMMA's parenting time with the minor children must be immediately restricted and/or suspended. SEBASTIN should be granted immediate exclusive physical custody over the minor children, until further order of Court.

31.     For reasons set forth above, SOSSAMMA should be restricted from making any unilateral decision regarding any aspect of R.S.'s treatment, including the changing or scheduling of appointments.

WHEREFORE, Petitioner, SEBASTIN FRANCIS requests this Honorable Court enter an Order as follows:

A.     Enter an order finding that SOSSAMMA GEORGE SEBASTIN's conduct constitutes a serious endangerment to the minor children;

B.     Enter an order restricting and/or suspending SOSSAMMA GEORGE SEBASTIN's parenting time with minor children;

C.     Enter an order restricting SOSSAMMA's unilateral decision-making regarding any aspect of R.S.' treatment including the changing or scheduling of appointments;

D.     Enter an order requiring SOSSAMMA GEORGE SEBASTIN to pay attorney's fees and costs incurred by SEBASTIN FRANCIS in connection with these proceedings; and

E.      For such other and further relief as this Court deems just and equitable.


                                            Respectfully submitted,
                                            SEBASTIN FRANCIS



                                    By:_____
                                            One of his Attorneys














Michone Riewer/6231058
Lauren Wu/6304336
STRATEGIC DIVORCE
900 N. Shore Dr., Suite 220
Lake Bluff, Illinois 60044
Tel:  847-234-4445 / Fax:  847-234-4449
Email: service@strategicdivorce.com


8

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT

LAKE COUNTY, ILLINOIS

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| SEBASTIN FRANCIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| and | ) | Case No. 2020 D 905 |
| | ) | |
| SOSSAMMA GEORGE SEBASTIN, | ) | |
| | ) | |
| Respondent. | ) | |

**AFFIDAVIT IN SUPPORT OF EMERGENCY MOTION TO RESTRICT PARENTAL RESPONSIBILITIES**

I, SEBASTIN FRANCIS, being first duly sworn on oath, states as follows:

1. I am the Petitioner in the above captioned matter and have personal knowledge of the facts set forth herein.

2. I make this Affidavit of my personal knowledge and, if called as a witness, am competent to testify to the matters set forth herein.

My Affidavit is submitted in support of my EMERGENCY MOTION TO RESTRICT

PARENTAL RESPONSIBILITIES and pursuant to Lake County Local Rule 13.4(a)(ii).

3. I have reviewed by petition which is brought as an emergency for the reasons stated therein and most importantly, because I believe that if SOSSAMMA GEORGE SEBASTIN's parenting time is not restricted, the children's physical, mental, moral, and emotional health will be endangered.

Sebastin Francis (May 12, 2023 16:33 CDT)

**SEBASTIN FRANCIS**

DATED: 05/12/2023

9



**IN THE CIRCUIT COURT OF THE NINETEENTH**
**JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS**

DEC 2 0 2022

*Eric Carnaugh Wawstra*
CIRCUIT-CLERK

| | | |
|---|---|---|
| IN RE THE MARRIAGE OF: | ) | |
| | ) | |
| SEBASTIN FRANCIS, | ) | |
| Petitioner, | ) | No. 2020 D 000905 |
| and | ) | |
| | ) | |
| SOSSAMMA GEORGE SEBASTIN, | ) | |
| Respondent. | ) | |

## ORDER
### December 13 & 14 2022

This cause coming before the Court on Sebastin's Emergency Petition to Compel Residential Treatment, For Restricted Parenting Time with Both Children and for Other Relief, the Court finding the Petition to be an emergency and proceeding to hearing over Respondent's attorneys' objection; all parties, their counsel and GAL being present for two days for an evidentiary hearing via zoom; and the Court being fully advised,

IT IS HEREBY ORDERED:

1. Sossamma's behavior, interaction and medical decision making regarding R▇▇ is found to be a serious endangerment to R▇▇'s mental health and emotional development.
2. Sossamma's testimony is found not to be credible.
3. Sebastin is immediately granted sole medical decision making as to R▇▇ Sebastin with complete disclosure and prior consultation with Sossamma, except in the event of a life threatening emergency as described below.
4. Neither party shall communicate to Renee any change regarding medical decision making or any other part of this litigation, or show her or discuss any order, Child Advocacy Center victim sensitive interview or what the GAL says.
5. Sebastin shall have Christmas visitation with A▇▇ from 12/24 at 10 a.m. until 12/25/22 at 10 a.m. Sossamma has from 12/25 at 10 a.m. until 12/26 at 10 a.m. In addition, Sossamma shall have New Year's visitation with A▇▇ from 12/31 at 10 a.m. until 1/1 at 10 a.m. and Sebastin shall have visitation from 1/1 at 10 a.m. until 1/2 at 10 a.m. The remaining visitation will stay as previously ordered.
6. The parties agree that Thanksgiving, Christmas and New Years parenting time shall be flipped in 2023.
7. Safia Kahn's release dated 11/7/22 is revoked.
8. Sossamma shall not make any medical decisions except in the event of a life threatening emergency, where Sossamma may take the minor child to Highland Park Emergency Room/Hospital, immediately notify Sebastin, and thereafter, Sebastin shall make all medical decisions with complete disclosure and prior consultation with Sossamma.
9. The parties shall create a new thread for every issue/event and clearly label the topic in the subject line on OFW.
10. This matter is set for status on January 25, 2023, at 1:30 p.m. in C105 via Zoom.

ENTERED

1



EXHIBIT
A

Dated _____ _Rhonda E. Bruo_____

Judge

Michone J. Riewer/6231058
Ann Leone/6319329
Strategic Divorce
900 North Shore Drive, Suite 220
Lake Bluff, IL 60044
Tel: 847-234-4445
Email: service@strategicdivorce.com / aleone@strategicdivorce.com

Strategic Divorce, Attorneys for SEBASTIN FRANCIS, service@strategicdivorce.com
Ms. Caryn Barone, GAL, cbarone@sjtpom.com
Michael P. Alvarado of Davis Friedman, LLP, Attorneys for SOSSAMMA GEORGE,
malvarado@davisfriedman.com
service@davisfriedman.com

2

**From:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>
**Sent:** Wednesday, May 10, 2023 12:30 PM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>; sossamma george <sossammag@yahoo.com>
**Subject:** Re: [EXTERNAL] Re: Welcome to SSA!

---

**This Message Is From an External Sender**

This message came from outside your organization.

**This banner is provided by CAP IS**

We did have a session yesterday, due to the change, but ▮▮▮ was not present in the session yesterday! In the first family session I typically discuss the resident's history with parents and ask parents what their main concerns are, or if there is anything they would like to share with me that was not addressed during the intake process. At the beginning of each family session, I check in with parents before bringing in the resident, so you are welcome to use that time to speak on any of those matters when we meet. I sincerely apologize the change in day/time was not communicated to you!

▮▮▮ and I completed an initial master treatment plan together during our individual session, which I can email to you as well, for you to look over and have! I will do an update with ▮▮▮ every 21-30 days on her

2

EXHIBIT
B

treatment plan, and I send updates to parents as they are completed. If you have any questions, please let me know!

**Samantha Zaremba, MA, LMHC-A**

**Therapist**

Southshore Academy / Midwest Center for Youth & Families

2301 Cumberland Drive

Valparaiso, IN 46383

(219) 548-3400 Ext. 129

www.midwest-center.com

---

**From:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Sent:** Wednesday, May 10, 2023 12:22 PM
**To:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>; sossamma george <sossammag@yahoo.com>
**Subject:** [EXTERNAL] RE: [EXTERNAL] Re: Welcome to SSA!

Hi Samantha,

No worries. Tuesdays at 12 PM works for me. Just to confirm, are we starting our first session next Tuesday (May 16th) at 12PM Central? Did you already have a session yesterday, Tuesday @12PM that I may have missed?

Sebastin

**From:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>
**Sent:** Wednesday, May 10, 2023 12:19 PM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>; sossamma george <sossammag@yahoo.com>
**Subject:** Re: [EXTERNAL] Re: Welcome to SSA!

3

I apologize, we last minute had to switch to Tuesday @ 12pm (central time). As of right now, I also have Tuesday @ 11am (central time) open. Please consult with Sossamma and let me know which time works best for both of you moving forward! I apologize for the miscommunication!


**Samantha Zaremba, MA, LMHC-A**

**Therapist**

Southshore Academy / Midwest Center for Youth & Families

2301 Cumberland Drive

Valparaiso, IN 46383

(219) 548-3400 Ext. 129

www.midwest-center.com

---

**From:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Sent:** Wednesday, May 10, 2023 12:05 PM
**To:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>; sossamma george <sossammag@yahoo.com>
**Subject:** [EXTERNAL] RE: [EXTERNAL] Re: Welcome to SSA!


Hi Samantha,

Just checking in to see if we're still meeting today. I'm logged into the Zoom meeting (shows waiting for the host to start the meeting).


Thanks!

Sebastin


**From:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>
**Sent:** Wednesday, May 3, 2023 12:16 PM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>; sossamma george <sossammag@yahoo.com>
**Subject:** Re: [EXTERNAL] Re: Welcome to SSA!

'Unfortunately, I do not have anything open this week, I will be out of the office on Friday. However, I will schedule us to meet next week on Wednesday at 12pm (central time)! If you need to change it to Tuesday before then, just send me an email and I can change it. I look forward to connecting with you! For the first session, I typically meet with the parents for the majority of time, so we can discuss any concerns you may have and can provide your perspective 🌐

**Samantha Zaremba, MA, LMHC-A**

**Therapist**

Southshore Academy / Midwest Center for Youth & Families

2301 Cumberland Drive

Valparaiso, IN 46383

(219) 548-3400 Ext. 129

www.midwest-center.com

---

**From:** sossamma george <sossammag@yahoo.com>
**Sent:** Tuesday, May 2, 2023 6:46 PM
**To:** SFRANCI@CAP.ORG <SFRANCI@CAP.ORG>; Zaremba, Samantha <samantha.zaremba@uhsinc.com>
**Subject:** [EXTERNAL] Re: Welcome to SSA!

Hi Sam,

Good to hear from you!

For next week, either Tuesday or Wednesday noon works for me.

Unfortunately, I am not available for tomorrow noon. If you have other options, please let me know.

5

Thanks,

Sosamma

Sent from Yahoo Mail on Android

On Tue, May 2, 2023 at 6:09 PM, Sebastin Francis (s)

<SFRANCI@CAP.ORG> wrote:

I'm ok to start this week. Defer to your recommendation, Samantha!

Sebastin

---

From: Zaremba, Samantha <samantha.zaremba@uhsinc.com>
Sent: Tuesday, May 2, 2023 5:58:57 PM
To: Sebastin Francis (s) <SFRANCI@CAP.ORG>; sossammag@yahoo.com <sossammag@yahoo.com>
Subject: Re: Welcome to SSA!

Perfect, I will schedule us for then! Would you like to meet this week, or begin sessions next week?

**Samantha Zaremba, MA, LMHC-A**

Therapist

Southshore Academy / Midwest Center for Youth & Families

2301 Cumberland Drive

Valparaiso, IN 46383

(219) 548-3400 Ext. 129

www.midwest-center.com

**From:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Sent:** Tuesday, May 2, 2023 4:45 PM
**To:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>; sossammag@yahoo.com <sossammag@yahoo.com>
**Subject:** [EXTERNAL] RE: Welcome to SSA!

Hi Samantha,

Wednesday works better for me please.

Thanks!

Sebastin

**From:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>
**Sent:** Tuesday, May 2, 2023 4:41 PM
**To:** Sebastin Francis (s) <SFRANCI@CAP.ORG>; sossammag@yahoo.com
**Subject:** Re: Welcome to SSA!

Thank you so much for the quick response! I apologize for my error, I have Tuesday or Wednesday at 12pm open (central time), I can schedule us for either one, whichever works best for you 😊

Samantha Zaremba, MA, LMHC-A

**Therapist**

Southshore Academy / Midwest Center for Youth & Families

2301 Cumberland Drive

Valparaiso, IN 46383

(219) 548-3400 Ext. 129

www.midwest-center.com

7

**From:** Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Sent:** Tuesday, May 2, 2023 11:50 AM
**To:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>; sossammag@yahoo.com <sossammag@yahoo.com>
**Subject:** [EXTERNAL] RE: Welcome to SSA!

Hi Samantha,

Thanks so much for all the helpful information! For next week, either Wednesday or Thursday at noon would work for me.

Regards,

Sebastin

**From:** Zaremba, Samantha <samantha.zaremba@uhsinc.com>
**Sent:** Tuesday, May 2, 2023 11:32 AM
**To:** sossammag@yahoo.com; Sebastin Francis (s) <SFRANCI@CAP.ORG>
**Subject:** Welcome to SSA!

Hello Sossaroma George and Francis!

My name is Sam and I will be R█████'s therapist while they are at SSA! Attached to this email is a *Welcome to SSA* letter, which includes important information you will need during R████'s treatment. I also attached other important documents: instructions for parent DBT classes, various DBT resources, and links for parent DBT videos, which are accessible online.

For all residents at SSA, I meet with them for individual therapy once per week, family therapy once per week, and group therapy every week day. All sessions are approximately 50 minutes. All family sessions are conducted over Zoom! For each Zoom session, you may access our session through my personal meeting ID, which I have included below. You may use the same meeting ID for each week😊 **For next week, I have Wednesday @ 12pm, or Thursday @ 12pm (central time) open for family session, reoccurring each week. Please let me know which time works best for you, so I can schedule it as soon as possible!** If you ever need to reschedule family session, please notify me as soon as possible, so I can do my best to accommodate. During the first family session, I meet with the parents for majority of the session to gain insight into the parent's perspective; moving forward R████ will join us for sessions! Please

8

keep in mind, all sessions are on central time. If you have any questions during R███s stay, please contact the nurse's station at (219) 548-3400.

In order to speak with R███, you will need her personal phone code: S5011R

Zoom Personal Meeting ID: 897 384 1123

Sincerely,

Samantha Zaremba, MA, LMHC-A

Therapist

Southshore Academy / Midwest Center for Youth & Families

2301 Cumberland Drive

Valparaiso, IN 46383

(219) 548-3400 Ext. 129

www.midwest-center.com

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use,

disclosure or distribution of this information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this Information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

UHS of Delaware, Inc. Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of the Intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution of this information is prohibited, and may be punishable by law. If this was sent to you in error, please notify the sender by reply e-mail and destroy all copies of the original message.

10

**EXHIBIT E**

back for R███ to get treatment here in Illinois.

Q   Did you review the OFW between Sossamma and Sebastin that took place while Sossamma and the children were in India?

A   Yes.

Q   And did you -- what did you note regarding Sossamma's reporting of R████'s well-being?

A   Like R███ was doing well.

Q   And then once you talked to Safia Khan, did you find out that Sossamma was not being honest on the OFW when she reported R███ was doing well?

MR. ALVARADO:  Objection.  Leading.  Objection.  Leading.

THE COURT:  It is, but we're trying to get through this hearing, Mr. Alvarado, so I'm going to overrule it.

Go ahead, Miss Barone.

BY THE WITNESS:

A   My conversation with Safia Khan was very shocking to me.  I immediately sent an e-mail to everybody following that conversation because what she told me was that R███ wasn't physically taking care of herself in terms of showering,

**EXHIBIT F**

that correct?

A    Three days AND that, I believe.

Q    Okay.  When she was hospitalized, where was she hospitalized?

A    She was taken to Highland Park.  And they didn't have a bed, so she was hospitalized at Rogers in Wisconsin.

Q    Have you learned anything about the Child Advocacy Center interview that has affected your opinions in this case?

A    I viewed it in its entirety.

Q    Based on that interview, do you believe that R███ told the truth?

A    No, I do not.

Q    Do you believe that R███ is being groomed by someone to say those things?

MR. ALVARADO:  Objection.  Calls for speculation.

THE COURT:  It does, but I think that's what a GAL is supposed to do in this situation, so I'm going to allow it.

Go ahead, Miss Barone.

BY THE WITNESS:

A    It was apparent from my introspective in

32

watching the video that R███ kept using the word "rape" but that she also had no comprehension of what that actually means and that there was never any details provided to come up with the rape. It just seemed like she was harping over and over again on being raped hundreds and hundreds of times and also requesting that her dad not have contact with her brother. And it was my impression that sometime between the initial dream sequence that maybe I had a dream that something happened up until this interview that this was coming from somewhere.

BY MS. RIEWER:

Q    Do you have an opinion about where it was coming from?

A    Presumably conversations with mom.

MR. ALVARADO:  Same objection, Judge. Pure speculation.

BY MS. RIEWER:

Q    What is the basis for that opinion?

A    Because during -- when R███ went to TK, she wasn't seeing dad at all.  She hadn't had any contact with dad leading up to the Ad Center interview.  I had to find out about the Ad Center

33

interview through my own observation investigation of calling the Ad Center to see if there was a scheduling for R███ to come in. Mom never communicated with me that there was a schedule to go to the Ad Center. And just a totality of of course that was going on.

I also keep going back to a conversation that I had with mom at the very beginning of this case when she was in my office and she indicated to me that she wanted dad to have supervised visits and I went through a litany of reasons as to why we weren't -- this wasn't a situation where we would do supervised visits. And when asked in cases -- where are cases or situations where we would do supervised visits, I discussed serious endangerment and I gave examples and I gave examples of like a heroin addict or when a parent has molested a child.

Q    And you believe based on the suggestions that mom made a litigation strategy based on your comments?

A    I had deep concerns that, yes.

Q    After being discharged from Rogers

34

**EXHIBIT G**

allow it.

Go ahead, Miss Barone.

BY THE WITNESS:

A    Rogers indicated to me that they believe R███ wasn't going anymore because mom had caught on to the fact that she wasn't able to manipulate them.

MR. ALVARADO:  Object to hearsay and speculation.  So this is actually a hearsay statement and it's speculation at the same time from that hearsay person.

THE COURT:  You're right, it is.  And ordinarily, Mr. Alvarado, you would be a hundred percent right, but I have a suicidal teenager that I'm trying to protect, so I'm going to allow it in.

BY MS. RIEWER:

Q    When R███ had missed two times at Rogers, what did you do?  When she had missed two PHP days, what did you do?

THE COURT:  Folks, hang on just a second. I have to tell the deputy something.  Give me --

(There was a short interruption.)

THE COURT:  Sorry, folks.  I'm just

# FEDCOMPLAINT - APPENDIX I

Association between Defendant Francis' counsel and Defendant Finn



'lakecountylawyer.info/)　　　contact us(/general/?type=contact)　　　sign in(/login.aspx)　　　register(/general/register_start.asp)

MENU

(/)

# 2018 Annual Family Law Conference

 View Registrations (/events/RSVPlist.aspx?id=1040718)　📧 Tell a Friend (/members/send.asp?event=1040718)

**4/19/2018 to 4/21/2018**

**When:** April 19-21, 2018

**Where:** Francis Marion Hotel
387 King St
Charleston, SC 29403
United States

**Presenter:** Dwayne Douglas and Kelly Collins

**Contact:** Virginia Elliott
info@lakebar.org (mailto:info@lakebar.org)
847-244-3143

*Online registration is closed.*

- View the 143 people who have already registered (/events/RSVPlist.aspx?id=1040718)



« Go to Upcoming Event List (/events/event_list.asp)

# 24TH ANNUAL FAMILY LAW CONFERENCE

## Charleston, South Carolina
## April 19-21, 2018

## The Hotel:   Francis Marion

$279/night (before March 23, 2018)

Call: 1-877-756-2121

**Provide the Group / Convention Code**

**Lake County Bar Association**

**8.0 CLE CREDITS**

**Topics/Speakers Announced:**

| | |
|---|---|
| **Litigants Using the Court System to Perpetuate Abuse** | **Michone Riewer & Dr. David Finn** |
| **Representing impaired Clients** | **Jennifer Beeler & Kathryn Ciesla** |
| **Income tax issues - 100 points for family law lawyers** | **Jeffrey Brend** |
| | **Mary Clark** |
| **Case Law Update** | **Local Panel** |
| **Income shares in South Carolina** | **Jordan Rosenberg & James Quigley** |
| **Issues surrounding section 607.6 of the IMDMA** | **Nancy Shafer** |
| **Maintenance after federal tax reform** | **Gloria Schmidt** |
| **Immigration laws and family law issues** | **David Del Re, Dr. Sol Rappaport & L. Kat Allen** |
| **Cross-examination of a 604.10b expert** | **Stephen Rice** |
| **Evidence** | **Brett Buckley** |
| **Third Party Intervention in Family Law Cases under Section 408 of the Illinois Code of Civil Procedure** | **Matt Kaplan & Brian O'Hagan** |
| **Prosecuting & Defending a Domestic Violence Case** | **Rachael Bernal & Deanna Hoyt** |
| | **Brian Lewis** |
| **Equitable estoppel in child support cases** | |
| **Cross-examination of experts** | |

# SCHEDULE OF EVENTS

# GROUP ACTIVITIES

*Update your registration online or contact us at 847-244-3143*

**Thursday, April 19, 2018**

- **Welcome Reception**

**THURSDAY, APRIL 19**

**5:30 - 7:30 p.m.**

**WELCOME RECEPTION**

**STARS ROOFTOP**

*You and your guest must RSVP to attend*

- **Friday, April 20, 2018**

  - **4.0 hours of CLE (8:00 am-12:15 pm)**

  - **Lunch on Your own**

  - **Group Activity**

  - **Dinner on your own**

**FRIDAY, APRIL 20**

**YOU CHOOSE**

2:30 p.m.   SOLD OUT 1 .5 Hour Walking Tour of Historic Charleston ($24 per person

or

3:00 p.m.   1 Hour Horse Drawn Carriage Tour  ($27 per person)

(*tours will proceed rain or shine)

**Saturday, April 21, 2018**

- **4.0 hours of CLE (8:00 am—12:15 p.m.)**

- **Closing Luncheon**

**Sunday, April, 22, 2018**

- **Departure**

**SATURDAY, APRIL 21**

**1:00 p.m. - 3:00 p.m.**

Join us as we close the conference with a group luncheon

**"Tastes of the Low Country"**
**at the Francis Marion**

**Cash Bar**

*\* LCBA policy:  GUESTS must be registered to attend the welcome reception or participate in any of the optional activities.*

*Members must sign in to receive member discounts*

*All materials will be distributed electronically, if you prefer a hard copy please select this option when registering*

*Cancellation/refunds gladly accepted by April 6, 2018, substitutions accepted anytime*

# Lake County Bar Association

300 GRAND AVE. SUITE A | WAUKEGAN, IL 60085
P: 847.244.3143 (TEL:847.244.3143) | E:INFO@LAKEBAR.ORG(MAILTO:INFO@LAKEBAR.ORG)

## WEBSITE PROVIDED BY A GENEROUS GRANT FROM THE LAKE COUNTY BAR FOUNDATION

Membership Software Powered by YourMembership (http://www.yourmembership.com/) :: Legal/ams/legal-privacy.htm)

# FEDCOMPLAINT - APPENDIX J

Dr. Chinni's website profile

# Psychology Today



# Chinni Chilamkurti

Psychologist, PhD

Verified by Psychology Today

1800 Nations Drive, Suite 212, Gurnee, IL 60031

**(847) 744-8064**

Dr. Chinni Chilamkurti is a licensed, pediatric psychologist with over 25 years of experience providing comprehensive behavioral health services for children and families. She specializes in working with children and families presenting with a wide range of challenges. Her specialty areas include Attention Deficit Hyperactivity Disorders (ADHD), Anxiety Disorder, Parenting and Co-Parenting. Her approach is pragmatic and collaborative. She firmly believes that resources aimed at enhancing children's emotional and behavioral resiliency are critical to help children succeed.

In addition to clinical services, Dr. Chilamkurti is actively involved in the teaching and training of mental health professionals. She also provides consultation services to school districts, non-profits and other professionals. She is a frequent presenter to both professionals and communities.

Dr. Chilamkurti holds an M.A. in Medical and Psychiatric Social Work as well as an M.A. and Ph.D. in Clinical Psychology. She did her residency at Children's Memorial Hospital in Chicago

**Take the first step to help.** Call or <u>email</u> Chinni Chilamkurti now - **(847) 744-8064**

## My Practice at a Glance

Available both in-person and online

Prema Center, Inc.
1800 Nations Drive
Suite 212
Gurnee, IL 60031  map
(847) 744-8064

I specialize in Child, ADHD and Anxiety

I see individuals, families and groups

## Qualifications



**Verified by Psychology Today**
Licensed by State of Illinois / 071 004368
Chinni Chilamkurti

## Specialties and Expertise

### Top Specialties

Child

ADHD

Anxiety

### Expertise

| | |
|---|---|
| Anger Management | Family Conflict |
| Asperger's Syndrome | Grief |
| Behavioral Issues | Impulse Control Disorders |
| Bipolar Disorder | Mood Disorders |
| Chronic Pain | Oppositional Defiance (ODD) |
| Depression | Parenting |
| Developmental Disorders | School Issues |
| Divorce | Testing and Evaluation |
| Emotional Disturbance | |

## Client Focus

**Age**

Toddler, Children (6 to 10), Preteen, Teen

**Participants**

Individuals, Family, Group

**I also speak**

Hindi

## Treatment Approach

### Types of Therapy

Attachment-based

Coaching

Cognitive Behavioral (CBT)

Dialectical Behavior (DBT)

Family Systems

Integrative

Mindfulness-Based (MBCT)

Play Therapy

Psychological Testing and Evaluation

# Location

Are You A Mental Health Professional?
Join The Psychology Today Directory.

**Sign Up and Get Listed**

## Primary Location

Prema Center, Inc.
1800 Nations Drive
Suite 212
Gurnee, IL 60031
(847) 744-8064

Email me

My website

## Nearby Areas

### Cities

Gurnee, IL

North Chicago, IL

Waukegan, IL

**About & Policies**

About

Careers

Privacy

Terms

Accessibility

Do Not Sell Or Share My
Personal Information

United States

**Get Help**

Therapists

Psychiatrists

Treatment Centers

Support Groups

### Counties

Lake

**Zips**

60031

60064

60079

Report an issue

# FEDCOMPLAINT - APPENDIX K

OFW message showing Defendant Francis's communication with TK therapist

# Message Report

✳ **OurFamilyWizard**®

OurFamilyWizard, LLC.
ourfamilywizard.com
info@ourfamilywizard.com
(866) 755-9991

**Generated:** 11/26/2025 at 12:36 AM by Sossamma George

**Timezone:** America/Chicago

**Format:** mm/dd/yyyy

**Parents:** Sebastin Francis, Sossamma George

**Child(ren):** A███ Sebastin , R███ Sebastin

**Date Range:** 10/07/2022 — 10/07/2022

**Contains:** 1 selected messages

**Order:** Chronological (oldest first, most recent last)

---

Message 1 of 1 ────────────────────────────────────

Sent:         10/07/2022 at 11:06 AM

From:         Sebastin Francis

To:           Sossamma George *(First Viewed: 10/07/2022 at 11:07 AM)*

Subject:      Call from TK

Hi,

Just got a call from Diamond, Re███'s individual therapist at TK. I had left her a message yesterday following R███'s call about her concerns for her safety, and wanting to come home. I tried to conference you in, but it went it rang for a while and went to your voicemail.

Diamond said she will talk to R███ today and will address her concerns, and also try to find out more details about her concerns for being touched or assaulted inappropriately. She also mentioned that R███ appears to be very intent on going home, and that some of the behaviors of trying to convince us to take her out of the program is common among many girls. She assured me that per their protocol, they will do everything to ensure she is safe, and after her talk with R███, if something needs to be done to address any actual safety concerns, they will do so.

She said she will get back to us after she talks to R███ and investigates.

Sebastin

# FEDCOMPLAINT - APPENDIX L

Plaintiff's counsel's email to Defendant Barone

Message 1 of 1

**Sent at:** 7/7/2023 4:52:15 PM

# In the Marriage of Sossamma George-Sebastin and Sebastin Francis Lake County Case No. 20 D 905

From: Dwayne Douglas <ddouglas@douglaslawoffices.com>

To: cbarone@sjtpom.com <cbarone@sjtpom.com>

Cc: sossammag@yahoo.com <sossammag@yahoo.com>, Melissa Perry <mperry@douglaslawoffices.com>

Caryn,

Before today, Sebastin provided an address, *one* address where he will be staying during the trip. You considered this to be sufficient.

However, we pressed the point today, and it turned out that what you deemed to be sufficient was in fact untrue. He is not staying at that one location. Over objection, the issue of where he will be staying was ordered to be provided, and here is where the child will be overnight:

Per your request and the court order, here are the details of Asher's itinerary:
July 13 George Kodakuthumparambil 69 Peter Lane New Hyde Park, NY 11040
July 14 HOLIDAY INN COCHIN 33/1739 A,Chakkaraparambu Junction National Highways ByPass Vennala, Cochin, India Subin:+91 484 4199000
July 15, 16, 17 Koilparampil House 39/393a, Vadackal Rd, Kalarcode, Eravukadu, Alappuzha, Kerala 688003, India
July 18, 19 & 20 DoubleTree by Hilton Jaipur Amer 35 Kukas, Delhi Road, Jaipur, Rajasthan 302028, India
July 21 Lakend Hotels & Motels Pvt. Ltd. Alkapuri. Fatehsagar Lake Shore, Ambamata, Udaipur, Rajasthan 313001, India
July 22 Desert tent Parking, near Fort Road, Dhibba Para, Amar Sagar Pol, Jaisalmer, Rajasthan 345001, India
July 23,24 Welcome Hitel by ITC Hotels, Jodhpur 53, Uchiyarda Rd, near Euro International School, Dev Nagar, Jodhpur, Rajasthan 342027, India
July 25, 26, 27, 28 Sangeeth Stanley Payyappilly House, St. Albert's HS Lane, Ernakulam, Kochi, Kerala 682018, India
July 29 Plane-Emirates July 29 George Kodakuthumparambil 69 Peter Lane New Hyde Park, NY 11040

Where he said he will be, he will only be there July 25, 26, 27, 28, four days out of the trip. He was not telling the truth, and he will be in New York too it appears, which he mentioned to no one, and if Sossamma had tried to contact Asher thinking him to be in India and he was actually in New York operating under that time zone, she would not have reached him. *If Sossamma had said she is staying in one particular place and it turned out she was staying in multiple places in two different countries, she would have been castigated*. There cannot be a double standard.

Michone argued today that we should not have a hour by hour itinerary, and we never asked for one, and claimed that Sossamma wanted to send family or friends to interfere with the trip, also not true, and I made sure that ordering no such interference was without objection – the order says without objection - so she could not misrepresent that the order about no interference was forced down Sossamma's throat. This concern about interference was flat out made up.

If Sossamma's conduct comes under scrutiny, this has to cut *both* ways.



**Dwayne Douglas**
Attorney at Law
Douglas Law, A Professional Corporation
ddouglas@douglaslawoffices.coman
2801 Lakeside Dr., Suite 211
Bannockburn, IL 60015
847.220.4050 **tel**
847.220.4055 **fax**

This transmission may contain information that is privileged, confidential, legally privileged, and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is STRICTLY PROHIBITED. Although this transmission and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Douglas Law, A Professional Corporation, as applicable, for any loss or damage arising in any way from its use. If you received this transmission in error, please immediately contact the sender and destroy the material in its entirety, whether in electronic or hard copy format, reading, printing or saving it in any manner. This communication does not form an contractual obligation on behalf of Douglas Law, A Professional Corporation.

# FEDCOMPLAINT - APPENDIX M

R.S.'s therapist Safia Khan's email expressing concerns

**sossammas@gmail.com**

| | |
|---|---|
| **From:** | Sossamma George <sossammag@yahoo.com> |
| **Sent:** | Sunday, April 2, 2023 1:44 AM |
| **To:** | Sos G |
| **Subject:** | Fw: Sep 22: Safia's email to court clerk and other attorneys |

---------- Forwarded message ---------
From: **Safia Khan** <safia.khan.0526@gmail.com>
Date: Sat, Sep 3, 2022, 12:13 AM
Subject: Concerns regarding children care by legal counsel in case
To: <cbarone@sjtpom.com>, <TWarren@kgwlaw.com>, <cbaronesjtpalaw@gmail.com>
Cc: <denise@strategicdivorce.com>, <cc103@lakecountyil.gov>, <pleadings@kgwlaw.com>,
<aleone@strategicdivorce.com>, Lisa Gleich <lgleich@mtcus.com>, Sebastin Francis <SFRANCI@cap.org>,
<sossammas@gmail.com>, <Slinton@kgwlaw.com>, <jerroldlazar@comcast.net>

Hi Caryn, Todd,

I received notice that R█████ overdosed and that she is now being admitted medically. I spoke with R████ today as she was taken to the ER. I have also been seeing her regular for therapy even while in India. I have been concerned before this, but am now even more so.

I am concerned this situation is very detrimental to R████s mental health, especially as the mental health recommendations I have made previously have not been taken into consideration or followed. In fact, when I have provided recommendations, they have been either ignored or grossly misrepresented and shared within the court process without my knowledge or consent. I believe this misrepresentation has caused my clients (R████ and A███ Sebastin) and the family grave harm.

Due to my concerns, I have consulted at length with Lisa Gleich, who is licensed in clinical counseling supervision and has worked with the Kane County Judicial Center's "Kids In A Divorcing Society" Program for many years.

It is our recommendation at this time that when the time comes, R████ and her father attend reunification therapy with a licensed therapist, not with the individual named in the order handed down by the court today. The court order forwarded to me names <u>Missy</u> as the chosen reunification therapist and states this must be started within 7 days time; this is problematic.

Missy is the MTC office manager and does not hold a degree to qualify her to serve as a therapist or counselor for any of the parties involved. Additionally, neither Missy nor I were ever informed or asked if she was willing, or able, to serve in this role.

While I am not a legal authority of any kind, I am the therapist for both R████ and A███ Sebastin, and I would expect any therapist the court orders either child to see is both appropriately qualified and a consenting party to the role of reunification therapist. As I have expressed previously, I am not willing or able to serve in this role myself due to ethical considerations; however, I am happy to provide referrals to the legal counsel and parties involved so that the court may appoint a qualified therapist in the future.

Additionally, we feel R████ is NOT in a place to attend reunification therapy with ANY therapist until further notice. We believe it is the legal counsel's role to ensure divorce is handled so as to ensure the best for not only the parents, but for the children's physical, psychological, and social-emotional well-being.

As a licensed clinical mental health counselor and an impartial witness to both the parents and the children's day to day concerns for the past 5-6 months, I am highly dismayed at the gross negligence by the legal counsel to the mental well being of either child in this case. I would like this to be prioritized moving forward.

1

In light of transparency, I have copied all parties I'm aware of being a part of this case, as well as MTC clinical supervisor and director, Lisa Gleich. Please see attached referrals to reputable reunification therapists.

**Re: Reunification Referrals**
Linda Sheehan, LCSW
The Family Stress Clinic
1641 N. Milwaukee #7
Libertyville, IL 60048
224 430 9804
https://www.lindasheehan.net/

ASSOCIATES IN HUMAN DEVELOPMENT COUNSELING, LLC
2500 W Higgins Rd, Suite 1131
Hoffman Estates, IL 60169
847-483-0800
https://ahdcllc.net

Thank you,

Safia Khan
MA, LPC, NCC, TF-CBT
Licensed Clinical Mental Health Counselor
Behavioral Therapist,
Mobile Therapy Centers of America
Emergency Department Crisis Counselor,
Northshore University Healthsystems

2

# FEDCOMPLAINT - APPENDIX N

Messaging therapist, Pamela Rak stating that she was invited by Court ex-parte

----- Forwarded Message -----
**From:** "PAMELA" <pamelaraklcsw@gmail.com>
**To:** "Sossamma George" <sossammag@yahoo.com>
**Sent:** Thu, Dec 5, 2024 at 7:23 PM
**Subject:** Re: Please review

Good to know.

Please carefully reread (my) letter which allowed Sebastin's attorney to effectuate my discharge before December 31, 2024. With the matter in the Appellate no replacement professional would be permitted.

I attended at the request of the Court.

Cc'd


On Thu, Dec 5, 2024 at 6:25 PM Sossamma George <sossammag@yahoo.com> wrote:

> Please ignore this message. Sent to the wrong person by mistake

# FEDCOMPLAINT - APPENDIX O

Defendant DCFS Jone's text messages to Plaintiff



3:50 PM    View all    >

My conclusion is not that she is lying. Or that you coached her. I was unable to find any evidence to support the allegations. I cannot conclusively say what actually happened. My job is finding evidence to support or not support the allegations.

4:02 PM